UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

JOHN A. CHARRON,

        Plaintiff,

    vs.

COUNTY OF YORK, et al.,

        Defendants

Civil No. 18-00105-JAW

### COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, WITH INCORPORATED MEMORANDUM OF LAW

Late in the evening on March 8, 2016, Defendant Rachael Horning, in her capacity as a York County Sheriff's Deputy, was dispatched to respond to a pair of complaints in Acton, Maine. During the course of that evening, Deputy Horning spoke to two witnesses, reviewed physical evidence, and reached the conclusion that probable cause existed to arrest Plaintiff John Charron on charges of aggravated reckless conduct and criminal threatening. Defendants Steven Thistlewood, Heath Mains, and Darren Cyr provided backup to Deputy Horning but did not make the decision to arrest. Following the arrest, Defendant William King, in his capacity as York County Sheriff, and consistent with the York County Sheriff's Office's policy of transparency, issued a press release concerning Mr. Charron's arrest that was also posted on the York County Sheriff's Office Facebook page. These events do not give rise to any viable state or federal claims. Moreover, Defendant York County and the individually-named defendants (collectively "the County Defendants") – Deputy Horning, Sergeant Thistlewood, Deputy Mains, Deputy Cyr, Wilfred Vachon,[1] and Sheriff King – are protected by immunity. Pursuant to Federal Rule of Civil Procedure 56, the County Defendants request summary judgment on all claims.

---

[1] There does not appear to be any factual basis for any claim against Court Officer Vachon. He was not present for or involved in Mr. Charron's arrest. Nor is there any evidence that he had any involvement in the press release or the Facebook posting. In light of this record evidence, Court Officer Vachon is entitled to summary judgment.

## BACKGROUND

### I. FACTS

The factual background for this Motion is set forth in the accompanying Statement of Material Facts, which is hereby incorporated by reference. Fed. R. Civ. P. 10(c).

### II. PROCEDURAL POSTURE

The Plaintiff commenced this action by a Complaint filed on March 8, 2018. The Complaint is not organized into discrete counts. Based solely on the prayer for relief in the Complaint, it appears that Mr. Charron is asserting the following claims against the County Defendants: false arrest, false imprisonment, malicious prosecution, violation of the Plaintiff's civil rights under 42 U.S.C. § 1983, defamation per se, and intentional or negligent infliction of emotional distress. The County Defendants filed an Answer denying the material allegations of the Complaint and asserting numerous affirmative defenses, including: failure to state a cognizable claim; qualified immunity; and discretionary function immunity.

In discovery, the County Defendants attempted to clarify the specific claims that Mr. Charron is asserting. In his interrogatory answers, Mr. Charron indicated that his federal law claims were essentially based on four allegations: one, that he was arrested without probable cause; two, that the deputies "failed to disclose and take steps to preserve the 2002 Pontiac Sunfire that rear-ended [him]" (ECF No. 59-1 at 402-03 (¶ 4)); three, that the County Defendants perpetuated false allegations and prosecution against him (ECF No. 59-1 at 402-03 (¶ 4) and at 404 (¶ 6)); and four, that Sheriff King published information concerning Mr. Charron's arrest on the internet. (ECF No. 59-1 at 403 (¶ 5)). He further indicated in his interrogatory responses that his state law claims against the County Defendants were based on the same conduct alleged in support of his federal law claims. (ECF No. 59-1 at 406-07 (¶ 11)).

**ARGUMENT**

**I.      THE RECORD EVIDENCE DOES NOT SUPPORT LIABILITY AGAINST ANY OF THE COUNTY DEFENDANTS FOR CONSTITUTIONAL VIOLATIONS.**

Mr. Charron asserts claims under 42 U.S.C. § 1983 alleging that his federal constitutional rights were violated as a result of his arrest and the subsequent press release. Pursuant to Section 1983, a claim for relief may be asserted only against those persons who, "under color of law," act to deprive another of "rights, privileges, or immunities" secured by either the United States Constitution or federal statutes. § 1983; *see Board of County Comm'rs v. Brown*, 520 U.S. 397, 402-03 (1997) (citing and quoting Section 1983). The United States Court of Appeals for the First Circuit has elaborated on this standard:

> In assessing the imposition of liability under section 1983, we must first ask "(1) whether the conduct complained of was committed by a person acting under the color of state law; and (2) whether this conduct deprived a person of rights, privileges or immunities secured by the Constitution or laws of the United States."  There are two aspects to this second inquiry: "(1) there must have been a *deprivation* of federally protected rights, privileges or immunities, and (2) the conduct complained of must have been *causally connected* to the deprivation."

*Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 559 (1st Cir. 1989) (citations omitted) (emphasis in original). The United States Supreme Court has emphasized that Section 1983 "is not itself a source of substantive rights, 'but merely provides a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor*, 490 U.S. 386, 389-94 (1989) (citation omitted).

**A.  The record does not support any Fourth Amendment violations.**

Fourth Amendment standards govern Mr. Charron's claims of arrest without probable cause and malicious prosecution. The Fourth Amendment to the United States Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue,

but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

### i. The Plaintiff's arrest was supported by probable cause.

In order to conform to the Fourth Amendment's guaranty against unreasonable seizures of the person, a police officer is required to base arrests on probable cause. *Beck* v. *Ohio*, 379 U.S. 89, 91 (1964); *Alexis v. McDonald's Rest.*, 67 F.3d 341, 349 (1st Cir. 1995). "The 'probable cause' analysis entails 'an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time and not [an assessment of] the officer's state of mind at the time the challenged action was taken.'" *Alexis*, 67 F.3d at 349 (quoting *Maryland* v. *Macon*, 472 U.S. 463, 470-71 (1985) (internal quotation marks omitted)). Moreover, the existence of probable cause is based on the facts and circumstances known by the arresting officer at the time of the arrest and not from the perspective of hindsight. *Roche v. John Hancock Mut. Life Ins. Co.*, 81 F.3d 249, 254 (1st Cir. 1996) (citations omitted). Probable cause exists if "the facts and circumstances within [the officer's] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing that the [defendant] had committed or was committing an offense." *Rivera* v. *Murphy*, 979 F.2d 259, 263 (1st Cir. 1992). "And, moreover, though probable cause requires more than mere suspicion, it does not require the same quantum of proof as is needed to convict." *Logue v. Dore*, 103 F.3d 1040, 1044 (1st Cir. 1997) (citing *United States* v. *Aguirre*, 839 F.2d 854, 857-58 (1st Cir. 1988)).

Deputy Horning arrested Plaintiff John Charron on the charges of aggravated reckless conduct and criminal threatening. Under Maine law, "[a] person is guilty of aggravated reckless conduct if the person with terroristic intent engages in conduct that in fact creates a substantial risk of serious bodily injury to another person." 17-A M.R.S. § 213(1). The Maine criminal code defines "terroristic intent" to mean "the intent to do any of the following for the purpose of intimidating or coercing a civilian population or to affect the conduct of government: [c]ause

serious bodily injury or death to multiple persons; [c]ause substantial damage to multiple structures; or [c]ause substantial damage to critical infrastructure." 17-A M.R.S. § 2(25 (A-C)). Finally, Maine law provides that "[a] person is guilty of criminal threatening if he intentionally or knowingly places another person in fear of imminent bodily injury." 17-A M.R.S. § 209(1).

At the time Deputy Horning effected Mr. Charron's arrest, she had ample information to warrant a reasonable person in believing that Mr. Charron had committed the offenses for which she charged him. Deputy Horning went to the Langley Shores Drive area in Acton based in part on a report from the Sanford Regional Communications Center (SRCC) that an unidentified caller complained of cars peeling out their tires, yelling, and threats being made on Langley Shores Drive.

Upon arriving in the area, Deputy Horning interviewed Christopher Moss. Mr. Moss provided her with the following information:

- that he and a friend, Eric Pilvelait, were at Eric's house on Langley Shores Drive when Eric's neighbor, John Charron, came to Eric's house in Charron's plow truck;
- that a long-standing feud existed between Mr. Pilvelait and Mr. Charron over the sale of a vehicle and the theft of some tires;
- that when Mr. Charron arrived in his plow truck at the end of Mr. Pilvelait's driveway he started peeling his tires and yelling threats at them;
- that he and Mr. Pilvelait then got in Eric's car and drove down to Mr. Charron's driveway, at which point Mr. Charron came at them with his plow tilted and in the air;
- that Mr. Charron's plow truck struck Mr. Pilvelait's car and that the plow scraped over the hood of the car;
- that the airbags of Mr. Pilvelait's car deployed and that he sustained a blow to his head that caused a bump, a laceration, and bruising – injuries that Deputy Horning recorded in photographs;
- that Mr. Charron proceeded to use his plow truck to push the car containing him and Mr. Pilvelait down Langley Shores Drive;
- that as a result of these events he was in fear for his life;
- that when the vehicles got to the end of Langley Shores Drive Mr. Charron yelled to him and Mr. Pilvelait that "you guys are f***ing dead";
- that Mr. Charron's plow truck was a dark colored, older model GMC; and
- that he believed Mr. Charron was capable of killing him and Mr. Pilvelait and that he was in fear for his life.

Deputy Horning also obtained a written statement form Christopher Moss describing the crux of his allegations against Mr. Charron.

Deputy Horning also spoke with Christopher Moss' father, Walter Moss, prior to effecting Mr. Charron's arrest. Walter Moss told Deputy Horning that John Charron had called him that evening and told him that Mr. Pilvelait and Christopher Moss were laying rubber strips in Charron's driveway and that someone was going to get hurt. Walter Moss also told Deputy Horning that Mr. Charron had called him again later that evening and Mr. Charron had stated that he had a plow truck and that he was going to take Mr. Pilvelait and Christopher Moss into the ditch. Walter Moss also told Deputy Horning that after his second discussion with Mr. Charron he went to get Mr. Pilvelait and Christopher Moss, but that when he arrived Mr. Pilvelait's vehicle had already been pushed down the road. Walter Moss completed a witness statement for Deputy Horning after she spoke with him.

After speaking with Christopher and Walter Moss, Deputy Horning went to the location of Mr. Pilvelait's vehicle on Langley Shores Drive. She observed damage to Mr. Pilvelait's vehicle and markings on the ground that appeared consistent with a vehicle that had been struck by a plow truck and pushed into a snow banking down the street in the manner described by Christopher Moss. Deputy Horning observed vehicle parts in the road from the location of Mr. Pilvelait's vehicle back up Langley Shores Drive. She also observed that both the driver side and passenger side airbags of Mr. Pilvelait's vehicle had deployed. Deputy Horning also observed excessive and extensive damage to Eric Pilvelait's vehicle. She noticed scrape marks on the hood of Mr. Pilvelait's vehicle down from the windshield. She photographed the damage to the vehicle.

Finally, Deputy Horning went to Mr. Charron's residence on Langley Shores Drive. She observed a plow truck in Mr. Charron's driveway that matched the description given by Christopher Moss. Deputy Horning took pictures of the plow truck to record its appearance. Mr.

Charron refused to provide a written sworn statement to Deputy Horning on the evening of his arrest.

Based on the totality of these circumstances, Deputy Horning believed she had probable cause to charge Mr. Charron with aggravated reckless conduct and criminal threatening.[2] The information she possessed supported her belief that Mr. Charron intentionally or knowingly placed Christopher Moss in fear of imminent bodily injury – which satisfied the elements of criminal threatening. Moreover, the information she had at the time of the arrest supported her belief that Mr. Charron's interactions that evening with Christopher Moss in fact created a substantial risk of serious bodily injury to another person, and that Mr. Charron's intent was to intimidate or coerce Christopher Moss through the threat of serious bodily injury – which satisfied the elements of aggravated reckless conduct. Since Deputy Horning's arrest of Mr. Charron was supported by probable cause, it cannot be the basis of a Fourth Amendment claim.[3]

### ii.  The Plaintiff's warrantless arrest cannot give rise to a viable Fourth Amendment "malicious prosecution" claim.

It is not clear whether Mr. Charron is attempting to assert a constitutional claim based on alleged malicious prosecution. To the extent he is, such a claim fails as a matter of law.

The First Circuit has recognized that a plaintiff may bring a suit under Section 1983 to redress "malicious prosecution" premised on the Fourth Amendment if he or she can establish that: "'the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor.'"

---

[2] Notably, on June 7, 2016, the grand jury returned a six-count indictment against Mr. Charron arising out of the events in this case. The indictment included the following charges: aggravated reckless conduct; driving to endanger; two counts of aggravated assault; and two counts of criminal threatening with a dangerous weapon. At the time he submitted the case to the grand jury, ADA Myska was aware of Mr. Charron's theory of the case (that Mr. Pilvelait's car had hit Mr. Charron's truck from behind) and he was aware of the location of Mr. Pilvelait's Pontiac Sunfire.

[3] Although Sergeant Thistlewood and Deputies Cyr and Mains were providing backup for Deputy Horning at the time she arrested Mr. Charron, all of them recognized Deputy Horning as the lead investigator and none of them made the decision to effect Mr. Charron's arrest. Sheriff King and Court Officer Vachon were not present for the events of March 8-9, 2016 and neither of them participated in any way in the decision to arrest Mr. Charron. Therefore, Sergeant Thistlewood, Deputy Cyr, Deputy Mains, Sheriff King, and Court Officer Vachon could not be held liable for Mr. Charron's arrest in any event.

*Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 101 (1st Cir. 2013) (quoting *Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012)). However, a warrantless arrest cannot be part of the Fourth Amendment seizure upon which section 1983 "malicious prosecution" claim is based. *Nieves v. McSweeney*, 241 F.3d 46, 54 (1st Cir. 2001). In that context, a plaintiff must, at a minimum, demonstrate a post-arraignment deprivation of liberty consistent with the concept of a seizure. *Id.*

The undisputed facts preclude any Fourth Amendment "malicious prosecution" claim. Deputy Horning effected Mr. Charron's arrest without a warrant, pursuant to the power conferred on her by state law. *See* 17-A M.R.S. § 15(1)(A)(2 & 5). Moreover, following Mr. Charron's release from the York County Jail the morning of March 9, 2016, Mr. Charron was not incarcerated or in custody at any point. Since his first court appearance was over a month and a half after his release from jail, he cannot demonstrate a post-arraignment deprivation of liberty consistent with the concept of a seizure. Therefore, Mr. Charron does not have a viable Fourth Amendment[4] "malicious prosecution" claim.[5]

### B. The record does not support any due process violations.

Mr. Charron's claims of failing to disclose or preserve evidence and failing to influence the district attorney to drop the charges are ostensibly analyzed under the Due Process Clause of the Fourteenth Amendment, as is Mr. Charron's claim of defamation. The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides in pertinent part: "No State shall ... deprive any person of life, liberty, or property, without due process of law...." U.S. Const. amend. XIV, § 1.

---

[4] Because Maine law recognizes the tort of malicious prosecution, Mr. Charron cannot maintain a "malicious prosecution claim" under the Fourteenth Amendment. *See Nieves v. McSweeney*, 241 F.3d 46, 53 (1st Cir. 2001) (holding that "[n]o procedural due process claim can flourish in this soil because [pertinent state law] provides an adequate remedy for malicious prosecution"); *see also Nadeau v. State*, 395 A.2d 107, 116 (Me. 1978) ("Malicious prosecution has long been recognized as an actionable tort in this jurisdiction.").

[5] For the reasons discussed in note 3, supra, Sergeant Thistlewood, Deputy Cyr, Deputy Mains, Sheriff King, and Court Officer Vachon could not be held liable for malicious prosecution in any event.

### i. The Plaintiff's due process right to a fair trial was not violated by any action of the County Defendants.

The Supreme Court has held that the duties to disclose and preserve impeachment or exculpatory evidence are grounded in the due process right to a fair trial. *Kyles v. Whitley,* 514 U.S. 419, 434 (1995); *United States v. Bagley,* 473 U.S. 667, 678 (1985); *United States v. Agurs,* 427 U.S. 97, 104 (1976); *Brady v. Maryland,* 373 U.S. 83, 87 (1963). Consistent with this precedent, actions by a prosecutor to withhold or destroy of evidence violates a criminal defendant's constitutional rights only if, as a result of the withholding or destruction of evidence, the criminal defendant is denied a fair trial. *Bagley, 473 U.S. at 678.* Federal courts have consistently held that the right to a fair trial is not implicated – and, therefore, no cause of action exists under Section 1983 – in cases in which all criminal charges were dismissed prior to trial. *See Morgan v. Gertz,* 166 F.3d 1307, 1310 (10th Cir. 1999); *Rogala v. District of Columbia,* 161 F.3d 44, 55-56 (D.C. Cir. 1998) (per curiam); *Taylor v. Waters,* 81 F.3d 429, 435-36 & n.5 (4th Cir. 1996); *McCune v. City of Grand Rapids,* 842 F.2d 903, 907 (6th Cir. 1988); *Nygren v. Predovich,* 637 F. Supp. 1083, 1087 (D. Colo. 1986).

Mr. Charron's attempt to hold the County Defendants liable for allegedly failing to preserve evidence is deficient in several respects. First, it is undisputed that the charges against Mr. Charron were dismissed before trial; therefore, his right to a fair trial under the Due Process Clause was never imperiled. Second, the alleged exculpatory evidence – Mr. Pivelait's Pontiac Sunfire – was known to both the prosecutor and Mr. Charron's attorney and it was eventually available to the prosecution and Mr. Charron's attorney before the case was submitted to the grand jury. Therefore, even if the County Defendants were obligated to preserve the vehicle and neglected to do so, the eventual location and possession of the vehicle by Mr. Charron and his attorney prevented any possible constitutional deprivation. Third, even if the vehicle had been lost and even if a trial had ensued, the County Defendants were not obligated to preserve evidence for Mr. Charron – their obligation was to the prosecutor. *See Campbell v. Maine*, 632

F. Supp. 111, 121 (D. Me. 1985) ("there is no independent duty of a police officer or investigative officer to disclose exculpatory information to a defendant"), *aff'd*, 787 F.2d 776 (1st Cir. 1986); *see also Kyles v. Whitley*, 514 U.S. 419, 437-38 (1995) (holding that the disclosure obligation imposed by *Brady* extends to evidence known only to police officers, but that the responsibility for obtaining and disclosing such evidence remains the duty of the prosecutor, and not the police officer). For all of these reasons, the County Defendants are entitled to summary judgment on Mr. Charron's claims based on alleged failure to preserve evidence.[6]

### ii. The Plaintiff cannot state a viable defamation claim that can be redressed under Section 1983.

Mr. Charron alleges that he was defamed when Sheriff King released information concerning Mr. Charron's arrest to the press and when Sheriff King posted the information on the internet. Based on established Supreme Court precedent, a procedural due process claim cannot rest upon reputational harm alone. *Paul v. Davis*, 424 U.S. 693, 701 (1976). A plaintiff who asserts a violation of his or her procedural due process rights based on reputational harm must also show that the challenged governmental action adversely affected some right or status he or she previously enjoyed under substantive state or federal law. *See Paul*, 424 U.S. at 710-12; *Silva v. Worden*, 130 F.3d 26, 32 (1st Cir. 1997). The First Circuit has clarified that an alleged harm to a right or status that does not arise out of substantive state or federal law is insufficient. *See URI Student Senate v. Town of Narragansett*, 631 F.3d 1, 10 (1st Cir. 2011). Moreover, the alleged loss of rights or status must be caused directly by the challenged governmental action: "Where the stigma and the incremental harm — the 'plus' factor — derive from distinct sources, a party cannot make out a viable procedural due process claim." *Id.* (citing *Hawkins v. R.I. Lottery Comm'n*, 238 F.3d 112, 116 (1st Cir. 2001)).

---

[6] These legal doctrines would appear to dispense with Mr. Charron's complaints that the County Defendants failed to convince the district attorney to drop the case sooner. Police do not make prosecutorial decisions – prosecutors do. In any event, in light of the fact that the district attorney did dismiss all charges before any trial occurred, there could be no due process violation associated with a failure by police to argue on behalf of the criminal defendant because Mr. Charron was never denied a fair trial as a result.

To the extent Mr. Charron is asserting a due process claim based on allegedly defamatory statements by Sheriff King in a Facebook posting and a press release, his claim fails as a matter of law. As discussed in more detail below in the context of Mr. Charron's tort claim of defamation, the information in the press release and the Facebook posting accurately describes the allegations against Mr. Charron and the charges. Therefore, there is no actionable reputational injury that could flow from those statements. In any event, in response to the County Defendants' interrogatories, Mr. Charron does not identify any right or status he previously enjoyed under substantive state or federal law that he no longer enjoys, the loss of which was caused directly by the County Defendants' actions. Absent such evidence, he cannot maintain a due process claim arising out of alleged defamation.

## II.     THE INDIVIDUAL COUNTY DEFENDANTS ARE PROTECTED FROM LIABILITY FOR ALLEGED CONSTITUTIONAL VIOLATIONS BY QUALIFIED IMMUNITY.

All of the individual County Defendants – Deputies Horning, Cyr and Mains, Sergeant Thistlewood, Court Officer Vachon, and Sheriff King – are protected from liability under Section 1983 by qualified immunity. Qualified immunity protects government officials from liability for civil damages for actions taken under color of state law. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Supreme Court has held that "officers are entitled to qualified immunity under §1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589, 199 L. Ed. 2d 453 (2018) (quoting *Reichle* v. *Howards*, 566 U. S. 658, 664 (2012)). The Supreme Court has clarified that "[t]he protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (citation omitted). In short, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Therefore, a government official may invoke qualified immunity when the alleged actions, though causing

injury, did "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela* v. *Hughes*, 138 S. Ct. 1148, 1152, 200 L. Ed. 2d 449 (2018) (*per curiam*) (internal quotation marks and citation omitted); *Conlogue v. Hamilton*, 906 F.3d 150, 154 (1st Cir. 2018) (quoting *Harlow*, 457 U.S. at 818)).

The Supreme Court has adopted a "two-pronged inquiry" in applying qualified immunity. *Tolan v. Cotton*, 572 U.S. 650, 655 (2014). The first area of inquiry "asks whether the facts, '[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right[.]'" *Id.* at 655-56 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The second area of inquiry "asks whether the right in question was 'clearly established' at the time of the violation." *Id.* at 656 (citing *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). Although the areas of inquiry are enumerated, the Supreme Court has held that the order in which a court conducts its inquiry is left to the court's sound discretion. *Id.* (citing *Pearson v. Callahan*, 555 U. S. 223, 236 (2009)).

In the context of qualified immunity, "'[c]learly established' means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Wesby*, 138 S. Ct. at 589 (internal quotation marks omitted) (quoting *Ashcroft v. al-Kidd,* 563 U.S. 731, 735 (2011) (quoting *Anderson v. Creighton*, 483 U. S. 635, 640 (1987))). The legal rule at issue "must be settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority." *Id.* at 589-90 (citations and internal quotation marks omitted). A rule that is merely "suggested by then-existing precedent" is not "clearly established"; "[t]he precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Id.* (citing *Reichle*, 566 U. S. at 666). In several recent decisions, the Supreme Court has emphasized the focus of the "clearly established" inquiry: "existing law must have placed the constitutionality of the officer's conduct '*beyond debate*.'" *Id.* (emphasis added) (quoting *al-Kidd,* 563 U.S. at 741).

Even if a plaintiff can demonstrate the existence of "'controlling authority' or a 'consensus of cases of persuasive authority,'" *Alfano v. Lynch*, 847 F.3d 71, 75 (1st Cir. 2017), a governmental official who violates such precedent is still protected by immunity unless the plaintiff can also show that "an objectively reasonable official in the defendant's position would have known that his conduct violated that rule of law." *Id.* (citation omitted). "The question is not whether the official actually abridged the plaintiff's constitutional rights but, rather, whether the official's conduct was unreasonable, given the state of the law when he acted." *Id.* (citation omitted). This requirement affords "some breathing room for a police officer even if he has made a mistake (albeit a reasonable one) about the lawfulness of his conduct." *Conlogue*, 906 F.3d at 155.

Finally, the Supreme Court has repeatedly reminded the federal courts "not to define clearly established law at a high level of generality." *Mullenix v. Luna*, 136 S. Ct. 305, 308, 193 L. Ed. 2d 255 (2015). The Court has instructed that "this inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004 (quoting *Saucier*, 533 U.S. at 201). "The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Id.* (emphasis supplied by the Supreme Court) (quoting *al-Kidd,* 563 U.S. at 742).

Under the circumstances of this case, Deputies Horning, Cyr and Mains, Sergeant Thistlewood, Court Officer Vachon, and Sheriff King are all protected by qualified immunity and are therefore entitled to summary judgment on all of Mr. Charron's Section 1983 claims. Even if Deputy Horning was incorrect in her assessment of the information she had, a reasonable officer in her position could have believed that the information supported the existence of probable cause with regard to either or both of the crimes with which she charged Mr. Charron: aggravated reckless conduct and criminal threatening. Moreover, a reasonable officer in Sheriff King's position could have believed that he would not be violating Mr. Charron's constitutional rights by reporting to the public the activities of deputies in his department with regard to an

arrest that was made and the allegations behind that arrest. Finally, since none of the individual County Defendants failed to disclose the appearance of the Pontiac Sunfire after the accident (which was recorded in photographs taken by Deputy Horning) and since Mr. Charron (or his attorney) located and secured the Pontiac Sunfire so that it could be examined before any trial occurred, a reasonable officer could have believed that their disclosure or preservation of evidence did not violate Mr. Charron's constitutional rights. For these reasons, the individual County Defendants are protected by qualified immunity.

### III.    YORK COUNTY IS ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFF'S SECTION 1983 CLAIMS BECAUSE THE PLAINTIFF CANNOT DEMONSTRATE A CUSTOM OR POLICY OF THE COUNTY THAT WAS A MOVING FORCE BEHIND ANY CONSTITUTIONAL VIOLATIONS.

Governmental entity liability under Section 1983 can be assessed only "where the municipality *itself* causes the constitutional violation at issue. *Respondeat superior* or vicarious liability will not attach under § 1983." *City of Canton, Ohio v. Harris,* 489 U.S. 378, 385 (1989). The Supreme Court has required a plaintiff to demonstrate that a policy or custom of the governmental entity led to the constitutional deprivation alleged. *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 694 (1978). The plaintiff must show both the existence of a policy or custom and a causal link between that policy and the constitutional harm. *See, e.g., City of Canton,* 489 U.S. at 387-90; *Oklahoma City v. Tuttle,* 471 U.S. 808, 823 (1985).

Moreover, the policy or custom must be the result of acts or omissions of the municipality's policymakers that exhibit "deliberate indifference" to the rights of the municipality's inhabitants. *City of Canton*, 489 U.S. at 387-90; *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 209 (1st Cir. 1990). The First Circuit has summarized the deliberate indifference standard as follows: "To demonstrate deliberate indifference a plaintiff must show (1) a grave risk of harm, (2) the defendant's actual or constructive knowledge of that risk, and (3) his failure to take easily available measures to address the risk." *Camilo-Robles v. Hoyos,* 151

F.3d 1, 7 (1st Cir. 1998) (citing *Manarite v. City of Springfield,* 957 F.2d 953, 956 (1st Cir. 1992)).

Finally, a governmental entity cannot be held liable under Section 1983 unless there was an underlying constitutional violation by its employees. *See Kennedy v. Town of Billerica*, 617 F.3d 520, 531 (1st Cir. 2010). "If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point." *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam).

To begin, the discussion above demonstrates that none of York County's officers or officials caused Mr. Charron to suffer any constitutional deprivation. Therefore, irrespective of County policy, the County cannot be held liable.

In any event, Mr. Charron has presented no evidence of a custom or policy of York County that was a moving force behind any constitutional violations. In response to the County Defendants' interrogatories, Mr. Charron failed to identify any customs or policies of York County that caused an unlawful arrest. Moreover, the York County Sheriff's Office's policy of transparency with regard to its operations was not a moving force behind any constitutional violations. In light of this record evidence, the County is entitled to summary judgment with regard to Mr. Charron's section 1983 claims.

## IV.    SHERIFF KING IS ENTITLED TO SUMMARY JUDGMENT ON ANY SECTION 1983 CLAIMS BASED ON SUPERVISORY LIABILITY.

The First Circuit has stated that supervisory liability under Section 1983 usually arises in one of two ways: "either the supervisor may be a 'primary violator or direct participant in the right-violating incident,' or liability may attach 'if a responsible official supervises, trains, or hires a subordinate with deliberate indifference toward the possibility that deficient

performance of the task eventually may contribute to a civil rights deprivation.'"[7] *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 49 (1st Cir. 2009) (quoting *Camilo-Robles v. Zapata*, 175 F.3d 41, 44 (1st Cir. 1999)). "In the latter scenario . . ., the analysis focuses on 'whether the supervisor's actions displayed a deliberate indifference toward the rights of third parties and had some causal connection to the subsequent tort.'" *Id.* In either circumstance, the plaintiff in a Section 1983 action "must show an 'affirmative link, whether through direct participation or through conduct that amounts to condonation or tacit authorization,' between the actor and the underlying violation." *Id.*

Sheriff King cannot be held liable with regard to Mr. Charron's arrest based on a theory of supervisory liability. It is undisputed that Sheriff King did not participate in the events of March 8 and March 9 of 2016. Moreover, there is no record evidence to suggest that he was aware of – and therefore condoned or tacitly authorized – any conduct directed at Mr. Charron as part of the arrest. Therefore, he is entitled to summary judgment to the extent Mr. Charron is asserting a supervisory liability claim based on the arrest.

---

[7] The Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) calls into question whether Section 1983 claims can be maintained against supervisors based on a theory of knowledge and acquiescence: "In a § 1983 suit or a *Bivens* action – where masters do not answer for the torts of their servants – the term 'supervisory liability' is a misnomer. Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *See id.* at 677. The First Circuit has yet to definitively rule on the effect of *Iqbal* in the context of claims against supervisors. *See, e.g., Ramirez-Lluveras v. Rivera-Merced*, 759 F.3d 10, 19 (1st Cir. 2014) (declining to "address what is a hypothetical argument" given the plaintiff's failure to meet the pre-existing standard for liability). However, other circuit courts have held that a supervisor's knowledge of or deliberate indifference to a possible constitutional violation at the hands of subordinates – in itself – does not give rise to liability under Section 1983. *See, e.g., Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010) ("In the due process context, this means the focus is on the force the *supervisor* used or caused to be used, the resulting injury attributable to his conduct, and the *mens rea* required of him to be held liable, which can be no less than the *mens rea* required of anyone else.") (citing *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)); *Dodds v. Richardson*, 614 F.3d 1185, 1204 (10th Cir. 2010) (a plaintiff can "no longer succeed on a § 1983 claim . . . by showing that as a supervisor [the defendant] behaved knowingly or with deliberate indifference that a constitutional violation would occur at the hands of his subordinates, unless that is the same state of mind required for the constitutional deprivation he alleges") (internal quotation omitted).

Since the County Defendants believe that Mr. Charron cannot meet the First Circuit's pre-*Iqbal* test, the Court need not decide whether that test is still viable. However, the County Defendants do not waive the argument that the First Circuit's "supervisory liability" paradigm has been superseded – if not overruled – by *Iqbal*.

**V.    THE YORK COUNTY DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFF'S STATE LAW CLAIMS BECAUSE THE PLAINTIFF CANNOT DEMONSTRATE REQUIRED ELEMENTS OF THE CLAIMS AND, IN ANY EVENT, THE DEFENDANTS ARE PROTECTED BY MAINE TORT CLAIMS ACT IMMUNITY.**

Mr. Charron appears to assert tort claims for false arrest, false imprisonment, malicious prosecution, defamation per se, and intentional or negligent infliction of emotional distress. All of these claims appear to arise out of Mr. Charron's arrest and the statements reflected in the York County Sheriff's Office's Facebook page and press release. None of these claims are legally viable based on the summary judgment record. In any event, as a matter of law, all County Defendants are protected from liability with regard to the alleged claims pursuant to immunity provided by the Maine Tort Claims Act, 14 M.R.S. §§ 8101-8118 ("the Act").

**A.  The summary judgment record does not support the elements of the Plaintiff's tort claims.**

In order to survive summary judgment, a plaintiff must demonstrate a triable issue of fact with regard to all elements of his or her claims. *See Noveletsky v. Metro. Life Ins. Co.*, 2013 U.S. Dist. LEXIS 83762, \*35-36 (D. Me. 2013) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.")). Mr. Charron cannot meet that requirement with regard to his tort claims.

**i.  The existence of probable cause for the Plaintiff's arrest precludes the claims of false arrest and false imprisonment.**

The Maine Law Court has held that "[f]alse imprisonment involves the unlawful detention or restraint of an individual against his will." *Nadeau v. State*, 395 A.2d 107, 116 (Me. 1978) (citation omitted). An arrest supported by probable cause cannot give rise to tort claims of false imprisonment or false arrest. *See Jordan v. Town of Waldoboro*, 2018 U.S. Dist. LEXIS 167836, \*57-58 (D. Me. Sept. 2018). As demonstrated above, Mr. Charron's arrest was

supported by probable cause. Therefore, his claims of false imprisonment and false arrest fail as a matter of law.

### ii. The existence of probable cause for the Plaintiff's arrest precludes the claim of malicious prosecution.

A plaintiff seeking to prove a claim of malicious prosecution must show that: "(1) [t]he defendant initiated, procured or continued a criminal action without probable cause; (2) [t]he defendant acted with malice; and (3) [t]he plaintiff received a favorable termination of the proceedings." *Trask v. Devlin*, 2002 ME 10, ¶ 11, 788 A.2d 179. As demonstrated above, Mr. Charron's arrest was supported by probable cause. Therefore, he cannot prove all the elements of malicious prosecution.

### iii. The Plaintiff's defamation claim fails as a matter of law because the press release and the Facebook posting accurately describe the alleged events and the charges against the Plaintiff.

A plaintiff seeking to prove a claim of defamation must demonstrate the existence of "(a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Rice v. Alley*, 2002 ME 43, ¶ 19, 791 A.2d 932 (citation and internal quotation marks omitted). Mr. Charron complains that the press release issued by Sheriff King and the posting of that press release on the York County Sheriff Office's Facebook page was defamatory. However, the information about Mr. Charron in those statements (which are effectively one statement) is not false. The statements accurately reflect that Mr. Charron had been accused of using his plow truck to hit another vehicle and that he had been charged with crimes as a result. Therefore, Sheriff King cannot be held liable for defamation. *See Jordan v. Town of Waldoboro*, 2018 U.S. Dist. LEXIS 167836, *63 (D. Me. Sept. 2018) (holding that quotations by law enforcement officers reported in the newspaper describing the allegations

against a criminal defendant were not false because "they accurately reflected the nature of the case against the plaintiff, which was a matter of public interest").

### iv. The Plaintiff cannot demonstrate several required elements of intentional infliction of emotional distress and negligent infliction of emotional distress.

A plaintiff asserting a claim of intentional infliction of emotional distress ("IIED") must show the following elements:

> (1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from her conduct;
>
> (2) the conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, utterly intolerable in a civilized community;
>
> (3) the actions of the defendant caused the plaintiff's emotional distress; and
>
> (4) the emotional distress suffered by the plaintiff was so severe that no reasonable [person] could be expected to endure it.

*Curtis v. Porter*, 2001 ME 158, ¶ 10, 784 A.2d 18 (citation, internal quotation marks, and footnote omitted) (brackets in original). "[W]hen . . . the existence of the fourth element cannot be inferred from the extreme and outrageous nature of the defendant's conduct alone, a plaintiff must prove that . . . her emotional distress was so severe as to have manifested objective symptoms demonstrating shock, illness, or other bodily harm." *Lyman v. Huber*, 2010 ME 139, ¶ 23, 10 A.3d 707. The Law Court "do[es] not preclude the possibility that this can be achieved without the corroborating testimony of an expert medical or psychological witness[,]" but considers "[t]hat possibility . . . remote." *Id.*

A plaintiff seeking to establish negligent infliction of emotional distress ("NIED") is required to show that "[the defendant] owed a duty to [the plaintiff]; that [the defendant] breached its duty; that [the plaintiff] suffered severe emotional distress; and that [the defendant's] conduct caused the harm." *Oceanic Inn, Inc. v. Sloan's Cove, LLC*, 2016 ME 34, ¶ 23, 133 A.3d 1021, 1028. NIED also requires the plaintiff to prove either a unique relationship

with the defendant or an underlying tort. *See Bryan R. v. Watchtower Bible & Tract Soc'y,* 1999 ME 144, ¶¶ 30-31, 738 A.2d 839.

Both NIED and IIED require proof of severe emotional distress. *Holland v. Sebunya,* 2000 ME 163, ¶ 18, 759 A.2d 205 (citing *Fuller v. Central Maine Power Co.*, 598 A.2d 457, 459 (Me. 1991). "'Serious emotional distress exists where a reasonable person normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the event.'" *Id.* (quoting *Town of Stonington v. Galilean Gospel Temple*, 1999 ME 2, ¶ 11, 722 A.2d 1269). Therefore, even if a plaintiff can generate an issue of fact with regard to experiencing distress that was severe, that plaintiff still must also show that "the harm alleged reasonably could have been expected to befall the ordinarily sensitive person." *Theriault v. Swan*, 558 A.2d 369, 372 (Me. 1989).

As demonstrated above, neither Mr. Charron's arrest nor the York County Sheriff's Office's release of information about the allegations and charges were unlawful. Therefore, as a matter of law, those acts cannot be characterized as extreme or outrageous. *See Jordan*, 2018 U.S. Dist. LEXIS 167836, *60. As such, he cannot establish a required element of IIED.

The record does not reflect a unique relationship between Mr. Charron and the County Defendants. Courts have held that there exists no special relationship – for the purposes of NIED – between a law enforcement officer and an arrestee. *See Santoni v. Potter*, 222 F. Supp. 2d 14, 28 (D. Me. 2002); *see also Richards v. Town of Eliot*, 2001 ME 136, ¶ 34, 780 A.2d 281 (noting, in analyzing an arrestee's NIED claim, that "there is no suggestion of a unique relationship between [the arrestee] and either of the police officers"). Moreover, as demonstrated above, there are no other viable tort theories; therefore, NIED cannot be premised on the existence of a separate tort. *See Curtis v. Porter*, 2001 ME 158, ¶ 19, 784 A.2d 18. Mr. Charron cannot demonstrate required elements for a NIED claim.

Finally, Mr. Charron's allegations that the arrest and the release of information caused him to experience "fear, embarrassment, humiliation, despair, despondency, helplessness,

outrage, social alienation and indignation" are inadequate to generate a triable issue of fact with regard to "serious" emotional distress. *See McDermott v. Town of Windham*, 204 F. Supp. 2d 54, 71 (D. Me. 2002). This is particularly true in light of the fact that Mr. Charron did not seek any treatment for alleged mental or emotional injuries. *See id.* In any event, even if the Court were to accept Mr. Charron's allegations as presenting a triable issue with regard to "serious" emotional distress, he has presented no evidence to suggest that his arrest and and the release of information about the charges are the type of circumstances that would engender mental stress beyond the coping skills of an ordinarily sensitive person: "although most people would experience distress at being wrongfully arrested, handcuffed and taken to the police station for booking, Plaintiff has failed to demonstrate that the 'ordinarily sensitive person' would 'be unable to adequately cope with the mental stress engendered' by that action." *Id.* (quoting *Holland*, 2000 ME 163, ¶ 18). For all of these reasons, Mr. Charron's claims of IIED and NIED fail as a matter of law.

### B. Mr. Charron's tort claims against the individual County Defendants are barred by absolute discretionary function immunity.

The Act confers upon governmental employees absolute discretionary function immunity. § 8111(1)(C); *Carroll v. City of Portland*, 1999 ME 131, ¶ 6, 736 A.2d 279 (emphasizing that that discretionary function immunity is absolute). Moreover, "discretionary immunity ... applies unless the defendants' conduct 'clearly exceeded, as a matter of law, the scope of any discretion [they] could have possessed in [their] official capacity as [police officers].'" *Polley v. Atwell*, 581 A.2d 410, 414 (Me. 1990) (emphasis in original).

It is established within this federal circuit that for purposes of the Act, an officer's decision to effectuate a warrantless arrest is a discretionary act. *See, e.g., Hegarty v. Somerset County*, 848 F. Supp. 257, 269 (D. Me. 1994), *aff'd in part, remanded in part on other grounds*, 53 F.3d 1367 (1st Cir. 1995); *Jackson v. Town of Sanford*, 1994 U.S. Dist. LEXIS 15367, *6 (D. Me. Sept. 23, 1994) ("A police officer performs a 'discretionary function' within the meaning of

section 8111(1)(C) when making a warrantless arrest.") (citing *Leach v. Betters,* 599 A.2d 424, 426 (Me. 1991)). Therefore, all of the claims that arise out of Mr. Charron's arrest – namely, false arrest, false imprisonment, malicious prosecution, and intentional or negligent infliction of emotional distress – are barred by discretionary function immunity.

Similarly, the Maine Law Court has held that public statements issued by a county sheriff for the purposes of fostering transparency in the operations of the sheriff's office are discretionary functions. In *Hilderbrand v. Washington County Commissioners*, 2011 ME 132, 33 A.3d 425, the Washington County sheriff publicly severed his department's working relationship with the Maine Drug Enforcement Agency ("MDEA"), explaining that his decision was based on inappropriate – and potentially criminal – conduct by an MDEA officer that was captured on video. *Id.* ¶ 4. The MDEA officer sued the sheriff for defamation. The sheriff interposed discretionary function immunity under the Act as a defense and the superior court granted him summary judgment on that basis. In affirming summary judgment, the Maine Law Court analyzed the scope of the sheriff's immunity by applying a four-factor test introduced in *Darling v. Augusta Mental Health Institute*, 535 A.2d 421 (Me. 1987) and ruled that the sheriff's actions satisfied all elements of that test. *Id.* ¶¶ 13-22. In particular, the Law Court noted that "[the sheriff's] public explanation of his decision to end cooperation with the MDEA is also essential to the realization or accomplishment of another basic governmental objective of the department—transparency in governmental action." *Id.* ¶ 14.

It is undisputed that Sheriff King's decision to issue a press release and post an item on the York County Sheriff's Office's Facebook page pertaining to Mr. Charron's arrest served a basic governmental objective of his Office – transparency. Therefore, any claims Mr. Charron may assert arising out of those statements – including defamation and intentional or negligent infliction of emotional distress – are barred by discretionary function immunity. For all of these reasons, the individual County Defendants are entitled to summary judgment on all of Mr. Charron's tort claims because they are protected by absolute immunity.

### C.  York County is immune with regard to the Plaintiff's tort claims.

The Act provides a general grant of tort immunity to governmental entities: "all governmental entities shall be immune from suit on any and all tort claims seeking recovery of damages." § 8103(1). By definition, governmental entities include counties. § 8102(2 & 3) ("governmental entity" defined to include "political subdivisions" of the State, including counties). The only exceptions to this immunity appear in 14 M.R.S. § 8104-A. Since immunity of governmental entities is the rule under the Act, "'exceptions to immunity are to be strictly construed.'" *Thompson v. Dep't of Inland Fisheries & Wildlife*, 2002 ME 78, ¶ 5, 796 A.2d 674 (quoting *New Orleans Tanker Corp. v. Dep't of Transp.*, 1999 ME 67, ¶ 5, 728 A.2d 673).

Moreover, despite the provisions of Section 8104-A, a governmental entity retains its immunity if the acts alleged constitute a discretionary function.  14 M.R.S. § 8104-B(3)[8]; *see Doucette v. City of Lewiston*, 1997 ME 157, ¶ 8 n.1, 697 A.2d 1292. The Law Court has applied Section 8104-B(3) consistent with the concept of discretionary function immunity afforded to governmental employees by Section 8111.  *Roberts v. State*, 1999 ME 89, ¶ 7, 731 A.2d 855.

### i.  The County is immune from the Plaintiff's tort claims.

Since Mr. Charron has asserted tort claims against the County, his claims are subject to the provisions of the Act. § 8103; *see Petillo v. City of Portland*, 657 A.2d 325, 326 (Me. 1995) ("The Act provides that governmental entities are immune from suit on tort claims, subject to specific, limited exceptions."). Pursuant to Section 8103 of the Act, the County is immune with regard to Mr. Charron's claims. § 8103. Moreover, none of the exceptions to immunity in Section 8104-A apply to claims arising out of a warrantless arrest or defamation.

---

[8] The pertinent provision of Section 8104-B provides:

> Notwithstanding section 8104-A, a governmental entity is not liable for any claim which results from:
>
> ....
>
> 3. Performing discretionary function.  Performing or failing to perform a discretionary function or duty, whether or not the discretion is abused and whether or not any statute, charter, ordinance, order, resolution or policy under which the discretionary function or duty is performed is valid or invalid.

### ii.     All of the Plaintiff's claims arise out of discretionary functions.

Even if the Plaintiff's claims did fall within an exception to immunity, the immunity is reinstated by operation of Section 8104-B(3). As demonstrated above, all of the County Defendants' alleged actions constitute discretionary functions. Therefore, Section 8104-B(3) re-establishes immunity from any potential liability pursuant to an exception in Section 8104-A.

### iii.    The County does not have insurance that would waive its immunity.

Finally, the County has not waived its immunity by the purchase of insurance.  As of the date of Mr. Charron's alleged claims, the County was covered under a Member Coverage Certificate issued by the Maine County Commissioners' Association Self-Funded Risk Management Pool. Apart from that Coverage Certificate, the County did not have any liability insurance coverage effective on the date of the Plaintiff's alleged injury that pertained to the activities of the York County Sheriff's Office or its officers. Coverage Certificate contains a provision that states that the coverage it provides does not extend to areas in which the County is immune under the Maine Tort Claims Act. In addition, the Certificate provides that the coverage does not effect a waiver of the immunities afforded to the County under the Act.  The Law Court has held that this statement of coverage, which expressly limits liability, prevents a waiver of immunity.  *Doucette*, 1997 ME 157, ¶¶ 8-10.  Therefore, the County has preserved its immunity defenses.  *Id*. ¶ 10.

### VI.    THE COUNTY DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE ISSUE OF PUNITIVE DAMAGES.

To the extent Mr. Charron is seeking an award of punitive damages in this case, the Court should grant the County Defendants summary judgment with regard to such damages. Punitive damages are not recoverable against the County under state tort law or under 42 U.S.C. § 1983. *See* 14 M.R.S. § 8105(5); *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 271 (1981). Therefore, York County is entitled to summary judgment as a matter of law.

Punitive damages against an individual in a Section 1983 action are available only "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to federally protected rights of others." *Smith v. Wade,* 461 U.S. 30, 56 (1983). Similarly, punitive damages under Maine law may be awarded only if the plaintiff can show either ill will or outrageous conduct. *See Tuttle v. Raymond*, 494 A.2d 1353 (1985). Mere negligence or reckless disregard of the circumstances are not enough to justify punitive damages. *Id.* at 1362-63. There is no evidence in the summary judgment record to suggest that any of the individual County Defendants were motivated by evil motive or intent, nor is there any evidence that they acted with reckless or callous indifference to Mr. Charron's federally-protected rights. Therefore, Mr. Charron cannot present a triable issue of punitive damages.

## CONCLUSION

For the reasons set forth in this Motion and incorporated memorandum of law, the County Defendants are entitled to summary judgment on all claims in this matter.

Dated at Portland, Maine this 25th day of July, 2019.

Attorneys for County Defendants
MONAGHAN LEAHY, LLP
95 Exchange Street, P.O. Box 7046
Portland, ME 04112-7046
(207) 774-3906
jwall@monaghanleahy.com
BY:    /s/ John J. Wall, III
       John J. Wall, III

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 25, 2019, I electronically filed **County Defendants' Motion for Summary Judgment, with Incorporated Memorandum of Law** using the CM/ECF system, which will provide notice to me and the following other counsel of record: greg@sanfordlaw.com.

Dated at Portland, Maine this 25th day of July, 2019.

Attorneys for County Defendants
MONAGHAN LEAHY, LLP
95 Exchange Street, P.O. Box 7046
Portland, ME 04112-7046
(207) 774-3906
jwall@monaghanleahy.com
BY:   /s/ John J. Wall, III
John J. Wall, III
