| | | |
|---|---|---|
| JOHN A. CHARRON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:18-cv-00105-JAW |
| | ) | |
| COUNTY OF YORK et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON MOTION FOR SUMMARY JUDGMENT

A person, arrested, charged, indicted, and later vindicated, brings a lawsuit against the county, the arresting deputy, other deputies involved in the investigation, the sheriff who publicized the arrest and supervised the sheriff's office, and a court officer. Regarding his federal claims, the Court grants the defendants' motion for summary judgment because, even after viewing contested facts in the light most favorable to him, the Court is unable to conclude that the defendants committed a constitutional violation against him and, in any event, the defendants are entitled to qualified immunity. Regarding his state law tort claims, the Court similarly concludes that he has failed to show that the defendants committed any of the alleged state torts against him and, in any event, the defendants are entitled to discretionary function immunity under state law.

## I. PROCEDURAL HISTORY

On March 8, 2018, John Charron filed a complaint in this Court, bringing a civil rights action against York County, Deputy Sheriff Rachel Horning, Deputy

Sheriff Darren Cyr, Deputy Sheriff Heath Mains, Sergeant Steven Thistlewood,[1] York County Sheriff William King, Jr., and Court Officer Wilfred Vachon (County Defendants), as well as Christopher Moss and Eric Pilvelait. *Compl.* at 1 (ECF No. 1). On June 18, 2018, the County Defendants filed an answer. *Answer, Affirmative Defenses and Jury Trial Demand (Defs. County of York, William L. King, Jr., Rachel Horning, Darren Cyr, Heath Mains, Steven Thistlewood and Bill Vachon)* (ECF No. 14).

On July 27, 2018, Mr. Charron filed motions for entry of default and default judgment against Christopher Moss and Mr. Pilvelait. *Pl.'s Appl. to Clerk for Default Against Non-County Defs. Christopher Moss and Eric J. Pilvelait* (ECF No. 18); *Pl.'s Verified Mot. for Default J. Against Non-County Defs. Christopher Moss and Eric J. Pilvelait* (ECF No. 19). The Deputy Clerk of Court granted the Motion for Entry of Default on July 30, 2018, *Order Granting Mot. for Entry of Default* (ECF No. 20), and the Court dismissed the Motion for Default Judgment without prejudice on October 22, 2018, *Order* (ECF No. 27), because Mr. Charron requested a damages determination by the jury at trial. *Pl.'s Mot. for Jury Determination of Damages Against Defaulted Defs.* (ECF No. 24); *Order* (ECF No. 25).

After the parties engaged in discovery, the discovery period closed on April 5, 2019. *Order Granting Without Obj. Mot. to Extend Time* (ECF No. 51). On April 10, 2019, the County Defendants filed a notice of intent to file a motion for summary

---

[1] Mr. Charron refers to Deputy Horning, Deputy Cyr, Deputy Mains, and Sergeant Thistlewood as "the four deputies." *See, e.g.*, *Pl.'s Mem. of Law in Opp'n to Summ. J. for the County Defs.* at 1 (ECF No. 87) (*Pl.'s Opp'n*).

judgment and need for a pre-filing conference per District of Maine Local Rule 56(h). *County Defs.' Notice of Intent to File Mot. for Summ. J.* (ECF No. 53). The Court held a conference and set a Local Rule 56(h) schedule on May 16, 2019. *Min. Entry* (ECF No. 56). On June 20, 2019, the parties jointly filed a stipulated record. *Local Rule 56(h) Joint Stipulated R.* (ECF No. 59) (*JSR*).

On July 25, 2019, the County Defendants filed a statement of material facts. *County Defs.' Statement of Material Facts in Supp. of Mot. for Summ. J.* (ECF No. 69) (*DSMF*). On the same day, the County Defendants filed a motion for summary judgment. *County Defs.' Mot. for Summ. J.* (ECF No. 68) (*Defs.' Mot.*). On October 15, 2019, Mr. Charron filed a response to the County Defendants' Motion for Summary Judgment as well as a response to their statement of material facts, which included a statement of additional material facts. *Pl.'s Opp'n*; *Pl.'s Opposing Statement of Material Facts Including Additional Material Facts Precluding Summ. J. for the County Defs.* (ECF No. 86) (for paragraphs 1-93, PRDSMF; for paragraphs 94-199, PSAMF).[2] On December 3, 2019, the County Defendants filed a reply to Mr.

---

[2] On September 30, 2019, Mr. Charron filed an initial response to the County Defendants' statement of material facts. *Pl.'s Opposing Statement of Material Facts Including Additional Material Facts Precluding Summ. J. for the County Defs.* (ECF No. 80). Also on September 30, 2019, Mr. Charron filed an unopposed motion to extend his time to file his memorandum of law in response to the County Defendants' Motion for Summary Judgment. *Unopposed Verified Mot. by Pl. to Extend Time to File Opp'n to Defs.' Mot. for Summ. J.* (ECF No. 81). The Court granted this motion on October 2, 2019. *Order Granting Mot. to Extend Time* (ECF No. 82). On October 7, 2019, Mr. Charron filed an unopposed motion for a further extension of his time to file his memorandum of law. *Unopposed Verified Mot. by Pl. to Extend Time to File Opp'n to Defs.' Mot. for Summ. J.* (ECF No. 83). The Court granted this additional extension on October 8, 2019. *Order Granting Mot. to Extend Time* (ECF No. 84). Mr. Charron did not move to continue his time to file a responsive statement of facts and additional facts.

Then, on October 15, 2019, when Mr. Charron filed his responsive memorandum of law, he also filed—without motion—a second responsive statement of facts, PRDSMF ¶¶ 1-93, and an additional statement of facts. PSAMF ¶¶ 94-199. He stated in his memorandum of law that this document superseded his September 30, 2019, filing. *Pl.'s Opp'n* at 2 n.1. Mr. Charron should have

Charron's response to their statement of material facts and Mr. Charron's statement of additional material facts as well as a reply to Mr. Charron's opposition to their motion for summary judgment. *Consolidated Statements of Material Facts Including County Defs.' Resp. to Pl.'s Additional Material Facts* (ECF No. 93) (DRPSAMF); *County Defs.' Reply Mem. of Law in Supp. of Mot. for Summ. J.* (ECF No. 92) (*Defs.' Reply*).

On December 17, 2019, Mr. Charron filed a motion to extend the time for him to file his response to the County Defendants' reply to Mr. Charron's response to their statement of material facts and Mr. Charron's statement of additional material facts pursuant to District of Maine Local Rule 56(e). *Unopposed Verified Mot. by Pl. to Extend Time for Local Rule 56(e) Resp. to Defs.' Reply Statement of Material Facts* (ECF No. 94). The Court granted this motion on December 18, 2019. *Order Granting Mot. to Extend Time* (ECF No. 95). On January 2, 2020, Mr. Charron filed his response. *Pl.'s Resp. to Defs.' Reply Statement of Material Facts* (ECF No. 96) (PRDRPSAMF).[3]

---

filed a motion for leave to file the late responsive statement of facts and additional statement of facts and then simply filed the late document with the Court. Nevertheless, as the County Defendants responded to the October 15, 2019, filing, the Court sua sponte grants Mr. Charron's presumed motion for late filing of the superseding responsive statement of facts and statement of additional facts.

[3]     Local Rule 56(e) provides that if there is a request to strike a party's statement of facts, the party may respond "in the reply statement of material facts as provided in this rule or, if the request was made in a reply statement of material facts, by filing a response within 14 days." D. ME. LOC. R. 56(e). It adds that the response "shall be strictly limited to a brief statement of the reason(s) why the statement of fact should be considered and the authority or record citation in support." *Id.* Mr. Charron's responses extend beyond the limitations of this rule in two ways. First, while most of the responses are to requests to strike, he also responds to some qualifications and denials that do not contain requests to strike. Second, many of his responses are far from brief. Nonetheless, since the County Defendants have not objected to any of Mr. Charron's responses, the Court considered them.

## II.    FACTUAL BACKGROUND[4]

### A.    Initial 911 Call from Ryan Lemay

On March 8, 2016,[5] at approximately 10:30 p.m., Ryan Lemay heard squealing tires and people yelling hostilities at his neighbor, John Charron.    PSAMF ¶ 94; DRPSAMF ¶ 94.  Mr. Lemay observed a dark vehicle and its occupants pull into Mr. Charron's driveway, yell threats, peel out, come back, yell more threats, and peel out again.  PSAMF ¶ 95; DRPSAMF ¶ 95.  Mr. Lemay did not hear any threats from Mr. Charron.  PSAMF ¶ 95; DRPSAMF ¶ 95.  Mr. Lemay called the police emergency line (911) at 10:31 p.m. to report what he saw, providing his phone number and identifying the location of his observation as "the second house on the right" on Langley Shores Drive,[6] which is Mr. Charron's residence.[7]    PSAMF ¶ 96;  DRPSAMF ¶ 96;

---

[4]    The Court states the facts "in the light most hospitable to [Mr. Charron], consistent with record support . . .." *Mancini v. City of Providence ex rel. Lombardi*, 909 F.3d 32, 37 (1st Cir. 2018) (citing *Ahern v. Shinseki*, 629 F.3d 49, 51 (1st Cir. 2010); *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 17 (1st Cir. 2002)).

[5]    All events in this case took place in 2016 unless otherwise specified.

[6]    The parties sometimes refer to this road as Langley Shore Drive, not Langley Shores Drive. Based on the record, the Court believes that Langley Shores Drive is correct and has referred to the road throughout as Langley Shores Drive.

[7]    The County Defendants qualify paragraph ninety-six of Mr. Charron's statement of additional material facts because "[t]he cited affidavit testimony does not contain the substance of the assertions in this paragraph" and request that the Court strike or disregard the substance of the assertions in this paragraph in accordance with Local Rule 56(e) and (f).  DRPSAMF ¶ 96.  Mr. Charron responds, in accordance with Local Rule 56(e), by providing a clearer record citation to the audio file and transcript that provide the information contained in the paragraph.  PRDRPSAMF ¶ 96.  The Court reviewed the cited portions of the record and finds that, while paragraph ninety-six did not contain a record citation to the fact Mr. Lemay was the 911 caller, Mr. Charron's response to the County Defendants' qualification does provide a record citation for this information.  PRDRPSAMF ¶ 96; *see Pl.'s Suppl. Summ J. R. Items*, Attach. 1, *Aff. of Ryan Lemay* ¶ 6 (ECF No. 74) (*Aff. of Lemay*); *Letter from Gregory McCullough to Nick Gordon, Clerk*, Attach. 6 (ECF No. 63) (*JSR Ex. 38*).  The Court declines to accept the County Defendants' qualified response on this basis.

The County Defendants also argue that the Court should strike or disregard the assertions in Mr. Charron's additional paragraph ninety-six as inadmissible hearsay to the extent that they offer out of court statements for the truth of the matter asserted.  DRPSAMF ¶ 96.  Mr. Charron responds by arguing that "[Mr.] Lemay's statements to the 911 dispatcher as contained in the 911 call audio and transcript are adopted by, and incorporated into, paragraph 6 of [Mr.] Lemay's affidavit" and "[t]his is all that is required for summary judgment purposes."  PRDRPSAMF ¶ 96 (citing FED. R. CIV.

PRDRPSAMF ¶ 96. The 911 operator informed Mr. Lemay that the police "ha[d] got a deputy started that way."[8] PSAMF ¶ 97; DRPSAMF ¶ 97.

Deputy Horning was on duty as a patrol deputy for the York County Sheriff's Office on the evening of March 8 and the early morning hours of March 9. DSMF ¶ 1; PRDSMF ¶ 1. Deputy Horning's patrol area that evening included the municipalities of Acton and Shapleigh, Maine, and she was the only patrol deputy assigned to that specific patrol area at that time.[9] DSMF ¶¶ 2-3, 72; PRDSMF ¶ 2-3, 72.

At approximately 10:31 p.m. on March 8, Deputy Horning received a report from the Sanford Regional Communications Center (SRCC) that an unidentified caller complained of cars peeling out their tires, yelling, and threats being made on

P. 56(c)(4)). He further argues that "even without his affidavit, [Mr.] Lemay's statements to the 911 call operator are admissible as present sense impressions and excited utterances. PRDRPSAMF ¶ 96.

The facts in Mr. Lemay's statement are admissible on a number of bases. First, the facts are within Mr. Lemay's own personal knowledge and he would be able to testify to them at trial. Second, his statements might be admissible as present sense impressions or excited utterances; however, as this is not a trial, the record is not sufficiently developed to make a final ruling on those exceptions. Viewing the evidence in the light most favorable to Mr. Charron, the Court concludes that for purposes of this record, the statements are admissible for their truth under both hearsay exceptions. *See* FED. R. EVID. 803(1), 803(2). Third, to the extent the County Defendants are challenging Mr. Lemay's credibility (and it is not clear that they are, hence it is not clear why they are objecting), the statements are admissible to rebut an implied charge of recent fabrication. *See* FED. R. EVID. 801(d)(1)(B)(i). The Court overrules the County Defendants' evidentiary objection to the statements Mr. Lemay made to the dispatcher. *See Aff. of Lemay* ¶ 6.

[8] The County Defendants qualify Mr. Charron's additional paragraph ninety-seven, asserting that it offers out of court statements for the truth of the matter asserted and the Court should strike or disregard it as inadmissible hearsay. DRPSAMF ¶ 97. Mr. Charron responds that the 911 operator's statement "is admissible as a present sense impression and as a statement of the dispatcher's then existing state of mind, plan, or intent," in accordance with Federal Rule of Evidence 803(1) and (3). PRDRPSAMF ¶ 97. The Court overrules the County Defendants' objection because it does not admit the statement for its truth but only to provide context for what happened next, namely that law enforcement proceeded to Langley Shores Drive.

[9] Mr. Charron qualifies paragraph three of the County Defendants' statement of material facts by pointing out that the four deputies "all met at the scene and went together to arrest Mr. Charron." PRDSMF ¶ 3. Although Mr. Charron is correct that all four deputies met at the scene of Mr. Charron's plow truck, *JSR*, Attach. 6, *Dep. of Steven Thistlewood* at 12:23-13:1 (*Dep. of Thistlewood*), this fact does not negate the fact that Deputy Horning was the only deputy assigned to the specific patrol area containing Acton and Shapleigh. The Court declines to qualify the paragraph but added the word "specific" for clarity.

Langley Shores Drive in Acton.[10]   DSMF ¶ 5; PRDSMF ¶ 5.   Deputy Horning and Deputy Cyr, who was also on duty as a patrol deputy, responded to this dispatch call at 10:32 p.m. and 10:33 p.m., respectively.  DSMF ¶ 71; PRDSMF ¶ 71; PSAMF ¶ 98; DRPSAMF ¶ 98.  Deputy Cyr provided backup to Deputy Horning with regard to this dispatch call.  DSMF ¶ 73; PRDSMF ¶ 73.

## B.     The Langley Shores Drive Collision and Aftermath

Before Deputies Horning and Cyr arrived, the dark vehicle which Mr. Lemay observed turned left out of Mr. Charron's driveway and sped up Langley Shores Drive toward Buzzell Road.  PSAMF ¶ 99; DRPSAMF ¶ 99.  Mr. Charron tried to follow the vehicle to see who was in it, where it went, and whether its occupants were terrorizing anyone else, but the vehicle was out of sight.  PSAMF ¶ 100; DRPSAMF ¶ 100.  When Mr. Charron got to where Langley Shores Drive starts, at its intersection with Buzzell Road, he turned around to return to his residence.  PSAMF ¶ 100; DRPSAMF ¶ 100.  As he was driving down Langley Shores Drive back to his residence, Mr. Charron noticed the same vehicle coming at a high rate of speed behind him.  PSAMF ¶ 101; DRPSAMF ¶ 101.  He pulled over to get out of the way, but the vehicle rear-ended

---

[10]     Mr. Charron qualifies the County Defendants' paragraph five by stating that "[t]he call about peeling tires on Langley Shore[s] Drive came at 10:31 PM."  PRDSMF ¶ 5.  The Court reviewed the cited portions of the record and finds that the dispatch log for this call aligns with Mr. Charron's response.  *See Pl.'s Suppl. Summ J. R. Items*, Attach. 4, *Aff. of Gregory McCullough* at 11 (ECF No. 74) (*Aff. of McCullough*).  The Court altered the paragraph accordingly.

Mr. Charron's further qualification of this statement is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 5, and the Court disregards it as violative of District of Maine Local Rule 56(c).  *See Michaud*, 2017 WL 902133, at *1 n.1 (noting that "qualifications" that exceed the scope of the original statement are appropriately presented as additional facts rather than qualifications).

him in front of the home of Mr. Charron's neighbor, John LeBlanc, the first house on the right on Langley Shores Drive.  PSAMF ¶ 101; DRPSAMF ¶ 101.

The hood of the vehicle, which Mr. Charron identified as the Pontiac Sunfire occupied by Eric Pilvelait and Christopher Moss, slid under the rear bumper of Mr. Charron's truck; the Sunfire's broken windshield was consistent with Mr. Charron's memory of the accident and with the Sunfire's front end striking his truck's rear bumper.[11]  PSAMF ¶ 102; DRPSAMF ¶ 102; PRDRPSAMF ¶ 102.  Mr. Charron tried

---

[11]     The County Defendants deny Mr. Charron's additional paragraph one hundred and two and request that the Court strike or disregard it because Mr. Charron "testified at his deposition that he never got out of his vehicle while the two vehicles were connected and he did not observe how the vehicles were connected."  DRPSAMF ¶ 102 (citing *Tropigas De P.R. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011)).  They add that Mr. Charron "is not permitted to undermine his clear deposition testimony with contradictory information in an affidavit submitted in support of an opposition to summary judgment."  DRPSAMF ¶ 102 (citing *Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994)).  Mr. Charron responds that his deposition testimony is consistent with his affidavit for various reasons.  PRDRPSAMF ¶ 102.

The County Defendants' objection is frivolous.  The driver of a pickup that is rear-ended by a compact car with a low hood like a Pontiac Sunfire in the way Mr. Charron describes, sliding under the rear of the pickup and getting stuck under the bumper of the pickup so that the pickup cannot disengage from the motor vehicle without rocking back and forth, does not have to get out and inspect the scene to know what happened.  Although Mr. Charron might not have personal knowledge that the windshield of the Sunfire was broken by the accident, he may testify that the broken windshield on the Sunfire is consistent with his personal knowledge of the accident.  The Court slightly amended Mr. Charron's additional paragraph one hundred and two to respond to the County Defendants' objection.

It is true that "[w]hen an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed."  *Colantuoni*, 44 F.3d at 4-5.  However, the Court agrees with Mr. Charron and does not regard the discrepancy here as contradictory.  In his deposition testimony, Mr. Charron said that he "never got out" of his truck directly after the collision, but he does not give a clear answer to whether he saw "how the two cars were connected," *JSR*, Attach. 1, *Dep. of John Charron* at 60:1-3 (*Dep. of Charron*), and other statements in his deposition suggest that he could see how the cars were connected through his back window.  *Id.* at 59:8-10, 23-25 (showing that Mr. Charron stated that he "do[es] have a window and [he] turned around and looked" and that he didn't "want to drag [the Sunfire] all the way down the road hooked onto [his] bumper").

It is also true that "the court 'afford[s] no evidentiary weight to conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative.'  *Tropigas de P.R.*, 637 F.3d at 56.  However, the Court finds enough evidence to support the fact that Mr. Charron could see how the two vehicles were connected and the impact the collision had on the Sunfire.  *See Dep. of Charron* at 59:8-10, 23-25.  On a motion for summary judgment, taking all reasonable inferences in favor of the non-movant, it is clear that the affidavit controls.  *See Gillen*,

to leave but his truck was stuck to the Sunfire. PSAMF ¶ 103; DRPSAMF ¶ 103. He had to rock his truck back and forth, in forward and reverse, to get free. PSAMF ¶ 103; DRPSAMF ¶ 103. While Mr. Charron was doing this, Christopher Moss exited the passenger side of the Sunfire and tried to attack him, but Mr. Charron got loose and drove away before Christopher Moss could reach him.[12] PSAMF ¶ 104; DRPSAMF ¶ 104; PRDRPSAMF ¶ 104. Mr. Charron could see that Mr. Pilvelait was the driver of the Sunfire. PSAMF ¶ 104; DRPSAMF ¶ 104.

Mr. Charron drove back to his residence and turned right into his driveway. PSAMF ¶ 105; DRPSAMF ¶ 105. As he was exiting his truck, he heard the Sunfire race past his driveway down to the end of Langley Shores Drive, where he could hear it peeling out and see its headlights through the trees. PSAMF ¶ 105; DRPSAMF

---

283 F.3d at 26 (noting that "[a] subsequent affidavit that merely explains, or amplifies upon, opaque testimony given in a previous deposition is entitled to consideration in opposition to a motion for summary judgment").

[12]     The County Defendants qualify the portion of Mr. Charron's additional paragraph one hundred and four that states that Christopher Moss "tried to attack" Mr. Charron, PSAMF ¶ 104, and request that the court strike or disregard it as speculation because Mr. Charron "has no personal knowledge as to what [Christopher] Moss may have intended in exiting the vehicle" and he testified at his deposition that "he saw Christopher Moss get out of the other vehicle while the two vehicles were connected but he did not suggest that [Christopher] Moss tried to attack him at that time." DRPSAMF ¶ 104 (citing *Tropigas de P.R.*, 637 F.3d at 56). They add that Mr. Charron "is not permitted to undermine his clear deposition testimony with contradictory information in an affidavit submitted in support of an opposition to summary judgment." DRPSAMF ¶ 104 (citing *Colantuoni*, 44 F.3d at 4-5). Mr. Charron responds that his deposition testimony is "consistent with [his] affidavit testimony" for various reasons, including that "[o]pposing counsel never asked [Mr.] Charron to explain why he testified that [Christopher] Moss 'jumped out' of the Sunfire or how [Christopher] Moss appeared when he did so." PRDRPSAMF ¶ 104.

The Court is not impressed with the County Defendants' first objection, that Mr. Charron may not testify that Christopher Moss was trying to attack him because he does not know what was in Christopher Moss' mind at the time. A person knows of his own personal knowledge whether someone else is trying to attack him. That he may not know his attacker's motive does not mean the victim may not testify to the attempted assault.

The Court further agrees with Mr. Charron that, taking all reasonable inferences in favor of the non-movant, the affidavit elaborates on but does not contradict the deposition testimony and Mr. Charron could reasonably infer that Christopher Moss was trying to attack him. *See Pl.'s Suppl. Summ. J. R. Items*, Attach. 3, *Aff. of John Charron* ¶ 11 (ECF No. 74) (*Aff. of Charron*). The affidavit controls here and the Court rejects the qualification.

¶ 105.  Mr. Charron next noticed that the lights were not moving, and he could hear the engine racing.  PSAMF ¶ 106; DRPSAMF ¶ 106.  He could tell that the Sunfire was not moving and was apparently stuck in the snow.  PSAMF ¶ 106; DRPSAMF ¶ 106.

Mr. Charron got back into his truck and went down the hill to the end of Langley Shores Drive to get a better look.[13]  PSAMF ¶ 107; DRPSAMF ¶ 107; PRDRPSAMF ¶ 107.  He could see that the Sunfire was stuck in the snowbank, as it appears in the digital photos later taken by Deputy Horning.  PSAMF ¶ 107; DRPSAMF ¶ 107.  He then put his truck in reverse and backed up the hill to return to his residence.  PSAMF ¶ 108; DRPSAMF ¶ 108.  As he was doing so, he saw Christopher Moss exit the Sunfire and start chasing him.  PSAMF ¶ 108; DRPSAMF ¶ 108.  While Christopher Moss continued to chase him, Mr. Charron drove into his driveway, exited his truck, ran into his residence, and locked the door.  PSAMF ¶ 109; DRPSAMF ¶ 109.  Christopher Moss banged on the door and yelled, "Come out you fucking pussy!"  PSAMF ¶ 109; DRPSAMF ¶ 109.  Mr. Charron watched through his window as Christopher Moss went to his truck and broke its passenger side window.

---

[13]     The County Defendants qualify Mr. Charron's additional paragraph one hundred and seven by arguing that "[t]he cited record evidence does not specify what photos [Mr. Charron] is referring to; therefore, the assertion in this paragraph concerning Deputy Horning's photos should be disregarded as not properly supported by record references."  DRPSAMF ¶ 107 (citing D. ME. LOC. R. 56(f)).  Mr. Charron responds that there is no issue as to which photos this paragraphs refers to because "[t]he only digital photos that show the Sunfire at the end of Langley Shore[s] Drive are the digital photos that Deputy Horning admittedly took, which show the Sunfire 'half in the snowbank and half in the road,' and which are attached to [Deputy] Horning's affidavit as exhibits 5-12."  PRDRPSAMF ¶ 107 (internal citations omitted).  The Court rejects the qualification because the assertion in Mr. Charron's affidavit that the digital pictures Deputy Horning took show the Sunfire stuck in the snowbank, *Aff. of Charron* ¶ 14, is sufficiently specific.  Moreover, the Court did not need to search for the pictures because the County Defendants themselves cited them.  *See* DSMF ¶¶ 37-38.

PSAMF ¶ 110; DRPSAMF ¶ 110. Mr. Lemay later stated that he heard the sound of glass breaking from where Mr. Charron's truck was parked. PSAMF ¶ 111; DRPSAMF ¶ 111.

Christopher Moss' father, Walter Moss, showed up on the road in front of Mr. Charron's house, as Mr. Charron had called him to complain about what Christopher Moss and Mr. Pilvelait were doing. PSAMF ¶ 112; DRPSAMF ¶ 112. Mr. Lemay later said he heard what he thought was Walter Moss yelling to his son to stop and get into the car because Christopher Moss was "drunk."[14] PSAMF ¶ 113; DRPSAMF ¶ 113. Christopher Moss got into his father's car and they drove off. PSAMF ¶ 114;

---

[14] The County Defendants deny Mr. Charron's additional paragraph one hundred and thirteen, arguing that the record evidence does not identify either party speaking or what was said, the reference to being drunk is an unsupported speculation that should be stricken or disregarded, and any reference to hearing someone say someone else was drunk "should be stricken or disregarded as inadmissible hearsay." DRPSAMF ¶ 113. Mr. Charron responds that there is "at least a reasonable inference" that the voices Mr. Lemay heard were of Walter and Christopher Moss, the command portion of Walter Moss' statement is not a hearsay statement but rather an imperative statement pursuant to Federal Rule of Evidence 801(a), and the "drunk" portion of the statement is Walter Moss' present sense impression pursuant to Federal Rule of Evidence 803(1) and thus admissible as an exception to hearsay. PRDRPSAMF ¶ 113 (citing *United States v. Marshall*, 173 F.3d 1312, 1315 (11th Cir. 1999); *Sineni v. Cumberland Cty. Sheriff's Office*, No. 2:16-cv-00520-JAW, 2018 WL 2122911, at *5 (D. Me. May 8, 2018)).

The Court reviewed the record evidence and finds that, viewing the evidence in the light most favorable to Mr. Charron, there is a reasonable inference that what Mr. Lemay heard was Walter Moss speaking to Christopher Moss. *See Aff. of Lemay* ¶ 10. The Court also agrees with Mr. Charron that Walter Moss' command is nonhearsay because it is an imperative statement, *see Sineni*, 2018 WL 2122911, at *5, although the Court has removed the quotation marks because the record evidence does not support specific words used. An imperative statement cannot be true or false. *See Baines v. Walgreen Co.*, 863 F.3d 656, 662 (7th Cir. 2017) ("In other words, [hearsay] statements assert propositions that may be true or false. They are distinct from other forms of communication, such as questions or commands"); *United States v. Rodriguez-Lopez*, 565 F.3d 312, 314 (6th Cir. 2009) ("[I]f the statements were questions or commands, they could not . . . be offered for their truth because they would not be assertive speech at all. They would not assert a proposition that could be true or false"); *see also United States v. Murphy*, 193 F.3d 1, 5 (1st Cir. 1999) (pointing out that instructions are nonhearsay, because they are not assertions).

Finally, the Court finds the "drunk" statement admissible not to prove Christopher Moss was drunk but to show that Walter Moss thought he was. Furthermore, as other evidence in the record, including from Christopher Moss' mother, confirms that Christopher Moss had been drinking, the Court is confused why the County Defendants have found it necessary to object to a fact that does not appear to be in dispute. In any event, the Court rejects the County Defendants' denial but altered the quotation marks as described.

DRPSAMF ¶ 114. It was quiet for the next twenty minutes, and Mr. Lemay went to sleep. PSAMF ¶ 115; DRPSAMF ¶ 115.

### C. 911 Call from Denise Moss and Visit to 250 Buzzell Road

At approximately 10:52 p.m., while Deputies Horning and Cyr were responding to the first 911 call, Deputy Horning received a report from the SRCC that a female caller, Denise Moss, wanted her son, Christopher Moss, removed from her home at 250 Buzzell Road in Acton.[15] DSMF ¶ 4; PRDSMF ¶ 4; PSAMF ¶ 124; DRPSAMF ¶ 124. This call diverted Deputy Horning, who proceeded to 250 Buzzell Road and spoke with Christopher Moss.[16] DSMF ¶ 6; PRDSMF ¶ 6; PSAMF ¶ 124; DRPSAMF ¶ 124; PRDRPSAMF ¶ 124. The call also diverted Deputy Cyr, who responded to the dispatch call at 250 Buzzell Road and provided backup to Deputy Horning.[17] DSMF ¶ 71; PRDSMF ¶ 71; PSAMF ¶ 124; DRPSAMF ¶ 124; PRDRPSAMF ¶ 124. According to the dispatch records, Deputies Horning and Cyr were cleared from the

---

[15] Mr. Charron's qualification of the County Defendants' paragraph four is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 4, and the Court rejects it. *See supra* note 10.

[16] The County Defendants qualify the portion of Mr. Charron's additional paragraph one hundred and twenty-four that states that Deputy Horning and Deputy Cyr were "diverted." DRPSAMF ¶ 124. Mr. Charron responds that his citations of his additional paragraphs sixty-seven and seventy-one provide the requisite record evidence. PRDRPSAMF ¶ 124. The Court reviewed the cited portions of the record referred to by Mr. Charron, agrees with Mr. Charron, and rejects the qualification.

[17] Mr. Charron qualifies the County Defendants' paragraph seventy-one by stating that "Deputy Cyr first responded with Deputy Horning to the 911 call about a disturbance on Langley Shore[s] Drive at 10:31 PM" and that "[h]e and Deputy Horning were then diverted to 250 Buzzell Road about 20 minutes later as directed by Sergeant Thistlewood." PRDSMF ¶ 71. This information does not conflict with the County Defendants' paragraph seventy-one; both parties agree that Deputy Cyr responded to the dispatch call at 250 Buzzell Road. Moreover, Mr. Charron's additional paragraph ninety-eight, which the County Defendants admit, addresses Deputy Cyr's response to the dispatch call at Langley Shores Drive. The Court rejects this qualification.

first call at the same time that they were dispatched in response to the second call.[18] PSAMF ¶ 125; DRPSAMF ¶ 125; PRDRPSAMF ¶ 125.

At some point after Deputy Horning arrived at 250 Buzzell Road, Christopher Moss told Deputy Horning

1.      he and a friend, Mr. Pilvelait, were at Mr. Pilvelait's house on Langley Shores Drive when Mr. Pilvelait's neighbor, Mr. Charron, came to the house in Mr. Charron's plow truck,[19]  DSMF ¶ 7; PRDSMF ¶ 7;

2.      a long-standing feud existed between Mr. Pilvelait and Mr. Charron over the sale of a vehicle and the theft of some tires, DSMF ¶ 8; PRDSMF ¶ 8;

3.      when Mr. Charron arrived in his plow truck at the end of Mr. Pilvelait's driveway, he started peeling his tires and yelling threats,[20] DSMF ¶ 9; PRDSMF ¶ 9;

---

[18]      The County Defendants qualify Mr. Charron's additional paragraph one hundred and twenty-five as speculation and ask the Court to strike or disregard it.  DRPSAMF ¶ 125.  Mr. Charron responds that the County Defendants are ignoring the foundational evidence for the dispatch log it cited.  PRDRPSAMF ¶ 125 (citing PRDSMF ¶ 5).  The Court reviewed the cited portions of the record, agrees with Mr. Charron, and rejects the qualification.

[19]      Mr. Charron's qualification of the County Defendants' paragraph seven is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 7, and the Court rejects it.  *See supra* note 10.

[20]      Paragraph one hundred and thirty-five of Mr. Charron's statement of additional material facts states, "Christopher Moss'[] allegation that Mr. Charron was 'peeling his tires at the end of [Mr. Pilvelait's] driveway' was also contradicted by the person who called 911 on March 8 . . . at 10:31 PM, as this person referred to Mr. Charron's residence ('the second house on the right') as the location where the 'tires burning out, spinning out,' was occurring."  PSAMF ¶ 135 (citing PSAMF ¶¶ 94-96).  The County Defendants deny this paragraph because it is argument and there is no conflict between the two statements.  DRPSAMF ¶ 135.  Mr. Charron responds that, at a minimum, a jury could find that the two reported locations of peeling tires were contradictory.  PRDRPSAMF ¶ 135.  The Court agrees with the County Defendants and does not see any contradiction between the two accounts of peeling tires at different locations by different people.  The Court struck the paragraph.

4.      Christopher Moss and Mr. Pilvelait then got in Mr. Pilvelait's car and drove down to Mr. Charron's driveway, at which point Mr. Charron came at them with his plow tilted and in the air,[21] DSMF ¶ 10; PRDSMF ¶ 10;

5.      Mr. Charron's plow truck struck Mr. Pilvelait's car and the plow scraped over the hood of the car,[22] DSMF ¶ 11; PRDSMF ¶ 11;

---

[21]    Mr. Charron denies the County Defendants' paragraph ten because, according to Mr. Charron, Christopher Moss told Deputy Horning that he and Mr. Pilvelait were at the end of Mr. Pilvelait's driveway, not Mr. Charron's driveway, when Mr. Charron came at them. PRDSMF ¶ 10. The Court reviewed the cited portions of the record, as well as evidence surrounding the cited portions, and disagrees with Mr. Charron that the evidence presents an inconsistency as to where the collision took place. *See JSR*, Attach. 2, *Dep. of Rachel A. Horning* at 8:20-12:16 (*Dep. of Horning*). Deputy Horning's arrest report may not provide clarity on this point, but her deposition testimony is clear and not, on its face, inconsistent with her report. Even viewed in the light most favorable to Mr. Charron, the evidence establishes that Christopher Moss told Deputy Horning that the collision occurred at the end of Mr. Charron's driveway. Accordingly, the Court rejects Mr. Charron's denial.
        Paragraph one hundred and thirty-seven of Mr. Charron's statement of additional material facts alleges that Christopher Moss's description "implied that the Sunfire was parked in Mr. Pilvelait's driveway when 'he and [Mr. Pilvelait] got into [Mr. Pilvelait]'s car and were at the end of the driveway' when Mr. Charron "came at them with his plow tilted and in the air." PSAMF ¶ 137. It adds that "[t]his description further implied that the rear of the Sunfire was facing the street, as people normally park front first in their driveways as opposed to backing in." PSAMF ¶ 137. The County Defendants deny this paragraph, asserting that it contains arguments rather than facts and is speculation, and ask the Court to strike or disregard it pursuant to Local Rule 56(e). DRPSAMF ¶ 137. Mr. Charron responds by referring to previous arguments and by stating that it is not argument to point out something that is fact. PRDRPSAMF ¶ 137. Applying the same logic as above, the Court disagrees with Mr. Charron regarding the implications of the phrase "the driveway." The Court further agrees that the inference that the description implied the Sunfire was facing the street does not have record support. The Court struck this paragraph.
[22]    Mr. Charron's qualification of the County Defendants' paragraph eleven is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 11, and the Court rejects it. *See supra* note 10.
        Paragraph one hundred and thirty-eight of Mr. Charron's statement of additional material facts states, "Christopher Moss's description, as reported by Deputy Horning, that Mr. Charron 'struck [Mr. Pilvelait]'s car with his plow truck and the plow scraped over the hood' of the Sunfire is not plausible if the Sunfire was parked front first in [Mr. Pilvelait]'s driveway," and "could have occurred only if the Sunfire was parked rear first (with its front facing the street) as would be the case if the Sunfire had backed into [Mr. Pilvelait]'s driveway to park." PSAMF ¶ 138. The County Defendants deny this paragraph, asserting that it contains arguments rather than facts and is speculation, and ask the Court to strike or disregard is pursuant to Local Rule 56(e). DRPSAMF ¶ 138. Mr. Charron responds by referring to previous arguments and stating that it is not argument to point out something that is "inherently implausible." PRDRPSAMF ¶ 138. The Court concludes that this paragraph is argument and, pursuant to Local Rule 56(e), struck it.

6.      the air bags of Mr. Pilvelait's car deployed and Christopher Moss sustained a blow to his head that caused a bump, a laceration, and bruising, DSMF ¶ 12; PRDSMF ¶ 12;

7.      Mr. Charron proceeded to use his plow truck to push the car containing Christopher Moss and Mr. Pilvelait down Langley Shores Drive and then off the road into the snowbank where the Sunfire was found,[23] DSMF ¶ 13; PRDSMF ¶ 13; PSAMF ¶ 140; DRPSAMF ¶ 140; PRDRPSAMF ¶ 140;

8.      as a result of these events, Christopher Moss was in fear for his life,[24] DSMF ¶ 14; PRDSMF ¶ 14;

---

[23]     Mr. Charron's qualification of the County Defendants' paragraph thirteen is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 13, and the Court rejects it.  *See supra* note 10.

The County Defendants qualify Mr. Charron's additional paragraph one hundred and forty, asserting that Deputy Horning's testimony states the Sunfire was pushed off the road but does not refer to the snowbank.  DRPSAMF ¶ 140.  Mr. Charron responds that the assertion has full support because Deputy Horning was responding in the affirmative to a question about whether she was told the Sunfire was pushed by the plow truck into the snowbank.  PRDRPSAMF ¶ 140.  The Court reviewed the cited portions of the record and, viewing the facts in the light most favorable to Mr. Charron, agrees with Mr. Charron.  Thus, the Court rejects the County Defendants' qualification.

Paragraph one hundred and thirty-nine of Mr. Charron's statement of additional material facts states that "[i]f Mr. Charron had struck the Sunfire as alleged, it is not plausible that he could have 'continued to push [Mr. Pilvelait]'s car with the two of them inside down to the end' of Langley Shore[s] Drive," and that "[i]nstead, the Sunfire would have been pushed into the driveway."  PSAMF ¶ 139.  It adds that "it would not be possible to push the Sunfire rear-first from the end of [Mr.] Pilvelait's driveway to the end of Langley Shore[s] Drive because the roadway contains several curves, and the rear tires would have caused the Sunfire to travel in a straight line."  PSAMF ¶ 139.  As above, the County Defendants deny this paragraph, asserting that it contains arguments rather than facts and is speculation, and asks the Court to strike or disregard it pursuant to Local Rule 56(e).  DRPSAMF ¶ 139.  Mr. Charron responds by referring to his response to the County Defendants' paragraph one hundred and thirty-eight and stating that "[t]hese are facts a jury is entitled to find."  PRDRPSAMF ¶ 139.  For the same reasons as above, the Court struck Mr. Charron's additional paragraph one hundred and thirty-nine.

[24]     Mr. Charron's qualification of the County Defendants' paragraph fourteen is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 14, and the Court rejects it.  *See supra* note 10.

9.      when the vehicles got to the end of Langley Shores Drive, Mr. Charron yelled to Christopher Moss and Mr. Pilvelait that "you guys are fucking dead," DSMF ¶ 15; PRDSMF ¶ 15;

10.      at that point, Mr. Charron drove his plow truck back to his house, DSMF ¶ 16; PRDSMF ¶ 16;

11.      Mr. Charron's plow truck was a dark-colored, older-model GMC, DSMF ¶ 17; PRDSMF ¶ 17; and

12.      Christopher Moss believed Mr. Charron was capable of killing him and Mr. Pilvelait and he was in fear for his life.[25]  DSMF ¶ 18; PRDSMF ¶ 18.

Deputy Horning took photographs of Christopher Moss' alleged injuries, and true and accurate copies of the photographs are attached to Deputy Horning's affidavit as Exhibits One and Two.[26]  DSMF ¶¶ 19, 20; PRDSMF ¶¶ 19, 20.  Mr. Charron was not present for Deputy Horning's conversation with Christopher Moss. DSMF ¶ 23; PRDSMF ¶ 23.

Also on the evening of March 8, Deputy Horning spoke with Christopher Moss' father, Walter Moss.  DSMF ¶ 24; PRDSMF ¶ 24.  Walter Moss told Deputy Horning

---

[25]      Mr. Charron's qualification of the County Defendants' paragraph eighteen is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 18, and the Court rejects it.  *See supra* note 10.

[26]      Mr. Charron qualifies the County Defendants' paragraph nineteen by arguing that the upload times of the photographs indicate that they were not taken on March 8.  PRDSMF ¶ 19.  The Court reviewed the cited portions of the record and finds this argument speculative rather than based on the record.  Accordingly, the Court rejects this qualification.  Mr. Charron's further qualifications of the County Defendants' paragraph nineteen are argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 19, and the Court rejects them.  *See supra* note 10.

Mr. Charron qualifies the County Defendants' paragraph twenty for the same reasons he qualifies the County Defendants' paragraph nineteen.  PRDSMF ¶ 20.  Accordingly, the Court rejects these qualifications.

that Mr. Charron had called him that evening and told him that Mr. Pilvelait and Christopher Moss were laying rubber strips in Mr. Charron's driveway and that someone was going to get hurt.[27] DSMF ¶ 25; PRDSMF ¶ 25. He told Deputy Horning that Mr. Charron had called him again later that evening and that Mr. Charron stated that he had a plow truck and that he was going to take Mr. Pilvelait and Christopher Moss into the ditch.[28] DSMF ¶ 26; PRDSMF ¶ 26. He further told Deputy Horning that after his second discussion with Mr. Charron he went to get Mr. Pilvelait and Christopher Moss, but that when he arrived Mr. Pilvelait's vehicle had already been pushed down the road.[29] DSMF ¶ 27; PRDSMF ¶ 27. Mr. Charron was not present for Deputy Horning's conversation with Walter Moss. DSMF ¶ 30; PRDSMF ¶ 30.

Christopher Moss did not end up getting removed from the house at 250 Buzzell Road because his mother was fine with him by the time Deputy Horning and Deputy Cyr arrived. *Dep. of Horning* at 8:03-12. Deputy Horning later said that she "could understand why [Christopher Moss'] mother would want him removed from

---

[27] Paragraph one hundred and thirty-four of Mr. Charron's statement of additional material facts states that this statement by Walter Moss (and a similar one about laying rubber strips in his written statement) contradict Christopher Moss' oral allegation that Mr. Charron was "peeling his tires at the end of [Mr. Pilvelait's] driveway." PSAMF ¶ 134. The County Defendants deny this paragraph because it is argument and there is no conflict between the two statements. DRPSAMF ¶ 134. Mr. Charron responds that, at a minimum, a jury could find that they are contrary reports. PRDRPSAMF ¶ 134. The Court agrees with the County Defendants and does not see any contradiction between Mr. Charron peeling his tires in Mr. Pilvelait's driveway and Christopher Moss and Mr. Pilvelait laying rubber strips in Mr. Charron's driveway. The Court rejects the County Defendants' denial.

[28] Mr. Charron's qualifications of the County Defendants' paragraph twenty-six are argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 26, and the Court rejects them. *See supra* note 10.

[29] Mr. Charron's qualifications of the County Defendants' paragraph twenty-seven are argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 27, and the Court rejects them. *See supra* note 10.

the house because he was so worked up, and she was like, I don't want to deal with him like this at this level."[30]  PSAMF ¶ 126; DRPSAMF ¶ 126; PRDRPSAMF ¶ 126. According to her report, when Deputy Horning spoke with Christopher Moss, she "could see and smell that he had been drinking."[31]  PSAMF ¶ 133; DRPSAMF ¶ 133. Also, concerning where Christopher Moss told her the collision took place, Deputy Horning later said that it was "irrelevant" which driveway was involved.[32]  PSAMF ¶ 136; DRPSAMF ¶ 136; PRDRPSAMF ¶ 136.

---

[30] The County Defendants qualify Mr. Charron's additional paragraph one hundred and twenty-six by adding context to Deputy Horning's quote from her deposition.  DRPSAMF ¶ 126.  Mr. Charron responds by stating that the complete quote "does not change the gist" of the paragraph.  PRDRPSAMF ¶ 126.  The Court reviewed the cited portions of the record, agrees with Mr. Charron, and rejects the qualification.  The Court adds the sentence prior to this fact to clarify that Denise Moss no longer wanted Christopher Moss removed from the house by the time Deputy Horning and Deputy Cyr arrived.

     Paragraph one hundred and twenty-seven of Mr. Charron's statement of additional material facts asserts that "Christopher Moss garnered sympathy and deflected attention from himself as a trouble maker by alleging that he was a victim."  PSAMF ¶ 127.  The County Defendants deny this paragraph as "entirely argument."  DRPSAMF ¶ 127.  Mr. Charron responds that the statement is a reasonable inference from Deputy Horning's cited deposition testimony.  PRDRPSAMF ¶ 127.  The Court reviewed the cited portions of the record and determines that the paragraph is argument rather than fact.  Deputy Horning does not mention feeling sympathy for Christopher Moss, and the shift of attention and identification of Christopher Moss as a victim is clear from the County Defendants' paragraphs seven through eighteen.  Therefore, the Court struck this paragraph.

[31] Paragraph one hundred and thirty-three of Mr. Charron's statement of additional material facts states that Deputy Horning observed that Christopher Moss had been drinking when she "spoke with Christopher Moss and collected his handwritten statement . . . ."  PSAMF ¶ 133.  Given the ambiguity about when she collected the written statements discussed below, the Court struck the reference to the handwritten statement in this paragraph.

[32] The County Defendants deny Mr. Charron's additional paragraph one hundred and thirty-six by arguing that "Deputy Horning clearly testified as to what she was told by Christopher Moss—that the collision occurred near the end of [Mr.] Charron's driveway" and that "[t]he testimony cited by [Mr. Charron] clearly refers to his counsel's argument that the Deputy did not specify which driveway she was told the collision occurred," meaning that "the lack of specificity in her report," not the driveway involved, was irrelevant.  DRPSAMF ¶ 136.  Mr. Charron responds that, at a minimum, a jury could find that "[i]t is clear from [Deputy] Horning's report that Christopher Moss told her that Mr. Charron was peeling his tires at the end of [Mr.] Pilvelait's driveway, contrary to the location of the peeling tires provided by Christopher [Moss'] father, Walter Moss, and by the 911 caller, Ryan Lemay."  PRDRPSAMF ¶ 136.  The Court reviewed the cited portions of the record and agrees that Deputy Horning used the word "irrelevant" regarding which driveway was involved.  *See Dep. of Horning* at 11:21.  The remainder of this paragraph is not supported by the record, and the Court struck it.

### D. Written Witness Statements

Christopher Moss completed a written witness statement at some point, and a true and accurate copy of it is attached to Deputy Horning's affidavit as Exhibit Three.[33] DSMF ¶¶ 21, 22. Walter Moss also completed a written witness statement for Deputy Horning at some point after she spoke with him, and a true and accurate copy of the witness statement is attached to Deputy Horning's affidavit as Exhibit Four.[34] DSMF ¶¶ 28-29; PRDSMF ¶¶ 28-29.

Deputy Horning's report states that she "collected a witness statement" from Christopher Moss when she met with him.[35] PSAMF ¶ 129; DRPSAMF ¶ 129; PRDRPSAMF ¶ 129. However, the dispatch log and dispatch audio indicate that, after Deputy Horning spoke with Christopher Moss, she and Deputy Cyr went to the end of Langley Shores Drive to inspect the Sunfire and were "out with the vehicle

---

[33]    Paragraph twenty-one of the County Defendants' statement of material facts states that "Christopher Moss completed a witness statement for Deputy Horning after she spoke with him on March 8, 2016." DSMF ¶ 21. Mr. Charron qualifies this paragraph by pointing out, among other things, that "[a]lthough Deputy Horning's report states that she 'collected a witness statement' from Christopher when she met with him, the dispatch audio indicates that she left a witness statement form at his residence minutes before midnight, without waiting for him to complete it, if he was even home at the time, which is not apparent from the audio." PRDSMF ¶ 21. The Court reviewed the cited portions of the record and, drawing all reasonable inferences in favor of the non-movant, finds that the record does not support Christopher Moss completing his witness statement on March 8. The Court altered paragraph twenty-one accordingly.

[34]    Mr. Charron qualifies the County Defendants' paragraph twenty-eight for the same reasons he qualifies the County Defendants' paragraph twenty-one. PRDSMF ¶ 28. The Court altered paragraph twenty-eight in the same manner.

[35]    The County Defendants qualify Mr. Charron's additional paragraph one hundred and twenty-nine by stating that the record evidence "does not specify at what point during the evening Deputy Horning physically received Christopher Moss's written witness statement." DRPSAMF ¶ 129. Mr. Charron responds that the report is in chronological order and there is "at least a reasonable inference, based on [Deputy Horning's] report, that she obtained [Christopher] Moss's handwritten statement when she first met with him." PRDRPSAMF ¶ 129. The Court reviewed the cited portions of the record, agrees with Mr. Charron that the inference that Deputy Horning was referring to the time she first met with him is reasonable, and rejects the qualification.

that ha[d] been struck" at approximately 11:21 p.m.[36]  PSAMF ¶ 130; DRPSAMF ¶ 130; PRDRPSAMF ¶ 130.  The audio indicates that afterwards, Deputy Horning went back to 250 Buzzell Road to drop off a witness statement form, whereupon she returned quickly to the end of Langley Shores Drive.  PSAMF ¶ 130; DRPSAMF ¶ 130.  At this time, 11:35 p.m., a fellow deputy, apparently Deputy Cyr, informed Deputy Horning, "I'm gonna stick around down here while you go collect that statement.  There's a gentleman . . . operating a snowmobile. . . . I don't know if he's coming back to the car . . .."  PSAMF ¶ 131 (alterations in original); DRPSAMF ¶ 131. Five minutes later, the same deputy said the person was "riding in a suspicious nature" and then "disappeared," and the deputy asked Deputy Horning, "Did your witness [Christopher Moss] say how old he [the suspect] was? Because [our] records show a 20-year-old."[37]  PSAMF ¶ 132 (some alterations in original); DRPSAMF ¶ 132; PRDRPSAMF ¶ 132.

[36]     Paragraph one hundred and thirty of Mr. Charron's statement of additional material facts also states that, after returning to the end of Langley Shores Drive, Deputy Horning "went with [Sergeant] Thistlewood, [Deputy] Mains, and [Deputy] Cyr to arrest Mr. Charron."  PSAMF ¶ 130.  The County Defendants qualify this paragraph by stating that the recordings "reflect that Deputy Horning went to Christopher Moss's residence to collect a statement after she and Deputy Cyr had looked at the vehicle that had been in the accident" and further "reflect[] that she went to '106 Langley Shores' after she collected the statement."  DRPSAMF ¶ 130.  The County Defendants conclude that "[t]he remaining assertions are not supported by the cited record materials and should therefore be disregarded."  DRPSAMF ¶ 130.  Mr. Charron responds that "[t]he record materials cited, together with all reasonable inferences to which [Mr. Charron] is entitled, fully support PSMF ¶ 130."  PRDRPSAMF ¶ 130.  The Court does not see any difference between Mr. Charron's and the County Defendants' accounts of these events besides the last assertion of the paragraph.  The Court reviewed the cited portions of the record, finds that the statement regarding arresting Mr. Charron is not supported by the record citations, and accordingly struck it.

[37]     Paragraph one hundred and thirty-two of Mr. Charron's statement of additional material facts quotes the audio dispatch recording and makes the inference that the "he" referred to in the quote above was Mr. Pilvelait.  PSAMF ¶ 132.  The County Defendants qualify this paragraph by asserting that the deputy was asking Deputy Horning to confirm "the suspect's age," not Mr. Pilvelait's age.  DRPSAMF ¶ 132.  Mr. Charron responds:

> There is at least a reasonable inference that the deputy was referring to [Mr.] Pilvelait,
> who was 20 years old at the time, when he said a person was 'riding in a suspicious

Christopher Moss' first handwritten statement said, "we went down [and Mr. Charron] pushed us against a snow b[]ank with his plow truck—then yelled you guys are fucking dead"; this information differed in part from Christopher Moss' oral statement that, after striking them, Mr. Charron "continued to push [Mr. Pilvelait's] car with the two of them inside down to the end of Langley Shore[s] Drive" and pushed them off the road into a snowbank.[38]  PSAMF ¶¶ 128, 140; DRPSAMF ¶¶ 128, 140; PRDRPSAMF ¶ 128.

Christopher Moss completed a second handwritten witness statement, which is undated and appears to be signed by Christopher Moss but is written in different handwriting.[39]   PSAMF ¶ 147; DRPSAMF ¶ 147; PRDRPSAMF ¶ 147.   Deputy

---

manner,' as this was 'the suspect's age,' to use the [County Defendants'] own words in their reply statement.  PRDRPSAMF ¶ 132.
    The Court reviewed the audio recording and finds that, although the facts must be viewed in the light most favorable to the non-moving party, there is no reasonable inference that the deputy was referring to Mr. Pilvelait, given that Deputy Horning had previously said that Christopher Moss said the person on the snowmobile was Mr. Charron and Deputy Horning responded to the question by saying that she believes he (meaning Mr. Charron) is in his fifties.  *JSR Ex. 38* at 25:40-26:45.  Thus, the Court altered the paragraph to reflect that the "he" the deputy was asking about was the suspect, not Mr. Pilvelait.

[38]    Paragraph one hundred and twenty-eight of Mr. Charron's statement of additional material facts also states that Christopher Moss' handwritten statement contradicted his oral account of the events to Deputy Horning because of the location of the cars after the collision and the amount of pushing alleged, and it adds that by "went down" Christopher Moss meant to the end of Langley Shores Drive.  The County Defendants deny this paragraph, calling it argument rather than fact and stating that Mr. Charron adds information not contained in the record quotes, particularly concerning the driveway discussion.  DRPSAMF ¶ 128.  Mr. Charron responds that the contradiction between the two accounts is clear and "it is not 'argument' to point this out with reference to the actual words used."  PRDRPSAMF ¶ 128.  The Court agrees with the County Defendants regarding the references to the driveway discussion, *see supra* note 21, and struck this portion of the paragraph.  Regarding the pushing facts, the Court agrees with Mr. Charron and rejects the denial.  The Court reworked the structure of the paragraph to account for these findings.

[39]    The County Defendants qualify Mr. Charron's additional paragraph one hundred and forty-seven, asserting that it contains speculative arguments and should be stricken or disregarded.  DRPSAMF ¶ 147.  Mr. Charron responds that "[i]t is clear" the second handwritten statement contradicts Christopher Moss' earlier statements and that the handwriting is different, or at least there is a reasonable inference that this is the case.  PRDRPSAMF ¶ 147.  The Court reviewed the cited portions of the record and agrees with Mr. Charron regarding the handwriting inference.  The

Horning's name appears to be in the same handwriting as her name on the first handwritten witness statement, implying that she wrote her name on the statement at some point.[40]   PSAMF ¶ 148; DRPSAMF ¶ 148; PRDRPSAMF ¶ 148.   The York County District Attorney's Office supplied Mr. Charron's attorney with Christopher Moss' and Mr. Pilvelait's second witness statements on April 12.[41]   PSAMF ¶ 149; DRPSAMF ¶ 149; PRDRPSAMF ¶ 149.

According to Mr. Pilvelait's second witness statement, Mr. Charron "had driven by yelling," then Mr. Pilvelait and Christopher Moss "drove down to his house," then Mr. Charron "proceeded to push" them "down the hill," then they "went to his driveway" and "yelled," then "[h]e didn't come out," and then they left.   PSAMF ¶ 150; DRPSAMF ¶ 150.   In Christopher Moss' second handwritten witness statement, he alleges, consistent with Mr. Pilvelait's second witness statement, that Mr. Charron

---

Court agrees with the County Defendants regarding the portion of additional paragraph one hundred and forty-seven stating that Christopher Moss' statements were contradictory because Mr. Charron did not point to any specific contradictions and the Court did not find any.   The Court struck this portion of the paragraph.

[40]     The County Defendants qualify Mr. Charron's additional paragraph one hundred and forty-eight, asserting that it contains speculative arguments and should be stricken or disregarded. DRPSAMF ¶ 148.   Mr. Charron responds that there is a reasonable inference that Deputy Horning's name is written in the same handwriting on each statement and that this inference leads to the further inference that Deputy Horning collected the second written statement from Christopher Moss. PRDRPSAMF ¶ 148.   The Court reviewed the cited portion of the record and agrees with Mr. Charron regarding the first inference but not the second.   The Court rejects the qualification, but the Court modified the paragraph to eliminate the second inference regarding Deputy Horning retrieving the statement.

[41]     Paragraph one hundred and forty-nine of Mr. Charron's statement of additional material facts also states, "Deputy Horning appears to have collected Christopher [Moss'] second handwritten witness statement on or about March 30, 2016, when she collected a second witness statement from [Mr.] Pilvelait, as both witness statements were supplied to the prosecutor at the same time."   PSAMF ¶ 149.   The County Defendants qualify this portion of the paragraph as argument and speculation that should be stricken or disregarded.   DRPSAMF ¶ 149.   Mr. Charron responds that it is a reasonable inference that Deputy Horning collected Christopher Moss' second handwritten witness statement on March 30, when she collected Mr. Pilvelait's second statement.   PRDRPSAMF ¶ 149.   The Court reviewed the cited portions of the record, agrees with the County Defendants, and struck this portion of the paragraph.

"drove by multiple times revving his motor and yelling out his window," then Christopher Moss and Mr. Pilvelait "drove by his house and turned around and on the way back up[]hill he hit [them] and pushed [them] down the hill," and then they "got out" and "walked up to his house," where they "yelled for him to come out . . .." PSAMF ¶ 151; DRPSAMF ¶ 151. This allegation indicates that the Sunfire would have been struck in the front and pushed rear first into the snowbank if the allegation were true, contrary to the orientation of the Sunfire in the snowbank.[42] PSAMF ¶ 152; DRPSAMF ¶ 152; PRDRPSAMF ¶ 152.

### E. Investigation of Eric Pilvelait's Pontiac Sunfire and John Charron's Plow Truck

#### 1. Eric Pilvelait's Pontiac Sunfire

After going to 250 Buzzell Road on the evening of March 8, Deputies Horning and Cyr went to the location of Mr. Pilvelait's vehicle on Langley Shores Drive.[43] DSMF ¶ 31; PRDSMF ¶ 31. The Sunfire was positioned front first in the snowbank. PSAMF ¶ 141; DRPSAMF ¶ 141. If Mr. Charron had struck the front of the Sunfire as alleged and pushed it into the snowbank as alleged, it is likely that the Sunfire would have been pushed rear first into the snowbank, not front-end first, as depicted

---

[42]     The County Defendants qualify Mr. Charron's additional paragraph one hundred and fifty-two, asserting that it contains speculative arguments rather than facts and that the Court should strike or disregard it. DRPSAMF ¶ 152. Mr. Charron responds that pointing out necessary or reasonable inferences is not argument, referring to his reasoning in his response to the County Defendants' objection to his additional paragraph one hundred and forty-one. PRDRPSAMF ¶ 152. The Court reviewed the cited portions of the record, agrees with Mr. Charron that this paragraph is a reasonable inference from Christopher Moss' description of the incident, and rejects the County Defendants' qualified response.

[43]     Mr. Charron's qualification of the County Defendants' paragraph thirty-one is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 31. *See supra* note 10. The court rejects it but added that Deputy Cyr went with Deputy Horning for clarity purposes.

in the post-incident photographs.[44]   PSMF ¶ 141; DRPSMF ¶ 141; PRDRPSAMF

¶ 141.  Deputy Horning observed (1) markings on the ground that appeared to her

consistent with a vehicle that had been struck by a plow truck and pushed into a

snowbank down the street, (2) vehicle parts in the road somewhere on Langley Shores

Drive, likely the same debris observed by Mr. LeBlanc, (3) deployed air bags on both

the driver side and passenger side of Mr. Pilvelait's vehicle, and (4) extensive damage

to Mr. Pilvelait's vehicle, including scrape marks on the hood of the vehicle down from

the windshield.[45]   DSMF ¶¶ 32-36; PRDSMF ¶¶ 32-36; PSAMF ¶ 122; DRPSAMF

---

[44]      The County Defendants qualify Mr. Charron's additional paragraph one hundred and forty-one, asserting that it contains speculative arguments rather than facts, and ask the Court to strike or disregard it pursuant to Local Rule 56(e).  DRPSAMF ¶ 141.  Mr. Charron responds by stating it is "not 'argument' to point out the necessary or reasonable inference from [Christopher] Moss' allegation as reported by [Deputy] Horning."  PRDRPSAMF ¶ 141.  The Court agrees with Mr. Charron that this paragraph is a reasonable inference from Christopher Moss' description of the incident.  The Court declines to accept the County Defendants' qualified response.

[45]      Mr. Charron denies the County Defendants' paragraph thirty-two, referring to his additional paragraphs one hundred and thirty-seven through one hundred and forty-six and one hundred and fifty-three through one hundred and fifty-seven.  PRDSMF ¶ 32.  The Court reviewed these responses and the cited portions of the record and finds no inconsistencies that provide a basis for the denial.  The Court altered the paragraph to more clearly reflect that the consistency was Deputy Horning's subjective belief, not necessarily objective fact.

Mr. Charron denies the County Defendants' paragraph thirty-three and argues that "[t]he only vehicle parts in the road were adjacent to Mr. LeBlanc's residence" and that "Deputy Horning's affidavit contradicts her deposition testimony in this respect . . .."  PRDSMF ¶ 33.  The Court reviewed the cited portions of the record and does not find a direct contradiction but, in looking at the facts in the light most favorable to Mr. Charron, altered the paragraph to more accurately reflect Deputy Horning's deposition testimony about where she saw the vehicle parts.

Mr. Charron's additional reason for denying the County Defendants' paragraph thirty-three is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 33, and the Court rejects it.  *See supra* note 10.

Paragraph one hundred and twenty-two of Mr. Charron's statement of additional material facts states that "Deputy Horning saw and noted this debris [the same debris that Mr. LeBlanc saw], although she does not recall where along Langley Shore[s] Drive she saw it."  PSAMF ¶ 122.  The County Defendants qualify this paragraph by recounting Deputy Horning's exact deposition testimony and including her report statement that "as she 'drove down the street [sh]e could see vehicle parts from the car.'"  DRPSAMF ¶ 122.  Mr. Charron responds by reiterating that "[t]here is a reasonable inference that the debris observed by Deputy Horning and Deputy Cyr was the same debris observed by [Mr.] LeBlanc and Mr. Charron."  PRDRPSAMF ¶ 122.  Viewing disputed facts in the light most favorable to Mr. Charron, the Court finds that, given the short time between Mr. LeBlanc's observation and Deputy Horning's observation and in the absence of evidence of an intervening incident, the Court declines to accept the County Defendants' qualified response.

¶ 122; PRDRPSAMF ¶ 122. Deputy Cyr also saw and noted vehicle debris, likely the same debris observed by Mr. LeBlanc, although he did not inspect it or say where it was located.[46]  PSAMF ¶ 123; DRPSAMF ¶ 123; PRDRPSAMF ¶ 123.

Deputy Horning took photographs of Mr. Pilvelait's vehicle showing the conditions she observed on March 8; true and accurate copies of these photographs are attached to her affidavit as Exhibits Five through Twelve.[47]  DSMF ¶¶ 37-38; PRDSMF ¶¶ 37-38.  One of these photographs is of the rear of the Sunfire in the snowbank and shows a tread in the snow behind the right rear tire from apparently traveling through the snow and a dent in the right rear bumper of the Sunfire; based on the position of the vehicle and the tire track, the Sunfire appears to have gone front first into the snowbank.[48]  PSAMF ¶¶ 142, 144; DRPSAMF ¶¶ 142, 144;

Mr. Charron's qualifications of the County Defendants' paragraphs thirty-five and thirty-six are argument outside the scope of the facts asserted in the statements, PRDSMF ¶¶ 35-36, and the Court rejects them. *See supra* note 10.

[46] The County Defendants' qualify Mr. Charron's additional paragraph one hundred and twenty-three on the same grounds they qualify Mr. Charron's additional paragraph one hundred twenty-two—the inference that Deputy Cyr saw the same car parts as Mr. LeBlanc is unsupported. DRPSAMF ¶ 123. Mr. Charron responds that the inference is reasonable. PRDRPSAMF ¶ 123. For the same reasons expressed about paragraph one hundred and twenty-two in note 45 above, the Court agrees with Mr. Charron.

[47] Mr. Charron's qualification of the County Defendants' paragraph thirty-eight is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 38, and the Court rejects it. *See supra* note 10.

[48] Paragraph one hundred and forty-two of Mr. Charron's statement of additional material facts asserts in part that "[t]he Sunfire appears to have driven front first into the snow bank, as indicated by the tire tread behind the right rear wheel and the path through the snow behind the right front tire." PSAMF ¶ 142.

The County Defendants qualify this part of the paragraph, asserting it is speculative argument and the Court should strike or disregard it. DRPSAMF ¶ 142. Mr. Charron states it is not argument but rather a reasonable inference. PRDRPSAMF ¶ 142. The Court agrees for the most part with Mr. Charron. Looking at the photograph in the light most favorable to Mr. Charron, it is a reasonable inference that the Sunfire went headfirst into the snowbank. But it is not a reasonable inference that the driver deliberately drove the vehicle into the snowbank as opposed to losing control of the vehicle or being pushed into the snowbank. In other words, the photograph does not allow an inference about the operator's intentions. Nor does the tire track alone allow the inference that the operator drove the Sunfire into the snowbank as opposed to someone pushing the vehicle into the snowbank. Absent expert testimony about how the rear wheel of the Sunfire would respond to being pushed and whether

PRDRPSAMF ¶¶ 142, 144. Deputy Horning later testified that the tire tread was

"irrelevant" to her in assessing the damages to the Sunfire.[49] *Dep. of Horning* at 27:6-

9; PSAMF ¶ 143; DRPSAMF ¶ 143; PRDRPSAMF ¶ 143. Deputy Horning also

being pushed as opposed to driven would leave a different tire mark, the Court concludes that the inference that the Sunfire was driven as opposed to was pushed into the snowbank is not reasonable from the tire track alone.

   The County Defendants qualify Mr. Charron's additional paragraph one hundred and forty-four "to the extent the assertions intend to characterize aspects of the photo" but admit the photograph shows the rear of the Sunfire. DRPSAMF ¶ 144. Mr. Charron responds that, in the light most favorable to him, the photograph shows a dent in the right rear bumper. PRDRPSAMF ¶ 144. The Court reviewed the photograph, agrees with Mr. Charron, and rejects the qualification.

   Paragraph one hundred and forty-five of Mr. Charron's statement of additional material facts asserts that "[a]part from the fact that there was no allegation that Mr. Charron's plow struck the Sunfire from the rear, the dent is not consistent with the Sunfire being pushed into the snowbank by Mr. Charron's plow truck, as the front, straight-line edge of the plow would have created a corresponding impression on the bumper or rear of the Sunfire if the plow had struck that portion of the Sunfire. PSAMF ¶ 145. The County Defendants qualify this paragraph, stating that it is speculative argument and the Court should strike or disregard it. DRPSAMF ¶ 145. Mr. Charron responds this his assertion is not argument. PRDRPSAMF ¶ 145. The Court finds that whether the plow would have created a similar dent if it had been used to push the Sunfire is speculative, especially as the County Defendants are not arguing that the dent is consistent with the Sunfire being pushed by the plow. The Court struck this paragraph.

   Paragraph one hundred and forty-six of Mr. Charron's statement of additional material facts asserts that "'[i]nstead, the dent on the right rear bumper of the Sunfire is consistent with that portion of the bumper hitting the planter barrel in front of [Mr.] LeBlanc's house." PSAMF ¶ 146. The Count Defendants qualify this paragraph, stating that it is speculative argument and the Court should strike or disregard it. DRPSAMF ¶ 146. Mr. Charron states that his assertion is a reasonable inference the jury could draw. PRDRPSAMF ¶ 146. The Court finds that this inference is speculative given that Mr. Charron provides no evidence for it other than the picture of the dent. Accordingly, the Court struck this paragraph.

[49]   Paragraph one hundred and forty-three of Mr. Charron's statement of additional material facts also states, "Deputy Horning and her fellow deputies (Cyr and Mains) and her sergeant (Thistlewood) could clearly see and understand this." PSAMF ¶ 143. By "this," Mr. Charron is presumably referring to his theory set forth in the preceding paragraph that the tire treads disprove Christopher Moss' version of the accident. The County Defendants deny this paragraph as speculative argument that the Court should strike or disregard. DRPSAMF ¶ 143. Mr. Charron responds that the cited testimony supports that the four deputies could see and understand that the Sunfire was driven into the snowbank because a jury could properly disregard Deputy Horning's testimony to the contrary. PRDRPSAMF ¶ 143. The Court reviewed the cited portions of the record and agrees with the County Defendants except as to Deputy Horning's use of the word "irrelevant." *See Dep. of Horning* at 27:06-09. The Court altered the paragraph to clarify the "irrelevant" comment and struck all other portions of this paragraph as speculation.

attempted to make contact with Mr. Pilvelait at his home on the evening of March 8, but no one answered the door.[50]  DSMF ¶ 39; PRDSMF ¶ 39.

Later on the same evening, Sergeant Steven Thistlewood, who was on duty as a patrol sergeant, received a call from Deputy Horning concerning the dispatch call she was responding to in the area of Langley Shores Drive.  DSMF ¶ 75; PRDSMF ¶ 75.  Deputy Horning requested Sergeant Thistlewood's assistance in making contact with Mr. Charron, and Sergeant Thistlewood provided backup to Deputy Horning.[51]  DSMF ¶¶ 76, 78; PRDSMF ¶¶ 76, 78.  Sergeant Thistlewood asked Deputy Heath Mains, who was on duty as a patrol deputy, to provide backup to Deputy Horning by responding to Langley Shores Drive as well, and Deputy Mains did so.[52]  DSMF ¶¶ 67, 69; PRDSMF ¶¶ 67, 69.  Sergeant Thistlewood and Deputy

---

[50]    Mr. Charron's qualification of the County Defendants' paragraph thirty-nine is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 39, and the Court rejects it.  *See supra* note 10.

[51]    Mr. Charron qualifies the County Defendants' paragraph seventy-six by stating that "[t]here was no intent to have any discussion with Mr. Charron" and that "[i]nstead, all four deputies made contact with Mr. Charron with the sole purpose of arresting him."  PRDSMF ¶ 76.  The Court reviewed the relevant portions of Sergeant Thistlewood's deposition and affidavit.  *See Dep. of Thistlewood* at 10:01-05, 13:03-05; *Aff. of Steven Thistlewood* ¶ 4 (ECF No. 64) (*Aff. of Thistlewood*).  Though there is no clear conflict between "making contact" and "having a discussion," or for that matter "making contact" and "immediately arresting," the Court altered the paragraph to reflect the deposition testimony, which Mr. Charron finds more favorable.

Mr. Charron's qualification of the County Defendants' paragraph seventy-eight is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 78, and the Court rejects it.  *See supra* note 10.

[52]    Paragraph sixty-seven of the County Defendants' statement of material facts asserts that Deputy Mains "was asked to assist Deputy Rachel Horning with regard to a call she was dealing with in the area of Buzzell Road in Acton, Maine."  DSMF ¶ 67.  Mr. Charron qualifies this part of the paragraph because Deputy Mains reported to Langley Shores Drive with Sergeant Thistlewood rather than 250 Buzzell Road with Deputy Horning.  PRDSMF ¶ 67.  The Court reviewed the cited portions of the record, agrees with Mr. Charron, and altered the paragraph accordingly.

Paragraph sixty-nine of the County Defendants' statement of material facts states, "Deputy Mains provided backup to Deputy Horning with regard to the dispatch call for an incident in the area of Buzzell Road."  DSMF ¶ 69.  Mr. Charron qualifies this statement for the same reason he qualifies the County Defendants' paragraph sixty-seven.  PRDSMF ¶ 69.  The Court altered this statement to reflect the finding that Deputy Mains provided backup on Langley Shores Drive, not Buzzell Road.

Mains met up with Deputies Horning and Cyr at Mr. Pilvelait's vehicle.  *Dep. of Thistlewood* at 12:12-13:01.

Looking at the evidence objectively after-the-fact, the two large gouge marks on the hood of the Sunfire do not correspond with any protrusions on Mr. Charron's plow blade, which is a straight line where it allegedly scraped over the hood of the Sunfire.[53]  PSAMF ¶ 153; DRPSAMF ¶ 153; PRDRPSAMF ¶ 153.  During his deposition, Sergeant Thistlewood had no explanation for how Mr. Charron's plow blade could have made the gouge marks on the hood of the Sunfire.[54]  PSAMF ¶ 154; DRPSAMF ¶ 154.  The two gouge marks do correspond to the two bolts and nuts that protrude from the underside of the rear bumper of Mr. Charron's plow truck, and the two lines on the left and right of the gouge marks correspond to other protrusions on the underside of the truck's rear bumper.[55]  PSAMF ¶¶ 155-56; DRPSAMF ¶¶ 155-

---

[53]    Mr. Charron asserts that the fact above "showed unmistakably that the allegations against Mr. Charron were false."  PSAMF ¶ 153.  The County Defendants deny the whole paragraph, arguing that it contains speculative arguments rather than facts and that the Court should strike or disregard it.  DRPSAMF ¶ 153.  Mr. Charron responds that pointing out factual inconsistency is not argument.  PRDRPSAMF ¶ 152.  The Court agrees with the County Defendants that the inferences are speculative and not supported by the record.  Accordingly, the Court struck this portion of Mr. Charron's additional paragraph one hundred and fifty-three.
        The County Defendants' additional reasons for denying Mr. Charron's additional paragraph one hundred and fifty-three are argument outside the scope of the facts asserted in the statement, DRPSAMF ¶ 153, *see supra* note 10, and do not address whether the marks corresponded with the plow blade.  The Court rejects them but altered the paragraph to make it clear this was not the stated observation of any of the deputies on the scene at the time.
[54]    The County Defendants' qualification of Mr. Charron's additional paragraph one hundred and fifty-four is argument outside the scope of the facts asserted in the statement, DRPSAMF ¶ 154, and the Court rejects it.  *See supra* note 10.
[55]    The County Defendants qualify Mr. Charron's additional paragraph one hundred and fifty-five, arguing that it contains speculative arguments rather than facts and the Court should strike or disregard it.  DRPSAMF ¶ 155.  Mr. Charron responds that this paragraph "points out an obvious factual congruence."  PRDRPSAMF ¶ 155.  The Court reviewed the cited portions of the record, agrees with Mr. Charron, and denies this qualification.
        The County Defendants qualify Mr. Charron's additional paragraph one hundred and fifty-six, arguing that it contains speculative arguments rather than facts and the Court should strike or disregard it.  DRPSAMF ¶ 156.  Mr. Charron responds that this fact is "an obvious factual congruence

56; PRDRPSAMF ¶¶ 155-56. Sergeant Thistlewood later testified that he thought anyone could make the measurements regarding the marks on the Sunfire's hood and the protrusions on the underside of the truck's rear bumper.[56] *Dep. of Thistlewood* at 42:24-43:25; PSAMF ¶ 157; DRPSAMF ¶ 157; PRDRPSAMF ¶ 157.

### 2. John Charron's Pickup Truck

The four deputies then went to Mr. Charron's residence, also on Langley Shores Drive, and observed a plow truck in Mr. Charron's driveway that matched Christopher Moss' description.[57] DSMF ¶ 40; PRDSMF ¶ 40. Deputy Horning took photographs of the plow attached to the truck in Mr. Charron's driveway, and true and accurate copies of these photographs are attached to Deputy Horning's affidavit as Exhibits Thirteen through Nineteen. DSMF ¶¶ 41-42; PRDSMF ¶¶ 41-42; PSAMF ¶ 160; DRPSAMF ¶ 160.

Deputy Horning looked at the plow on Mr. Charron's pickup. PSAMF ¶ 160; DRPSAMF ¶ 160. There was no damage to the front of Mr. Charron's plow, including the plow blade.[58] PSAMF ¶ 159; DRPSAMF ¶ 159; PRDRPSAMF ¶ 159. Deputy

---

. . .." PRDRPSAMF ¶ 156. The Court reviewed the cited portions of the record, agrees with Mr. Charron, and rejects the qualification.

[56] The County Defendants qualify Mr. Charron's additional paragraph one hundred and fifty-seven, arguing that it contains speculative arguments rather than facts and that the Court should strike or disregard it. DRPSAMF ¶ 157. The County Defendants add that "the cited record evidence does not support the argument asserted by" Mr. Charron. DRPSAMF ¶ 157. Mr. Charron responds that, viewing the evidence in the light most favorable to him, the record supports this paragraph. PRDRPSAMF ¶ 157. The Court reviewed the cited portions of the record and found support for the general idea the paragraph conveys rather than the specific reference to an accident reconstructionist. The Court altered the paragraph accordingly.

[57] Mr. Charron qualifies the County Defendants' paragraph forty by stating that all four deputies, rather than just Deputy Horning, went to Mr. Charron's residence. PRDSMF ¶ 40. While the Court views this qualification as outside the scope of the facts, *see supra* note 10, the Court altered the paragraph for clarity purposes.

[58] The County Defendants qualify Mr. Charron's additional paragraph one hundred and fifty-nine, asserting that it contains speculative arguments and the Court should strike or disregard it.

Horning did not check to see how high the plow could be raised by asking Mr. Charron to demonstrate this, although she could have if he had not been immediately arrested.[59] PSAMF ¶ 161; DRPSAMF ¶ 161; PRDRPSAMF ¶ 161. Mr. Charron later showed that the maximum height of his plow's lift mechanism does not reach the hood of another Pontiac Sunfire of the same make and model as the one involved in the present case. *Local Rule 56(h) Joint Stipulated R.*, Attach. 3 at 18-20 (ECF No. 61); PSAMF ¶ 159; DRPSAMF ¶ 159; PRDRPSAMF ¶ 159.

Mr. Charron's plow truck window was broken and there was glass on the ground beneath it, corresponding with Mr. Charron's statement before his arrest that the other individuals had broken his truck's window.[60] PSAMF ¶ 158; DRPSAMF

---

DRPSAMF ¶ 159. Mr. Charron responds that the evidence shows no damage to the plow and that the plow cannot be lifted high enough to reach the hood of the Sunfire. The Court reviewed the cited portions of the record and, viewing the evidence in the light most favorable to Mr. Charron, agrees with Mr. Charron on both accounts. The Court denies the qualification and altered the second half of this paragraph slightly for clarity.

[59] The County Defendants qualify the part of Mr. Charron's additional paragraph one hundred and sixty-one that states Deputy Horning could have asked Mr. Charron about the plow height if he had not been immediately arrested, arguing that it contains speculative arguments rather than facts and the Court should strike or disregard it. DRPSAMF ¶ 161. Mr. Charron responds that the cited evidence "fully supports the fact that she could have asked Charron to show how high his plow could be raised if he had not been immediately arrested." The Court reviewed the cited portion of the record, agrees with Mr. Charron, and rejects the denial.

Paragraph one hundred and sixty-two of Mr. Charron's statement of additional material facts states, "[Deputy Horning's] supervisor, Sergeant Thistlewood, knew from his own pickup with a hydraulic Fisher plow that the bottom of the plow blade cannot be raised high enough to be seen by him through his windshield." PSAMF ¶ 162. The County Defendants deny this paragraph because the cited record testimony does not support its assertion. DRPSAMF ¶ 162. Mr. Charron responds that the record evidence fully supports the assertion. PRDRPSAMF ¶ 162. The Court reviewed the cited portion of the record, agrees with the County Defendants, and struck Mr. Charron's additional paragraph one hundred and sixty-two.

[60] The County Defendants qualify Mr. Charron's additional paragraph one hundred and fifty-eight on the grounds that Mr. Charron's affidavit cannot override his deposition testimony that he did not tell the four deputies that evening how his truck window was broken. DRPSAMF ¶ 158. They add that Mr. Charron's statement is inadmissible hearsay and that this paragraph is argument the Court should strike or disregard. DRPSAMF ¶ 158. Mr. Charron's response states that Deputy Cyr (though the Court infers from the portion of the record cited that Mr. Charron is actually referring to Deputy Mains) confirmed that Mr. Charron made this statement in his report and deposition. PRDRPSAMF ¶ 158. The Court reviewed the cited portions of the record, agrees with Mr. Charron, and denies the

¶ 158; PRDRPSAMF ¶ 158. There was also glass from the windshield of the Sunfire on the rear bumper of Mr. Charron's plow truck, which is visible in one of the photos that Deputy Shaw took and emailed to Deputy Horning.[61] PSAMF ¶ 163; DRPSAMF ¶ 163; PRDRPSAMF ¶ 163.

### F. John Charron's Arrest

Deputy Horning spoke with Mr. Charron on the evening of March 8 and observed the odor of alcohol, bloodshot and glassy eyes, thick and slurred speech, and difficulty balancing while walking.[62] DSMF ¶¶ 43-44; PRDSMF ¶¶ 43-44; DRPSAMF ¶ 43; PRDRPSAMF ¶ 43. Based on the totality of the circumstances and the information Deputy Horning had at the time she arrested Mr. Charron, Deputy Horning determined that she had probable cause to believe that Mr. Charron had

---

qualification. The Court reworded the paragraph to better reflect the record. *See JSR*, Attach. 7, *Dep. of Heath Mains* at 37:14-16 (*Dep. of Mains*); *Additional Attachs.* at 91 (ECF No. 67).

[61] The County Defendants deny Mr. Charron's additional paragraph one hundred and sixty-three, arguing that it contains speculative arguments rather than facts and the Court should strike or disregard it. DRPSAMF ¶ 163. The County Defendants add that "the cited record evidence does not support the argument asserted by" Mr. Charron. DRPSAMF ¶ 163. Mr. Charron responds that, viewed in the light most favorable to the non-movant, the record fully supports the assertion. PRDRPSAMF ¶ 163. The Court reviewed the record, agrees with Mr. Charron, and rejects the denial. *See Local Rule 56(h) Joint Stipulated R.*, Attach. 4 at 25 (ECF No. 61).

[62] Mr. Charron denies the County Defendants' paragraph forty-three, arguing that Deputy Horning made no claim during her deposition that Mr. Charron appeared intoxicated and that he was not intoxicated at the time. PRDSMF ¶ 43. He adds that none of the deputies spoke with Mr. Charron before he was arrested. PRDSMF ¶ 43. The County Defendants reply that the Court should strike or disregard the added statements in Mr. Charron's denial pursuant to Local Rule 56(c). DRPSAMF ¶ 43. Mr. Charron further responds that his denial is responsive to the County Defendants' paragraph forty-three. PRDRPSAMF ¶ 43. Concerning whether Mr. Charron spoke to the deputies prior to his arrest, Mr. Charron cannot assert contradictory facts to suit him in different circumstances. Since Mr. Charron asserted that he told Deputy Mains that Christopher Moss had broken his window before he was arrested, *see supra* note 60, the Court rejects his argument here that the four deputies did not hear him speak prior to his arrest. The cited portions of the record, as well as Deputy Horning's arrest report, *Horning Narrative* at 1-2, support the statements in the paragraph, and Mr. Charron's denial on the basis of new facts is argument outside the scope of the facts asserted in the statement. *See supra* note 10. The Court rejects the denial.

Mr. Charron denies the County Defendants' paragraph forty-four for similar reasons as he denies the County Defendants' paragraph forty-three. PRDSMF ¶ 44. For the same reasons, the Court rejects this denial.

committed two offenses: aggravated reckless conduct, pursuant to 17-A M.R.S. § 213, and criminal threatening, pursuant to 17-A M.R.S. § 209.[63]   DSMF ¶ 48; PRDSMF ¶ 48.   Deputy Horning arrested Mr. Charron for aggravated reckless conduct and criminal threatening at approximately midnight between March 8 and March 9 and advised Mr. Charron that she was placing him under arrest for aggravated reckless conduct and criminal threatening.[64]   DSMF ¶¶ 45, 49; PRDSMF ¶¶ 45, 49.   Mr. Charron protested that he was innocent.[65]   PSAMF ¶ 188; DRPSAMF ¶ 188; PRDRPSAMF ¶ 188.   Deputy Horning wrote aggravated reckless conduct and criminal trespass, rather than criminal threatening, on the bail bond form she filled out at the York County Jail and wrote only aggravated reckless conduct on the Uniform Summons and Complaint.   *Additional Attachs.* at 68-69 (ECF No. 67).

---

[63]   Mr. Charron denies the County Defendants' paragraph forty-eight by pointing to the lack of reference to "probable cause" in the criminal discovery, Deputy Horning's deposition, or Sergeant Thistlewood's deposition.   PRDSMF ¶ 48.   Mr. Charron's assertion fails to challenge the paragraph because whether an officer has the subjective belief that she possesses probable cause does not depend on whether she wrote those words in her report.   Thus, the Court rejects this denial.

[64]   Mr. Charron denies the County Defendants' paragraph forty-five, asserting that "Mr. Charron was immediately arrested without being told that he was being arrested for any particular crime" and that "Deputy Horning charged him with aggravated reckless conduct only."   PRDSMF ¶ 45.   The accompanying citations may support Mr. Charron's second assertion but not his first.   Regardless, what Deputy Horning actually charged Mr. Charron with according to the bail bond form and the Uniform Summons and Complaint, *see Additional Attachs.* at 68-69 (ECF No. 67), does not establish what she told him during his arrest.   Given the lack of direct contradictory evidence, the Court rejects the denial.   The Court added a fact to this section to address the inconsistency on the paperwork.

   Mr. Charron's qualification of the County Defendants' paragraph forty-nine is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 49, and the Court rejects it.   *See supra* note 10.

[65]   Mr. Charron asserts in his additional paragraph one hundred and eighty-eight that Mr. Charron made protestations of innocence.   PSAMF ¶ 188.   The County Defendants qualify this paragraph, stating that it is argument and that the Court should strike or disregard it.   DRPSAMF ¶ 188.   Mr. Charron responds that his assertions are reasonable inferences.   PRDRPSAMF ¶ 188.   The Court notes that, while Mr. Charron does not cite to his affidavit here, he does elsewhere in his responses.   *See* PRDSMF ¶ 43.   The Court incorporates this citation and finds that, viewing the facts in the light most favorable to Mr. Charron, it supports the assertion that he told the four deputies he was innocent and "didn't do anything" when they arrested him.   *See Aff. of Charron* ¶ 20.

Deputies Mains and Cyr understood that Deputy Horning was the lead investigator with regard to the dispatch call for the incident in the area of Buzzell Road. DSMF ¶¶ 68, 72; PRDSMF ¶¶ 68, 72. Sergeant Thistlewood understood that Deputy Horning was the lead investigator with regard to the dispatch call for the incident in the area of Langley Shores Drive. DSMF ¶ 77; PRDSMF ¶ 77. Deputy Mains, Deputy Cyr, and Sergeant Thistlewood did not make the probable cause determination with regard to Mr. Charron's arrest—to the best of their knowledge, Deputy Horning made that determination.[66] DSMF ¶¶ 70, 74, 79; PRDSMF ¶¶ 70, 74, 79.

Court Officer Wilfred Vachon was not present for the events of March 8 and 9 in Acton surrounding Mr. Charron's arrest, was not involved in these events, and had no contact with Mr. Charron on either day. DSMF ¶¶ 80-82; PRDSMF ¶¶ 80-82.

### G. Post-Arrest Proceedings

#### 1. Post-Arrest Imprisonment and Conditions of Release

After the arrest, Deputy Horning transported Mr. Charron from his residence to the York County Jail. DSMF ¶ 46; PRDSMF ¶ 46. Before his arrest, Mr. Charron did not make a statement to Deputy Horning and after his arrest, while at the jail, Deputy Horning asked Mr. Charron whether he would like to give a statement to her

---

[66]     Mr. Charron qualifies the County Defendants' paragraph seventy by asserting that "no probable cause determination was made by any of the deputies." PRDSMF ¶ 70. The Court reviewed the cited portions of the record, agrees with the County Defendants, and rejects this qualification. *See also supra* note 63.
        Mr. Charron qualifies the County Defendants' paragraphs seventy-four and seventy-nine for the same reasons he qualifies the County Defendants' paragraph seventy. PRDSMF ¶¶ 74, 79. Applying the same logic, the Court rejects these qualifications.

and he declined.[67]  DSMF ¶ 47; PRDSMF ¶ 47.  The York County Jail released Mr. Charron the following morning, on March 9.[68]  DSMF ¶ 52; PRDSMF ¶ 52.  Following this release, Mr. Charron was not incarcerated or in custody at any point.  DSMF ¶ 52; PRDSMF ¶ 52.  Mr. Charron's conditions of release included a $3000 bail and requirements that he not use or possess alcohol, drugs, or dangerous weapons including firearms and that he submit to searches of his person, vehicle, and residence at any time without articulable suspicion or probable cause.  *Additional Attachs.* at 68 (ECF No. 67).

## 2. Prosecution Proceedings

York County Assistant District Attorney (ADA) Kyle Myska received the assignment of prosecuting the charges against Mr. Charron in this matter.  DSMF ¶ 53; PRDSMF ¶ 53.  Mr. Charron's initial appearance in court on the charges in the initial criminal complaint occurred on April 25.[69]  DSMF ¶ 54; PRDSMF ¶ 54.  On

---

[67]     The facts in the County Defendants' paragraph forty-seven are very hard to piece together given the parties' objections, citations to the record, and qualifications.  DSMF ¶ 47; PRDSMF ¶ 47. What appears from the record is that Mr. Charron did not make a statement to Deputy Horning before his arrest.  *Dep. of Horning* at 29:01-30:08.  When he was at the police station, Deputy Horning asked him whether he would like to talk to her and he declined.  *Id.* at 30:02-14; *Pl.'s Second Suppl. Summ. J. R. Items*, Attach. 1, *Second Aff. of John Charron* ¶ 2 (ECF No. 79) (*Second Aff. of Charron*).
        The parties have obscured this sequence of events.  For example, the County Defendants say that Mr. Charron refused to provide a written sworn statement to Deputy Horning.  DSMF ¶ 47.  This is consistent with Deputy Horning's sworn declaration.  But it is not limited to time or place.  Nor is it entirely consistent with Deputy Horning's deposition testimony in which she testified that she asked Mr. Charron whether he would like to speak with her and he declined.  In her deposition, she does not say that she asked him to give her a sworn statement, oral or written.  Viewing the evidence in the light most favorable to Mr. Charron, the Court has rewritten the facts to conform to the record.
[68]     Mr. Charron's qualification of the County Defendants' paragraph fifty-two is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 52.  *See supra* note 10.  Given the importance of the bail amount and conditions of release in Mr. Charron's response to the analysis of this motion, however, the Court altered the paragraph to include these conditions.
[69]     Mr. Charron's qualification of the County Defendants' paragraph fifty-four is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 54, and the Court rejects it.  *See supra* note 10.

June 7, the grand jury returned a six-count indictment against Mr. Charron arising out of the events in this case. DSMF ¶ 55; PRDSMF ¶ 55. At the time ADA Myska submitted the case to the grand jury, the following facts were true:

1.      ADA Myska was aware of Mr. Charron's theory of the case—that Mr. Pilvelait's car had hit Mr. Charron's truck from behind,[70] DSMF ¶ 56; PRDSMF ¶ 56;

2.      ADA Myska was aware of the location of the Sunfire,[71] DSMF ¶ 57; PRDSMF ¶ 57; and

3.      the Sunfire was in the possession of Mr. Charron's attorney, Gregory McCullough. DSMF ¶ 58; PRDSMF ¶ 58.

ADA Myska dismissed the criminal case against Mr. Charron on July 22. DSMF ¶ 59; PRDSMF ¶ 59. Consequently, Mr. Charron never stood trial for the charges at issue in this case.[72] DSMF ¶ 60; PRDSMF ¶ 60.

---

[70]     Mr. Charron's qualification of the County Defendants' paragraph fifty-six is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 56, and the Court rejects it. *See supra* note 10.

[71]     Mr. Charron denies the County Defendants' paragraph fifty-seven on the grounds that "there is no evidence indicating when the prosecutor submitted his case against Mr. Charron to the grand jury." PRDSMF ¶ 57. The Court reviewed the cited portions of the record and notes that when ADA Myska sent his email regarding the Sunfire, he also discussed whether he was going to have Mr. Charron testify before the grand jury. *Additional Attachs.*, Attach. 2 at 19 (ECF No. 67). The Court finds that ADA Myska had not yet submitted the case to the jury at the time of this email based on this discussion about Mr. Charron testifying. Accordingly, the court rejects the rationale for this denial.

     The reasoning of the remainder of Mr. Charron's denial is argument outside the scope of the facts asserted in the statement, and the Court rejects it. *See supra* note 10.

[72]     Mr. Charron qualification of the County Defendants' paragraph sixty is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 60, and the Court rejects it. *See supra* note 10.

### 3. Probable Cause Affidavits

ADA Myska solicited probable cause affidavits from the four deputies in response to Attorney McCullough's request for a probable cause hearing in the criminal case; these affidavits did not mention Mr. Charron saying he was innocent or other evidence that might have pointed to his innocence.[73] PSAMF ¶ 188; DRPSAMF ¶ 188; PRDRPSAMF ¶ 188. The four deputies' affidavits included, among others, the following statements:

1. Sergeant Thistlewood wrote that Deputy Horning told him she wanted the deputies "to speak" with Mr. Charron about the accident and that Mr. Charron was "refusing to cooperate" during his arrest, but Sergeant Thistlewood did not include that the four deputies did not interview Mr. Charron before the arrest and Mr. Charron said he was innocent at the scene,[74] PSAMF ¶ 189; DRPSAMF ¶ 189; PRDRPSAMF ¶ 189;

---

[73] The second half of Mr. Charron's additional paragraph one hundred and eighty-eight states, "but those affidavits failed to disclose the exculpatory evidence and circumstances known to the deputies, as noted above, including Mr. Charron's protestations of innocence, and they falsely characterized what transpired." PSAMF ¶ 188. The County Defendants qualify this part of the paragraph by referring to this portion of the paragraph as argument and asking the Court to strike or disregard it. DRPSAMF ¶ 188. Mr. Charron responds as he does to paragraphs one hundred and seventy-nine and one hundred and eighty. PRDRPSAMF ¶ 188. The Court rejects the County Defendant's qualification because the affidavits do not in fact mention Mr. Charron's claim of innocence or any other potentially exculpatory evidence. The Court altered this part of the paragraph to eliminate the unsupported claim that the affidavits "falsely characterized what transpired."

[74] Paragraph one hundred and eighty-nine of Mr. Charron's statement of additional material facts states, "For example, like Deputy Horning, Sergeant Thistlewood falsely stated that the deputies wanted 'to speak' with Mr. Charron when they went to his residence to arrest him, and falsely implied that they 'spoke with' or interviewed him prior to arresting him. In so doing, [Sergeant] Thistlewood falsely stated that Mr. Charron was 'refusing to cooperate' when the deputies immediately arrested him despite his protestations of innocence, which the physical evidence corroborated, unlike the implausible allegations against him." PSAMF ¶ 189. The County Defendants qualify this paragraph, asserting that it is argument and that the Court should strike or disregard it. DRPSAMF ¶ 189. Mr. Charron responds as he does to paragraphs 179 and 180. PRDRPSAMF ¶ 189; *see infra* notes 95 and 96. The Court reviewed the cited portion of the record, agrees with the County Defendants that some of the assertions are argument, and altered the paragraph accordingly. In particular, the Court

2.  Deputy Horning wrote that Mr. Charron was "slow to follow commands," although she previously testified that she was not one of the deputies who physically made the arrest, PSAMF ¶ 190; DRPSAMF ¶ 190; PRDRPSAMF ¶ 190;

3.  Deputy Mains wrote that he "observed" the Sunfire "pushed into the snow bank," PSAMF ¶ 191; DRPSAMF ¶ 191; PRDRPSAMF ¶ 191;

4.  Deputy Horning wrote that she could see that the Sunfire "had been struck by a plow and pushed into a snow banking down the street," PSAMF ¶ 191; DRPSAMF ¶ 191; PRDRPSAMF ¶ 191;

5.  Deputy Mains wrote that Mr. Charron was "very confrontational," refused to provide any details about the events of the evening besides that people broke his truck's window, and was unwilling "to speak" further about what happened to his truck window, but did not mention that Mr. Charron said he was innocent on the scene, PSAMF ¶¶ 192-93; DRPSAMF ¶¶ 192-93; PRDRPSAMF ¶¶ 192-93;

6.  Deputy Cyr wrote about the collision without mentioning that Christopher Moss said Mr. Charron's plow truck hit the Sunfire front first, PSAMF ¶ 194; DRPSAMF ¶ 194; PRDRPSAMF ¶ 194;

---

eliminated all uses of the word "falsely" since the cited portions of the record do not support these statements being false.

The Court applies the same logic to the County Defendants' qualifications and Mr. Charron's responses to those qualifications for Mr. Charron's additional paragraphs one hundred and ninety through one hundred and ninety-nine. The Court altered these paragraphs to reflect the facts in the affidavits without the added argumentative language.

7.     Deputies Cyr and Horning wrote about the vehicle debris without specifying where they saw it, PSAMF ¶ 195; DRPSAMF ¶ 195; PRDRPSAMF ¶ 195;

8.     Deputy Cyr wrote that the "damage on the hood" of the Sunfire "appeared to be consistent with Christopher[] [Moss'] account of the event," PSAMF ¶ 196; DRPSAMF ¶ 196; PRDRPSAMF ¶ 196;

9.     Deputy Cyr wrote that Mr. Charron was "argumentative," "confrontational," and "smelled of intoxicants," and did not mention any contradictions between Walter Moss' and Christopher Moss' statements, PSAMF ¶¶ 197-98; DRPSAMF ¶¶ 197-98; PRDRPSAMF ¶¶ 197-98; and

10.    Deputy Horning wrote that she was attaching witness statements from Mr. Pilvelait and Christopher Moss to her affidavit.  PSAMF ¶ 199; DRPSAMF ¶ 199; PRDRPSAMF ¶ 199.

### 4.    Sheriff William King's Press Release and Facebook Post

Sheriff William King prepared a press release pertaining to Mr. Charron's arrest on March 8 or March 9.[75]  DSMF ¶ 61; PRDSMF ¶ 61.  He posted the press

---

[75]    Paragraph sixty-one of the County Defendants' statement of material facts asserts that Sheriff King prepared the press release "at approximately midnight between March 8, 2016 and March 9, 2016."  DSMF ¶ 61.  Mr. Charron qualifies this paragraph by stating that "[t]here is no evidence cited as to when the press release was prepared" but that "Sheriff King asked Deputy Horning by email on March 9, 2016, at 9:14 PM to 'fact-check' the press release and to provide a photo of the Sunfire for it" and "[t]he press release . . . was posted on the York County Sheriff's Facebook page and in the Portland Press Herald on [March 9]."  PRDSMF ¶ 61.  The Court reviewed the cited portions of the record, agrees with Mr. Charron as to the lack of evidence about when the press release was prepared and the publication date of the Facebook post, and altered the paragraph to reflect this qualification.  As to the email, while Sheriff King did send an email to Deputy Horning asking her to fact check the press release on the evening of March 9, *Dep. of Horning* at 80:5-13, this fact does not mean that Sheriff King did not prepare a draft of the press release on March 8.

Mr. Charron's further qualification of paragraph sixty-one is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 61, and the Court rejects it.  *See supra* note 10.

release information about Mr. Charon's arrest on the York County Sheriff's Office's Facebook page on March 9.[76]  DSMF ¶ 63; PRDSMF ¶ 63.  True copies of the press release prepared by Sheriff King and the Facebook post are attached to Sheriff King's deposition as Exhibits Seven and Two, respectively.[77]  DSMF ¶¶ 62, 64; PRDSMF ¶¶ 62-64.  The York County Sheriff's Office habitually puts news releases on the Office's Facebook page for transparency and to let people know the Office's activities; Sheriff King made his March 9 post about Mr. Charron pursuant to an office policy to keep the public informed of the office's activities.[78]  DSMF ¶¶ 65-66; PRDSMF ¶¶ 65-66.

### 5.  Recovery of the Sunfire

Rankin Towing towed the Pontiac Sunfire from where it was found.[79]  DSMF ¶ 50; PRDSMF ¶ 50.  None of the County Defendants claims to know who took the

---

[76]  Paragraph sixty-three of the County Defendants' statement of material facts asserts that Sheriff King posted the press release on the Facebook page "at approximately midnight between March 8, 2016 and March 9, 2016 . . . ."  DSMF ¶ 63.  Mr. Charron qualifies this paragraph for the same reason he qualifies the County Defendants' paragraph sixty-one.  PRDSMF ¶ 63; *see supra* note 75.  The Court finds that the Facebook post is dated March 9, *Local Rule 56(h) Joint Stipulated R.*, Attach. 6 at 1 (ECF No. 62) (*Dep. of King Exs.*), and altered the paragraph accordingly.

[77]  Paragraph sixty-four of the County Defendants' statement of material facts states that the copy of the Facebook post "was marked as Exhibit 7 to Sheriff King's deposition."  DSMF ¶ 64.  Mr. Charron qualifies this statement by pointing out that "[t]he York County Sheriff's Office Facebook posting is marked as Exhibit 2 to Sheriff King's deposition."  PRDSMF ¶ 64.  The Court reviewed the cited portions of the record, agrees with Mr. Charron, and altered the paragraph accordingly.

[78]  Mr. Charron's denials of the County Defendants' paragraphs sixty-five and sixty-six are argument outside the scope of the facts asserted in the statements, PRDSMF ¶¶ 65-66, and the Court rejects them.  *See supra* note 10.

[79]  Paragraph fifty-one of the County Defendants' statement of material facts states that "[t]he fact that the Pontiac Sunfire was towed from where it was found by Rankin Towing was noted in Deputy Horning's arrest report."  DSMF ¶ 51.  Mr. Charron qualifies this statement by pointing out that "[t]he only reference to Rankin Towing in the arrest report is in connection with Mr. Charron's truck."  PRDSMF ¶ 51.  The Court reviewed the cited portions of the record and agrees with Mr. Charron that Deputy Horning's arrest report does not state that Rankin Towing towed the Pontiac Sunfire.  *Additional Attachs.* at 70-75 (ECF No. 67).  The Court finds that, even if Mr. Charron is right that the connection between Rankin Towing and Mr. Charron's truck is a "clerical error," PRDSMF ¶ 51, it is an error nonetheless.  Accordingly, the Court struck paragraph fifty-one.

daytime photos of the Sunfire that Deputy Horning uploaded into the Sheriff's Office Information Management Corporation (IMC) system on March 11 at 6:29-6:30 p.m. PSAMF ¶ 164; DRPSAMF ¶ 164.

Mr. Charron knew that the Sunfire would prove his innocence, if found, but it could not be located even with the assistance of ADA Myska and the court in the criminal case. PSAMF ¶ 165; DRPSAMF ¶ 165; PRDRPSAMF ¶ 165. Deputy Horning testified that when she was asked to check on the whereabouts of the Sunfire by a superior officer, she contacted Mr. Pilvelait and he told her that he did not want to pay the storage fees so he sold it for salvage.[80] PSAMF ¶ 165; DRPSAMF ¶ 165; PRDRPSAMF ¶ 165. Deputy Horning and Court Officer Vachon told ADA Myska that Mr. Pilvelait sold it to a junkyard as salvage.[81] PSAMF ¶ 165; DRPSAMF ¶ 165; PRDRPSAMF ¶ 165. ADA Myska asked, "which junkyard," but he never received a response, and Deputy Horning testified that she had "no idea" at which junkyard the Sunfire was located.[82] PSAMF ¶ 166; DRPSAMF ¶ 166; PRDRPSAMF ¶ 166.

---

[80] Mr. Charron objects to this statement by Mr. Pilvelait on the ground that it is hearsay if offered for the truth of the matter asserted. PRDRPSAMF ¶ 165. The Court has not included this statement for its truth. Deputy Horning would presumably not have known whether what Mr. Pilvelait told her about the Sunfire was true. Rather, the Court included the statement because it is the foundation for why Deputy Horning told ADA Myska that Mr. Pilvelait had sold the Sunfire for salvage.

[81] The County Defendants qualify Mr. Charron's additional paragraph one hundred and sixty-five, stating that Mr. Pilvelait told Deputy Horning he had sold the Sunfire for salvage and Court Officer Vachon relayed this information to ADA Myska, but that everything else in the paragraph is argument that the Court should strike or disregard. DRPSAMF ¶ 165. Mr. Charron responds that the County Defendants' qualification relies on hearsay and that none of it changes his assertions. PRDRPSAMF ¶ 165; *see supra* note 80.

The Court reviewed the cited portions of the record and finds support for all assertions in the paragraph except the words "falsely" and "gone," which the Court struck.

[82] The County Defendants qualify Mr. Charron's additional paragraph one hundred and sixty-six, stating that the evidence does not support the assertion that ADA Myska did not receive a response and that Deputy Horning did know the Sunfire was sold for salvage. DRPSAMF ¶ 166. Mr. Charron responds that ADA Myska's question was the end of an email thread and it is reasonable to infer that he did not get a response. PRDRPSAMF ¶ 166. The Court reviewed the cited portions of the record and agrees with Mr. Charron as to the response inference. The Court views Deputy Horning's

Mr. Charron contacted the tow truck operator, Jack Rankin, in an effort to find out where the Sunfire might be; Mr. Rankin and his son said they did not know where it was, and Mr. Charron would never find it.[83]  PSAMF ¶ 167; DRPSAMF ¶ 167; PRDRPSAMF ¶ 167.  Mr. Charron was suspicious, so he spoke with someone who informed him that Mr. Rankin has garage space at Moody's Collision in Sanford, Maine.  PSAMF ¶ 167; DRPSAMF ¶ 167; PRDRPSAMF ¶ 167.  Mr. Charron went to Moody's Collision in Sanford after court on April 25 and discovered the Sunfire in the rear of one of the two garage bays used by Mr. Rankin at that location.[84]  PSAMF ¶ 168; DRPSAMF ¶ 168; PRDRPSAMF ¶ 168.  Deputy Horning and Sheriff King both believed that Mr. Charron was trespassing when he discovered the Sunfire.[85]  PSAMF ¶ 169; DRPSAMF ¶ 169; PRDRPSAMF ¶ 169.

---

statement as taken out of context and altered the paragraph to reflect more clearly what Deputy Horning meant when she said she did not know where the Sunfire was.

[83]  The County Defendants qualify Mr. Charron's additional paragraph one hundred and sixty-seven, arguing that the statements within the paragraph are inadmissible hearsay and the Court should strike or disregard them.  DRPSAMF ¶ 167.  Mr. Charron responds that the statements are not being admitted for the truth of the matter asserted because other facts show these statements to be true.  PRDRPSAMF ¶ 167.  While not argued by Mr. Charron, the Court sees the purpose of these statements as showing the effect on the listener since they motivated Mr. Charron to investigate further.  Thus, the Court views them in this way and allows them, though not for their truth.

[84]  Paragraph one hundred and sixty-eight of Mr. Charron's statement of additional material facts states that the Sunfire was "hidden" in the rear of the garage.  PSAMF ¶ 168.  The County Defendants qualify this portion of the paragraph, asserting that the word "hidden" is argumentative and that the Court should strike or disregard the word.  DRPSAMF ¶ 168.  Mr. Charron responds that he is entitled to the inference that the Sunfire was "hidden" based on the evidence cited in paragraphs one hundred and sixty-eight through one hundred and seventy-three.  PRDRPSAMF ¶ 168.  The Court agrees with the County Defendants that the word "hidden" is argumentative and there is no direct evidence proving the Sunfire was hidden intentionally.  In fact, Mr. Charron himself provides an alternative reason for the Sunfire being inside.  *See* PSAMF ¶ 172.  The Court also notes that even if Mr. Rankin had been hiding the Sunfire, this fact would have no bearing on the analysis of Mr. Charron's malicious prosecution claims against the County Defendant unless there were evidence that Mr. Rankin did so at the direction of the County Defendants, and there is no such evidence.  The Court struck the word "hidden" from the paragraph.

[85]  Paragraph one hundred and sixty-nine of Mr. Charron's statement of additional material facts states in full, "Deputy Horning and Sheriff King both confirmed that the Sunfire was effectively hidden, as they believed that Mr. Charron was trespassing when he discovered the Sunfire."  PSAMF ¶ 169.  The County Defendants deny this paragraph, arguing that "the cited record evidence does not

The tow truck operator, Mr. Rankin, testified that he did not know where the daytime photos of the Sunfire were taken, even though he believed the Sunfire stayed in his possession at Moody's Collision after he towed it from the scene. PSAMF ¶ 170; DRPSAMF ¶ 170. He added that he was "not going to incriminate himself" regarding the daytime photographs. PSAMF ¶ 173; DRPSAMF ¶ 173. He testified that he kept the Sunfire outside for a few days and then put it inside the garage where Mr. Charron found it because he had to keep it that way after he learned that this was "going to turn into a—probably a legal thing . . . ." PSAMF ¶¶ 171-72; DRPSAMF ¶¶ 171-72; PRDRPSAMF ¶ 172. Mr. Rankin said he could not remember who he learned this from.[86] PSAMF ¶ 172; DRPSAMF ¶ 172; PRDRPSAMF ¶ 172.

Mr. Charron was concerned that the Sunfire might be moved or destroyed, so he did his best to keep a constant eye on it, risking a trespassing charge, while his attorney did what he could do to secure the Sunfire. PSAMF ¶ 174; DRPSAMF ¶ 174. After issuing a subpoena, Attorney McCullough purchased the Sunfire from Mr.

---

support the assertion that Deputy Horning or Sheriff King confirmed that the vehicle was hidden" and that the assertions are argument the Court should disregard or strike. DRPSAMF ¶ 169. Mr. Charron responds that a jury could infer that the belief of trespassing meant the Sunfire was hidden. PRDRPSAMF ¶ 169. The Court agrees with the County Defendants and struck the portion of this paragraph related to the Sunfire being hidden. The Court finds record support for the remainder of the paragraph and keeps it.

[86] Paragraph one hundred and seventy-two of Mr. Charron's statement of additional material facts also asserts that Mr. Rankin "could not explain who, other than the Sheriff's Office, he could have learned this from." PSAMF ¶ 172. The County Defendants qualify this paragraph, arguing that "the cited record evidence does not support the assertion that '[Mr. Rankin] could not explain who, other than the Sheriff's Office, he could have learned this from.'" DRPSAMF ¶ 172. Mr. Charron responds that he is entitled to the inference made in his assertion. PRDRPSAMF ¶ 172. The Court agrees with the County Defendants and struck this portion of the paragraph as unsupported, even when viewing it in the light most favorable to Mr. Charron.

Rankin, who Mr. Charron believed planned to scrap it, so that it could be preserved.[87] PSAMF ¶ 174; DRPSAMF ¶ 174; PRDRPSAMF ¶ 174.

In June, ADA Myska showed a willingness to inspect the Sunfire but requested time to arrange this with a sheriff's deputy.[88] PSAMF ¶ 175; DRPSAMF ¶ 175; PRDRPSAMF ¶ 175. At around the same time, ADA Myska also sought to disqualify Attorney McCullough as counsel for Mr. Charron. PSAMF ¶ 175; DRPSAMF ¶ 175; PRDRPSAMF ¶ 175. A month later, on July 22, ADA Myska dismissed the case "in the interest of justice" after the State Police agreed that the Sunfire rear-ended Mr. Charron's truck.[89] PSAMF ¶ 176; DRPSAMF ¶ 176; PRDRPSAMF ¶ 176.

---

[87] The County Defendants qualify Mr. Charron's additional paragraph one hundred and seventy-four by arguing that the statement about Mr. Rankin's plan to scrap the vehicle is inadmissible hearsay the Court should disregard or strike. DRPSAMF ¶ 174. Mr. Charron responds that Mr. Rankin's plan to scrap the Sunfire is admissible under the state of mind exception to the hearsay rule. PRDRPSAMF ¶ 174 (citing FED. R. EVID. 803(3)). The Court views the question of whether Mr. Rankin did in fact intend to scrap the Sunfire as hearsay if offered for the truth of the statement. However, the Court included the statement, not for its truth, but for its influence on Mr. Charron's state of mind, because it explains his conduct in reaction to his concern that the Sunfire would be destroyed.

[88] Paragraph one hundred and seventy-five of Mr. Charron's statement of additional material facts asserts that "[a]fter receiving the bound document on June 13, 2016, including photos establishing that the Sunfire rear-ended Mr. Charron's truck, the prosecutor showed a willingness to inspect the vehicle, but he needed more time to arrange this with a deputy." PSAMF ¶ 175. It continues, "[a]t the same time, [ADA Myska] sought to disqualify defense counsel, expressing skepticism about the information supplied." PSAMF ¶ 175. The County Defendants qualify this paragraph by stating that, other than ADA Myska moving to disqualify Attorney McCullough, the assertions are speculative argument the Court should strike or disregard. DRPSAMF ¶ 175. They add that ADA Myska's motion to disqualify "reflects that [he] understood [Mr. Charron's] arguments in defense of the charges." DRPSAMF ¶ 175. Mr. Charron responds to this added fact but not the other qualifications. PRDRPSAMF ¶ 175. The Court reviewed the cited portions of the record and does not find support for multiple assertions. The cited emails were sent before June 13. *Pl.'s Second Suppl. Summ. J. R. Items*, Attach. 2, *Second Aff. of Gregory McCullough* at 54-55 (ECF No. 79). Also, ADA Myska based his motion to disqualify on the likelihood that Attorney McCullough would have to testify at trial because of his involvement in procuring evidence. *Additional Attachs.* at 7-8 (ECF No. 67). The Court altered the paragraph accordingly.

[89] The County Defendants qualify Mr. Charron's additional paragraph one hundred and seventy-six by stating that the State Police agreeing that the Sunfire rear-ended Mr. Charron's truck is inadmissible hearsay the Court should strike or disregard. DRPSAMF ¶ 176. Mr. Charron responds that this statement "is not offered for the truth of the matter asserted, but to show that the prosecutor needed to hear this from law enforcement to accept it." PRDRPSAMF ¶ 176. The Court agrees with Mr. Charron that the State Police's view of the crash is being used here to show its effect on ADA Myska. The Court rejects the qualification accordingly.

### 6. John LeBlanc's Observations

Mr. LeBlanc was not present when the Sunfire rear-ended Mr. Charron's truck in front of Mr. LeBlanc's house, but he observed physical evidence of the collision the next day.[90]    PSAMF ¶¶ 116-17;  DRPSAMF ¶ 116-17;  PRDRPSAMF ¶ 117. Specifically, a planter barrel at the corner of his driveway was knocked from this location into the middle of Mr. LeBlanc's driveway and the damage to the Sunfire's right rear bumper was consistent with striking the planter barrel.[91]  PSAMF ¶ 118; DRPSAMF ¶ 118; PRDRPSAMF ¶ 118.  There were tire tracks in this location and there was glass in the road, which Mr. LeBlanc and Mr. Charron attributed to being from the windshield of the Sunfire where it broke when the Sunfire crashed into Mr. Charron's truck's rear bumper.[92]  PSAMF ¶¶ 102, 119-20; DRPSAMF ¶¶ 102, 119-

---

[90]    The County Defendants qualify Mr. Charron's additional paragraph one hundred and seventeen by stating that "[s]ince Mr. LeBlanc admits he was not present for the accident, he has no personal knowledge upon which to identify 'physical evidence' of the accident."  DRPSAMF ¶ 117. They ask the Court to strike or disregard the statement as speculation.  DRPSAMF ¶ 117.  Mr. Charron responds that the County Defendants' objection "ignores their admission of the facts stated in paragraph 101 . . . and the summary judgment standard," that "[p]aragraph 3 of [Mr.] LeBlanc's affidavit incorporates by reference the information in the email attached to his affidavit as Exhibit A," and that "[t]hat information, coupled with the other record evidence . . ., supports the inference that he observed physical evidence of the collision that had occurred the night before."  PRDRPSAMF ¶ 117. The Court reviewed the cited portions of the record, agrees with Mr. Charron that one can reasonably infer from the location of the collision and the photos of Mr. LeBlanc that Mr. LeBlanc saw physical evidence of the collision, and rejects the County Defendants' qualification.

[91]    The County Defendants qualify Mr. Charron's additional paragraph one hundred and eighteen by arguing that it is both hearsay and speculation and the Court should strike or disregard it. DRPSAMF ¶ 118.  They add that Mr. Charron's "assertions pertaining to what the referenced photograph shows [are] nothing more than argument, which should be stricken or disregarded as immaterial for the purposes of summary judgment."  DRPSAMF ¶ 118.  Mr. Charron responds that there is no hearsay issue and "it is not 'speculative' or 'argument' to infer that the dent in the right corner of the Sunfire's rear bumper came from the plant barrel being knocked from its location prior to the collision, or that the dent is 'consistent with' this inference."  PRDRPSAMF ¶ 118.  The Court finds that, given Mr. LeBlanc's affidavit, *Pl.'s Suppl. Summ J. R. Items*, Attach. 2, *Aff. of John LeBlanc* ¶ 3 (ECF No. 74), the statement is not hearsay.  The Court agrees with Mr. Charron that a factfinder could permissibly infer that the damage to the Sunfire was consistent with striking the planter barrel and therefore rejects the County Defendants' qualification.

[92]    Paragraph one hundred and nineteen of Mr. Charron's statement of additional material facts also states that the tire tracks are "consistent with the Sunfire backing into and through the planter

44

20; PRDRPSAMF ¶¶ 102, 119-20.  There was also debris on both sides of Langley Shores Drive adjacent to Mr. LeBlanc's property, which Mr. LeBlanc attributed to the Sunfire.[93]  PSAMF ¶ 121; DRPSAMF ¶ 121; PRDRPSAMF ¶ 121.

---

barrel as the Sunfire and Mr. Charron's truck pulled away from each other after being connected during the collision." PSAMF ¶ 119.  The County Defendants qualify this paragraph for the same reasons as paragraph one hundred and eighteen, and Mr. Charron responds by referring to paragraphs one hundred and seventeen and one hundred and eighteen and arguing that Mr. Charron "is entitled to" the reasonable inference contained in this paragraph.  DRPSAMF ¶ 119; PRDRPSAMF ¶ 119.  Applying the same reasoning as above in footnote 91, the Court reviewed the cited portions of the record and finds that the statement is not hearsay but the record does not contain sufficient evidence to support a reasonable inference that the tire tracks were necessarily caused by any particular vehicle at any particular moment.  The Court struck the part of the paragraph that posits that tire tracks are consistent with the Sunfire backing into the planter barrel and Mr. Charron's truck pulling away from the collision.

Paragraph one hundred and twenty of Mr. Charron's statement of additional material facts states that the glass was "apparently from the windshield of the Sunfire, where its windshield broke when it crashed into the rear bumper of Mr. Charron's truck." PSAMF ¶ 120.  The County Defendants qualify this paragraph by arguing that "[s]ince Mr. LeBlanc admits he was not present for the accident, he has no personal knowledge upon which to identify 'physical evidence' of the accident."  DRPSAMF ¶ 120.  They ask the Court to strike or disregard the statement as speculation.  DRPSAMF ¶ 120.  They add that "since [Mr. Charron] never exited his vehicle at the time of the collision and did not view the area in question until after he was[ ]released from jail, he is speculating as to the source of the glass on the road."  DRPSAMF ¶ 120.  Mr. Charron responds by referring to his responses to the County Defendants' objections to paragraphs one hundred and two and one hundred and seventeen through one hundred and nineteen and asserting that "[t]here is a reasonable inference that the glass in the road which [Mr.] Charron observed the day after the collision came from the Sunfire."  PRDRPSAMF ¶ 120.  The Court reviewed the cited portions of the record and finds that it is reasonable for Mr. Charron and Mr. LeBlanc to infer that the glass they saw was from the Sunfire and that, given Mr. Charron's additional paragraph one hundred and two, it is reasonable to infer that the glass was from when the windshield broke after the Sunfire crashed into Mr. Charron's truck's rear bumper.  The Court edited the paragraph to clarify that Mr. Charron and Mr. LeBlanc are the people attributing the glass to the Sunfire's windshield.

[93]  The County Defendants qualify Mr. Charron's additional paragraph one hundred and twenty-one as speculation and hearsay and ask the Court to strike or disregard it.  DRPSAMF ¶ 121.  Mr. Charron responds by citing his responses to the County Defendants' objections to his additional paragraphs one hundred and seventeen through one hundred and twenty and arguing that the statement is a reasonable inference.  PRDRPSAMF ¶ 121.  While Mr. Charron does not cite Mr. LeBlanc's affidavit in this paragraph, he cites the same document attachment and cites the affidavit in additional paragraph one hundred and twenty.  Thus, the Court finds that the paragraph is not hearsay.  *See supra* note 91.  Moreover, the Court determines that it is a reasonable inference to assume the debris is from the Sunfire, especially given Mr. Charron's additional paragraph one hundred and twenty-two and the corresponding record citations.  *See supra* note 45.  The Court altered the paragraph to clarify that Mr. LeBlanc is the person making this inference.

## H.  York County's Member Coverage Certificate

For the entirety of 2016, York County was a member of the Maine County Commissioners' Association Self-Funded Risk Management Pool.  DSMF ¶ 83; PRDSMF ¶ 83.  The Member Coverage Certificate issued to York County for this time period describes the coverage available to York County under the Risk Management Pool, and a true and accurate copy of the Coverage Certificate for 2016 is attached to Greg Zinser's affidavit as Exhibit One.  DSMF ¶¶ 84-85; PRDSMF ¶¶ 84-85.  The Coverage Certificate contains a provision that states that the coverage it provides does not extend to areas in which York County is immune under the Maine Tort Claims Act.  DSMF ¶ 86; PRDSMF ¶ 86.  In addition, the Coverage Certificate provides that the coverage does not effect a waiver of the immunities afforded to York County under the Maine Tort Claims Act.  DSMF ¶ 87; PRDSMF ¶ 87.  Apart from the coverage afforded by the Risk Management Pool, York County (including its operations at the York County Sheriff's Office) did not have any liability insurance coverage for the calendar year 2016.  DSMF ¶ 88; PRDSMF ¶ 88.

## I.  York County Policies

When an allegation of misconduct against the York County Sheriff's Office is filed, County Manager Gregory Zinser does not determine whether the allegation is true or false.[94]  PSAMF ¶ 178; DRPSAMF ¶ 178; PRDRPSAMF ¶ 178.  Similarly, Mr.

---

[94]     Paragraph one hundred and seventy-eight of Mr. Charron's statement of additional material facts states, "The County does not concern itself with whether allegations of misconduct by the Sheriff and his deputies are true."  PSAMF ¶ 178.  The County Defendants deny this paragraph, asserting that it is argument and unsupported by the record and the Court should strike or disregard it.  DRPSAMF ¶ 178.  The County Defendants also mention that the adjudicatory process makes determinations regarding whether anything improper occurred.  DRPSAMF ¶ 178.  Mr. Charron responds that a jury could infer from the cited evidence that York County has a policy of deliberate

Zinser does not personally review allegations against Sheriff King when they come in to see if he thinks Sheriff King acted properly.[95]  PSAMF ¶ 180; DRPSAMF ¶ 180; PRDRPSAMF ¶ 180.  Rather, he sends the notice of claim to the risk pool and it goes through an adjudicative process in court.  *Dep. of Zinser* at 13:2-5, 42:17-21.

indifference in this context.  PRDRPSAMF ¶ 178.  The Court reviewed the cited portions of the record, finds that Mr. Charron misstates what Mr. Zinser said, and altered the paragraph accordingly.  The paragraph still asserts a fact so the Court rejects the complete denial.

     Paragraph one hundred and seventy-seven of Mr. Charron's statement of additional material facts states, "As a result of discovery in this case, [Mr. Charron] has learned that the County of York has a policy of deliberate indifference relative to allegations of misconduct against the York County Sheriff and his deputies."  PSAMF ¶ 177.  The County Defendants deny this paragraph, asserting that it is argument and unsupported by the record and the Court should strike or disregard it.  DRPSAMF ¶ 177.  The County Defendants also mention what happens when the Sheriff's Office receives an allegation of misconduct.  DRPSAMF ¶ 177.  Mr. Charron responds that a jury could infer from the cited evidence that York County has a policy of deliberate indifference in this context.  PRDRPSAMF ¶ 177.  The Court reviewed the cited portions of the record, agrees with the County Defendants, and struck this paragraph as argument.

[95]     Paragraph one hundred and eighty of Mr. Charron's statement of additional material facts attributes the lack of review to York County as a whole.  PSAMF ¶ 180.  The County Defendants qualify this paragraph by asserting that "Mr. Zinser testified that allegations of misconduct by the Sheriff's Department are promptly forwarded to the County's risk pool for review and action" and "Mr. Zinser also indicated that when notices of claims are received, determinations as to whether anything improper occurred are made through the adjudicatory process in court."  DRPSAMF ¶ 180.  Mr. Charron responds that this qualification does not contradict his additional paragraph one hundred and eighty if viewed in the light most favorable to him.  PRDRPSAMF ¶ 180.  The Court reviewed the cited portion of the record and agrees with the County Defendants that Mr. Charron is misattributing Mr. Zinser's role to the whole County and leaving out measures York County takes in reviewing these allegations.  *See Local Rule 56(h) Joint Stipulated R.*, Attach. 2, *Dep. of Gregory T. Zinser* at 12:03-13:05, 16:05-16; 42:17-21 (ECF No. 60) (*Dep. of Zinser*).  The Court altered and supplemented the paragraph to more accurately reflect Mr. Zinser's testimony.

     Paragraph one hundred and eighty-one asserts that "[w]hen the County of York receives a notice of claim alleging misconduct by the Sheriff or his deputies, the County does not share the notice or the allegations with the Sheriff.  Thus, the Sheriff is not made aware of any such misconduct when a notice of claim is not served upon him, as in this case.  As a result, no correction or remedial action, that would otherwise occur, can occur."  PSAMF ¶ 181 (internal citations omitted).  The County Defendants qualify this paragraph, arguing that the cited record materials do not support its assertions because "Sheriff King testified that he generally receives the notices of claim served on the County that involve the sheriff's office," the paragraph contains speculative argument, and the Court should strike or disregard it.  DRPSAMF ¶ 181.  Mr. Charron responds that Sheriff King said he gets "some" of the notices and "[t]here is a reasonable inference that he only gets the ones with which he is formally served."  PRDRPSAMF ¶ 181.  The Court reviewed the cited portions of the record, finds no support for any of the assertions in the paragraph, and struck it.

Mr. Zinser is aware of Sheriff King's policy of posting information on Facebook and is indifferent to whether this information is on the internet.[96]  PSAMF ¶ 179; DRPSAMF ¶ 179; PRDRPSAMF ¶ 179.  Additionally, Mr. Zinser does not involve himself in the internal investigations of Sheriff King's deputies unless there is an employee grievance.[97]  PSAMF ¶ 182; DRPSAMF ¶ 182; PRDRPSAMF ¶ 182.  Mr. Zinser testified that he is unaware of any meritorious claims against Sheriff King or his deputies currently or in the past.[98]  PSAMF ¶ 183; DRPSAMF ¶ 183; PRDRPSAMF ¶ 183.

---

[96]     Paragraph one hundred and seventy-nine of Mr. Charron's statement of additional material facts states in full, "Similarly, the County is aware of the Sheriff's policy of posting information on Facebook, but the County is 'indifferent' as to whether that information is true or false."  PSAMF ¶ 179.  The County Defendants deny this paragraph, arguing that it is argument the Court should strike or disregard and that Mr. Charron is misinterpreting the use of "indifferent."  DRPSAMF ¶ 179.  Mr. Charron responds that a reasonable inference supports his interpretation of the use of "indifferent."  PRDRPSAMF ¶ 179.  The Court reviewed the record, agrees with the County Defendants, and altered the paragraph to clarify the context of the word "indifferent."  *See Dep. of Zinser* at 49:21-55:16.  Otherwise, the Court rejects the County Defendants' complete denial based on argument grounds.

[97]     Paragraph one hundred and eighty-two of Mr. Charron's statement of additional material facts states in full that "[i]f the County learns of allegations in a notice of claim that a deputy engaged in misconduct, it will not involve itself in the matter unless there is an employee grievance."  PSAMF ¶ 182.  The County Defendants deny this paragraph by clarifying that the County relies on the department head, such as Sheriff King for the Sheriff's Office, to conduct the internal review.  DRPSAMF ¶ 182.  Mr. Charron responds as he does to the County Defendants' objections to additional paragraphs one hundred and seventy-nine and one hundred and eighty.  PRDRPSAMF ¶ 182.  The Court reviewed the cited portions of the record, agrees with the County Defendants as to the accurate reflection of the record, and altered the paragraph accordingly rather than striking it.

[98]     The County Defendants qualify Mr. Charron's additional paragraph one hundred and eighty-three by restating what Mr. Zinser testified.  DRPSAMF ¶ 183.  Mr. Charron responds as he does to the County Defendants' objections to additional paragraphs one hundred and seventy-nine and one hundred and eighty.  PRDRPSAMF ¶ 183.  The Court reviewed the cited portions of the record, agrees with Mr. Charron that his addition of "currently or in the past" is a reasonable inference, and rejects the qualification.

         Paragraph one hundred and eighty-four of Mr. Charron's statement of additional material facts states, "[h]owever, discovery on this issue is incomplete."  PSAMF ¶ 184.  The County Defendants deny this paragraph, stating it is argument and the Court should strike or disregard it.  DRPSAMF ¶ 184.  Mr. Charron responds as he does to paragraphs one hundred and seventy-nine and one hundred and eighty.  The Court reviewed the cited portion of the record, agrees with the County Defendants, and struck this paragraph.

         Regarding Mr. Charron's claim that discovery is still ongoing, the Court notes that under the Magistrate Judge's Order dated January 14, 2019, the discovery deadline was fixed at April 5, 2019.

Sheriff King expects his deputies to investigate a case to the best of their training and ability.[99]    PSAMF ¶ 186; DRPSAMF ¶ 186; PRDRPSAMF ¶ 186. Despite the notice of claim filed in this case, he does not know what his deputies asked or what investigation, if any, they conducted at the scene or thereafter.    PSAMF ¶ 186; DRPSAMF ¶ 186; PRDRPSAMF ¶ 186.    By not taking the Sunfire into evidence, Deputy Horning acted pursuant to a policy against doing so unless there is a fatality or a search warrant is needed.[100]    PSAMF ¶ 185; DRPSAMF ¶ 185;

---

*Order Granting Without Obj. Mot. to Extend Time* (ECF No. 51). Mr. Charron points to the deposition of Mr. Zinser during which there is a discussion about information held by the risk pool and specific information about two cases that York County settled.  PSAMF ¶ 184 (citing *Dep. of Zinser* at 35:05-39:19).  The deposition suggests that counsel agreed to decide later how to proceed with these matters. *Dep. of Zinser* at 39:01-19.  Since Mr. Zinser's February 28, 2018, deposition, the parties have presented no discovery dispute on this issue to the Court and have filed no motion to extend the discovery deadline.  The issue of ongoing discovery was not raised at the Local Rule 56(h) conference and Mr. Charron filed no Federal Rule of Civil Procedure 56(d) motion requesting the Court extend time to complete discovery necessary to the resolution of the motion for summary judgment.  In sum, the Court disagrees that discovery is ongoing.  The discovery period is over.  Finally, if counsel had a side agreement to allow continued discovery, they should have resolved any dispute by now.  The Court declines to include Mr. Charron's additional paragraph one hundred and eighty-four in the statement of facts and struck it.

[99]    Paragraph one hundred and eighty-six of Mr. Charron's statement of additional material facts also states that Sheriff King "has a policy of non-supervision" and that he expects his deputies to investigate a case "in whatever manner they determine."  PSAMF ¶ 186.  The County Defendants qualify this paragraph by asserting that these statements are speculative argument, Sheriff King said he expects his deputies to "conduct their investigation to the best of their training and ability," and the Court should strike or disregard them.  DRPSAMF ¶ 186.  Mr. Charron responds as he does to the County Defendants' objections to additional paragraphs one hundred and seventy-nine and one hundred and eighty.  PRDRPSAMF ¶ 186.  The Court reviewed the cited portions of the record, agrees with the County Defendants, and altered the paragraph accordingly.

   Paragraph one hundred and eighty-seven of Mr. Charron's statement of additional material facts states, "Sheriff King is not even aware of his office's policies 'having to do with arrest procedures, probable cause, preservation of physical evidence, [and] collection of physical evidence.'"  PSAMF ¶ 187.  The County Defendants deny this paragraph, asserting that the cited material does not support the factual assertion and the Court should strike or disregard it.  DRPSAMF ¶ 187.  Mr. Charron responds as he does to the County Defendants' objections to additional paragraphs one hundred and seventy-nine and one hundred and eighty.  PRDRPSAMF ¶ 187.  The Court reviewed the cited portion of the record and its close surroundings, agrees with the County Defendants that Sheriff King did not say he did not know the policies, and struck this paragraph.

[100]    The County Defendants qualify Mr. Charron's additional paragraph one hundred and eighty-five by asserting that the parts not directly based on testimony are argumentative and speculative and the Court should strike or disregard them.  DRPSAMF ¶ 185.  Mr. Charron responds as he does to the County Defendants' objections to additional paragraphs one hundred and seventy-nine and one

PRDRPSAMF ¶ 185.  In a felony allegation of this sort, Sheriff King would expect the Sunfire to contain important physical evidence and be photographed, but not necessarily preserved, even though critical exculpatory evidence could be lost. PSAMF ¶ 185; DRPSAMF ¶ 185; PRDRPSAMF ¶ 185.

### J.    Mr. Charron's Interrogatory Answers

In his interrogatory answers, Mr. Charron indicated that his federal law claims were essentially based on four allegations: one, that he was arrested without probable cause; two, that the deputies "failed to disclose and take steps to preserve the 2002 Pontiac Sunfire that rear-ended [him]"; three, that the County Defendants perpetuated false allegations and prosecution against him; and four, that Sheriff King published information concerning Mr. Charron's arrest on the internet.[101]   DSMF ¶ 89; PRDSMF ¶ 89.  Mr. Charron further indicated in his interrogatory responses that his state law claims against the County Defendants were based on the same conduct alleged in support of his federal law claims.  DSMF ¶ 90; PRDSMF ¶ 90.  In these answers, Charron did not identify any specific policies or customs of York

---

hundred and eighty.  PRDRPSAMF ¶ 185.  The Court agrees with Mr. Charron that the inferences he makes are reasonable when viewing the facts in the light most favorable to him and rejects the qualification.

[101]    Mr. Charron qualifies the County Defendants' paragraph eighty-nine by stating that "Mr. Charron's interrogatory answers speak for themselves and are not as limited as stated in DSMF ¶ 89." PRDSMF ¶ 89.  The Court reviewed the cited portions of the record and finds that, while the interrogatories provide examples and evidence backing up the allegations, the answers boil down to the four allegations the County Defendants list in their paragraph eighty-nine.  *Dep. of Charron* at 84-88.  The Court rejects this qualification accordingly.

Mr. Charron's further qualification of the County Defendants' paragraph eighty-nine is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 89, and the Court rejects it.  *See supra* note 10.

County related to arrests or handling of evidence that he claimed were a moving force behind the alleged constitutional violations.[102]  DSMF ¶ 91; PRDSMF ¶ 91.

In his interrogatory answers, Mr. Charron described his mental and emotional injuries as follows:

> See previous answer.  [Mr. Charron] suffered physical pain, discomfort, and severe emotional distress from the time of his arrest until his release from jail.  He experienced fear, embarrassment, humiliation, despair, despondency, helplessness, outrage, social alienation and indignation during and long after his release from jail.  Although some of these conditions ended or waned when the felony charges against him were dismissed on July 22, 2016, [Mr. Charron] still experiences them as the false allegations against him remain on the Internet, and defendants have shown no willingness or inclination to remove or correct them, even after receiving notice of claim and being served with the present lawsuit.  [Mr. Charron] believes the stress of the events beginning with his false arrest and malicious prosecution contributed to his recent heart attack and deteriorating physical condition.[103]

DSMF ¶ 92; PRDSMF ¶ 92.  Mr. Charron did not receive any treatment for physical or emotional issues as a result of the actions of the County Defendants.  DSMF ¶ 93; PRDSMF ¶ 93.

---

[102]    Mr. Charron denies the County Defendants' paragraph ninety-one and cites to paragraph ten of Mr. Charron's interrogatory answers.  PRDSMF ¶ 91.  The Court reviewed the cited paragraph and finds that, although it mentions that the County Defendants "acted on behalf of the County of York in accordance with its customs and policies" and lists examples of actions York County took that Mr. Charron contends violated his rights, it does not mention any specific policies or customs.  *Dep. of Charron* at 88.  Mr. Charron's previous answers do not mention any specific policies or customs either.  *Id.* at 83-88.  The Court rejects this denial.

Mr. Charron's further denial of the County Defendants' paragraph ninety-one is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 91, and the Court rejects it.  *See supra* note 10.

[103]    Mr. Charron qualifies the County Defendants' paragraph ninety-two by stating that "Mr. Charron's description of his mental and emotional injuries has not been reproduced in its entirety in DSMF ¶ 92, which only starts with 'See previous answer.'"  PRDSMF ¶ 92.  The Court reviewed the cited portions of the record and finds that the previous interrogatory answer addresses Mr. Charron's damages claims but does not detail his mental or emotional injuries.  *Dep. of Charron* at 95-96.  Therefore, the Court rejects this qualification.

## III.    THE PARTIES' POSITIONS

### A.    The County Defendants' Motion for Summary Judgment

The County Defendants identify four allegations on which they believe Mr. Charron bases his federal law claims: (1) that he was arrested without probable cause; (2) that the County Defendants perpetuated false allegations and prosecution against him; (3) that the four deputies "failed to disclose and take steps to preserve the 2002 Pontiac Sunfire that rear-ended [him]"; and (4) that Sheriff King published information concerning Mr. Charron's arrest on the internet. *Defs.' Mot.* at 2 (quoting *Dep. of Charron* at 84-85). They add that Mr. Charron's interrogatory responses indicate that his state law claims are based on the same conduct. *Id.*

The County Defendants assert that neither Deputy Horning's conclusion that probable cause existed to arrest Mr. Charron on charges of aggravated reckless conduct and criminal threatening nor Sheriff King's issuance of a press release and a Facebook post about Mr. Charron's arrest consistent with the York County Sheriff's Office's policy of transparency "give rise to any viable state or federal claims." *Id.* at 1. The County Defendants also assert that they are all protected by immunity. *Id.*

### 1.    Constitutional Claims Under 42 U.S.C. § 1983

The County Defendants assert that a claim under 42 U.S.C. § 1983 may be brought only against persons who, under the color of law, "act to deprive another of 'rights, privileges, or immunities' secured by either the United States Constitution or federal statutes." *Id.* at 3 (quoting 42 U.S.C. § 1983). They cite First Circuit caselaw that defines two aspects of the deprivation prong: "(1) [T]here must have been a

deprivation of federally protected rights, privileges or immunities, and (2) the conduct complained of must have been causally connected to the deprivation." *Id.* (emphasis omitted) (quoting *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 559 (1st Cir. 1989)). The County Defendants add that "Section 1983 'is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 389-94 (1989)).

### a. Four Claims

#### i. Arrest Without Probable Cause Claim

The County Defendants assert that the Fourth Amendment governs Mr. Charron's claim of arrest without probable cause because "[i]n order to conform to the Fourth Amendment's guaranty against unreasonable seizures of the person, a police officer is required to base arrests on probable cause." *Id.* at 4. They state that the First Circuit has established the following rules regarding probable cause: (1) Its analysis "entails an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time" rather than an assessment of "the officer's state of mind at the time the challenged action was taken," *id.* at 4 (alteration in original) (quoting *Alexis v. McDonald's Rests. of Mass., Inc.*, 67 F.3d 341, 349 (1st Cir. 1995)); (2) its existence "is based on the facts and circumstances known by the arresting officer at the time of the arrest" rather than "from the perspective of hindsight," *id.* (citing *Roche v. John Hancock Mut. Life Ins. Co.*, 81 F.3d 249, 254 (1st Cir. 1996)); (3) it exists "if 'the facts and circumstances within [the officer's] knowledge and of which [he] had reasonably trustworthy information were sufficient

to warrant a prudent [person] in believing that the [defendant] had committed or was committing an offense,'" *id.* (quoting *Rivera v. Murphy*, 979 F.2d 259, 263 (1st Cir. 1992)); and (4) it "requires more than mere suspicion" but "does not require the same quantum of proof as is needed to convict." *Id.* (quoting *Logue v. Dore*, 103 F.3d 1040, 1044 (1st Cir. 1997)).

The County Defendants claim that, based on the totality of circumstances, Deputy Horning believed she had probable cause to arrest Mr. Charron and the information she had at the time of the arrest supported this belief because it satisfied the elements of the crimes she based the arrest on: aggravated reckless conduct and criminal threatening. *Id.* at 4-7. They lay out the elements of both crimes. *Id.* at 4-5 (quoting 17-A M.R.S. § 213(1); 17-A M.R.S. § 209(1)).

The County Defendants then list the information Deputy Horning had at the time of Mr. Charron's arrest, arguing that she had "ample information to warrant a reasonable person in believing that Mr. Charron had committed the offenses for which she charged him." *Id.* at 5. They assert that she heard or personally observed

1. a call to SRCC from an unidentified person who complained of cars peeling out their tires, yelling, and threats being made on Langley Shores Drive;

2. Christopher Moss' oral statements to Deputy Horning;

3. Christopher Moss' written statement;

4. Walter Moss' oral statement to Deputy Horning;

5. Walter Moss' written statement;

6.      "excessive and extensive" damage to Mr. Pilvelait's car including scrape marks on the hood, vehicle parts in the road, and markings on the ground "that appeared consistent with a vehicle that had been struck by a plow truck and pushed into a snow banking down the street in the manner described by Christopher Moss";

7.      deployed airbags on both the driver and passenger sides of Mr. Pilvelait's car;

8.      a plow truck in Mr. Charron's driveway that matched the description given by Christopher Moss; and

9.      Mr. Charron's refusal to provide a written sworn statement to Deputy Horning that evening.

*See id.* at 5-7.

The County Defendants also point out that a grand jury returned a six-count indictment, including counts of aggravated reckless conduct and criminal threatening, against Mr. Charron arising out of the events in this case. *Id.* at 7 n.2. They add that at the time of indictment, "ADA Myska was aware of Mr. Charron's theory of the case (that Mr. Pilvelait's car had hit Mr. Charron's truck from behind) and he was aware of the location of Mr. Pilvelait's Pontiac Sunfire." *Id.*

### ii.      Malicious Prosecution Claim

The County Defendants argue that, to the extent Mr. Charron is "attempting to assert a constitutional claim based on alleged malicious prosecution," "such a claim fails as a matter of law." *Id.* at 7. They state that, according to the First Circuit, for

a plaintiff to bring a suit under section 1983 to redress "malicious prosecution" premised on the Fourth Amendment, the plaintiff must establish that "the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor." *Id.* at 7-8 (quoting *Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 101 (1st Cir. 2013)). They add that a warrantless arrest cannot constitute the Fourth Amendment seizure for this claim and that "a plaintiff must, at a minimum, demonstrate a post-arraignment deprivation of liberty consistent with the concept of a seizure." *Id.* at 8 (citing *Nieves v. McSweeney*, 241 F.3d 46, 54 (1st Cir. 2001)).

The County Defendants assert that "[t]he undisputed facts preclude any Fourth Amendment 'malicious prosecution' claim." *Id.* They claim that "Deputy Horning effected Mr. Charron's arrest without a warrant" and there was no post-arraignment deprivation of liberty since York County Jail released Mr. Charron on March 9, Mr. Charron was not incarcerated or in custody again afterwards, and Mr. Charron's first court appearance was over a month and a half after the March 9 release. *Id.*

### iii. Failure to Disclose or Preserve Evidence Claim

The County Defendants place Mr. Charron's claims of "failing to disclose or preserve evidence" and "failing to influence the district attorney to drop the charges" under a Due Process Clause of the Fourteenth Amendment right to a fair trial analysis. *Id.* at 8-9. They state that a prosecutor withholding or destroying evidence only violates a criminal defendant's constitutional rights if the withholding or

destroying denies the defendant a fair trial. *Id.* at 9. In sum, they assert, "the right to a fair trial is not implicated—and, therefore, no cause of action exists under Section 1983—in cases in which all criminal charges were dismissed prior to trial." *Id.*

According to the County Defendants, Mr. Charron's right to a fair trial "was never imperiled" because "it is undisputed that the charges against Mr. Charron were dismissed before trial." *Id.* Moreover, the County Defendants argue, Mr. Pilvelait's Sunfire—the evidence in question—was available before the prosecutor submitted the case to the grand jury, so there was no constitutional deprivation. *Id.* Finally, the County Defendants assert that their obligation to preserve the evidence is an obligation to the prosecutor, not to Mr. Charron. *Id.* at 9-10 (citing *Campbell v. Maine*, 632 F. Supp. 111, 121 (D. Me. 1985)). The County Defendants claim that these arguments dispense with Mr. Charron's claim concerning their failure to convince the district attorney to drop the case sooner because the prosecutor makes the decision and, in any event, the district attorney did dismiss the case before any trial. *Id.* at 10 n.6.

### iv.    Defamation Claim

The County Defendants state that Mr. Charron cannot make a viable claim of defamation against Sheriff King that can be redressed under section 1983 because "a procedural due process claim cannot rest upon reputational harm alone." *Id.* at 10 (citing *Paul v. Davis*, 424 U.S. 693, 701 (1976)). According to the County Defendants, "[a] plaintiff who asserts a violation of his or her procedural due process rights based on reputational harm must also show that the challenged governmental action

adversely affected some right or status he or she previously enjoyed under substantive state or federal law." *Id.* They assert that the First Circuit clarified that to be sufficient, the alleged harm to a right or status must arise out of substantive state or federal law and must be caused directly by the challenged government action. *Id.*

The County Defendants argue that Mr. Charron's possible claim—that Sheriff King's defamatory statements in a Facebook post and press release presented a due process violation—fails as a matter of law. *Id.* at 11. They state that there is no actionable reputational injury from the statements because they accurately described the allegations and, in any event, Mr. Charron has not, in his interrogatories or elsewhere, "identif[ied] any right or status he previously enjoyed under substantive state or federal law that he no longer enjoys, the loss of which was caused directly by the County Defendants' actions." *Id.*

### b.    Qualified Immunity

The County Defendants claim that each individual defendant is protected from liability because "officers are entitled to qualified immunity under [section] 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *Id.* (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018)). They add that "qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

They then lay out the two-prong approach to applying qualified immunity, mentioning that a court has discretion on the order in which it conducts its inquiry. *Id.* at 12. Discussing the "clearly established" requirement, they cite First Circuit caselaw establishing that "[t]he question is not whether the official actually abridged the plaintiff's constitutional rights but, rather, whether the official's conduct was unreasonable, given the state of the law when he acted," *id.* at 13 (quoting *Alfano v. Lynch*, 847 F.3d 71, 75 (1st Cir. 2017)), stating that this requirement "affords 'some breathing room for a police officer even if he has made a mistake (albeit a reasonable one) about the lawfulness of his conduct.'" *Id.* (quoting *Conlogue v. Hamilton*, 906 F.3d 150, 155 (1st Cir. 2018)). They add that "[t]he [Supreme] Court has instructed that 'this inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)).

Applying the law to the facts, the County Defendants argue qualified immunity protects the individual County Defendants because (1) "[e]ven if Deputy Horning was incorrect in her assessment of the information she had, a reasonable officer in her position could have believed that the information supported the existence of probable cause with regard to either or both of the crimes with which she charged Mr. Charron," (2) "a reasonable officer in Sheriff King's position could have believed that he would not be violating Mr. Charron's constitutional rights by reporting to the public the activities of deputies in his department with regard to an arrest that was made and the allegations behind that arrest," and (3) due to Deputy Horning's

photographs of the Sunfire and Mr. Charron's ability to locate and secure it before any trial occurred, "a reasonable officer could have believed that their disclosure or preservation of evidence did not violate Mr. Charron's constitutional rights." *Id.* at 13-14.

### c. Governmental Entity Liability Claim Against York County

The County Defendants state that "a governmental entity cannot be held liable under Section 1983 unless there was an underlying constitutional violation by its employees." *Id.* at 15 (citing *Kennedy v. Town of Billerica*, 617 F.3d 520, 531 (1st Cir. 2010)). They also assert that the municipality itself must cause the constitutional violation at issue to be liable and that a plaintiff must "demonstrate that a policy or custom of the governmental entity led to the constitutional deprivation alleged." *Id.* at 14 (citing *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 694 (1978)). They state that the plaintiff must show "both the existence of a policy or custom and a causal link between that policy and the constitutional harm" and that "the policy or custom must be the result of acts or omissions of the municipality's policymakers that exhibit 'deliberate indifference' to the rights of the municipality's inhabitants." *Id.* The County Defendants list three elements a plaintiff must show to meet the deliberate indifference standard: "(1) a grave risk of harm, (2) the defendant's actual or constructive knowledge of that risk, and (3) his failure to take easily available measures to address the risk." *Id.* at 14-15 (quoting *Camilo-Robles v. Hoyos*, 151 F.3d 1, 7 (1st Cir. 1998)).

The County Defendants argue that York County cannot be liable regardless of policy because "none of York County's officers or officials caused Mr. Charron to suffer any constitutional deprivation." *Id.* at 15. In any event, they claim, York County is not liable because "Mr. Charron has presented no evidence of a custom or policy of York County that was a moving force behind any constitutional violations," in interrogatory responses or elsewhere. *Id.*

### d. Supervisory Liability Claim Against Sheriff King

The County Defendants list two ways supervisory liability can arise under section 1983: (1) The supervisor may be a "primary violator or direct participant in the right-violating incident" or (2) may "supervise[], train[], or hire[] a subordinate with deliberate indifference toward the possibility that deficient performance of the task eventually may contribute to a civil rights deprivation." *Id.* at 15-16 (quoting *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 49 (1st Cir. 2009)). The County Defendants state that the second method focuses on whether the supervisor's actions displayed the deliberate indifference required and had some causal connection to the right-violating tort. *Id.* at 16. They add that for either method, the plaintiff must show an affirmative link between the actor and the underlying violation. *Id.* Based on these two types of supervisory liability, the County Defendants argue, Sheriff King cannot be held liable under this theory based on the arrest because "[i]t is undisputed that Sheriff King did not participate in the events of March 8 and March 9" and "there is no record evidence to suggest that he was aware of—and therefore condoned or tacitly authorized—any conduct directed at Mr. Charron as part of the arrest." *Id.*

In listing these two methods, the County Defendants do not waive the argument that "the First Circuit's 'supervisory liability' paradigm has been superseded—if not overruled—by [*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)]." *Id.* at 16 n.7. Yet, the County Defendant assert, they do not discuss the issue at length because they "believe that Mr. Charron cannot meet the First Circuit's pre-*Iqbal* test" and so "the Court need not decide whether that test is still viable." *Id.*

### 2.  State Law Claims

The County Defendants identify the following state tort claims asserted by Mr. Charron and arising out of the arrest or the Facebook post and press release: false arrest, false imprisonment, malicious prosecution, defamation per se, and intentional or negligent infliction of emotional distress.[104]  *Id.* at 17.  The County Defendants claim that "[n]one of these claims are legally viable based on the summary judgment record" and that the Maine Tort Claims Act provides them with immunity.  *Id.* (citing 14 M.R.S. §§ 8101-8118).

### a.  Tort Claims

The County Defendants assert that, in order to survive summary judgment, Mr. Charron must "demonstrate a triable issue of fact with regard to all elements of his . . . claims." *Id.* (citing *Noveletsky v. Metro Life Ins. Co.*, No. 2:12-cv-00021-NT, 2013 WL 2945058, at *9 (D. Me. June 14, 2013)).  They state that he cannot meet this requirement with regard to any of his torts claims.  *Id.*

---

[104]    Mr. Charron's response does not assert a claim for intentional or negligent infliction of emotional distress, so the County Defendants' discussion of this tort is not included in this Order.

### i. False Arrest and False Imprisonment Claims

The County Defendants assert that "[t]he Maine Law Court has held that '[f]alse imprisonment involves the unlawful detention or restraint of an individual against his will.'" *Id.* (some alternations in original) (quoting *Nadeau v. State*, 395 A.2d 107, 116 (Me. 1978)). They state that an arrest supported by probable cause cannot give rise to a false imprisonment or false arrest tort claim. *Id.* (citing *Jordan v. Town of Waldoboro*, No. 2:17-cv-00025-JHR, 2018 WL 4688724, at *22 (D. Me. Sept. 28, 2018), *aff'd in part and rev'd in part on other grounds*, 943 F.3d 532 (1st Cir. 2019)). Thus, they argue, since Mr. Charron's arrest was supported by probable cause, his false arrest and false imprisonment claims "fail as a matter of law." *Id.* at 17-18.

### ii. Malicious Prosecution Claim

The County Defendants list three elements to a malicious prosecution claim: "(1) [T]he defendant initiated, procured or continued a criminal action without probable cause; (2) [t]he defendant acted with malice; and (3) [t]he plaintiff received a favorable termination of the proceedings." *Id.* at 18 (some alterations in original) (quoting *Trask v. Devlin*, 2002 ME 10, ¶ 11, 788 A.2d 179). They state that Mr. Charron's claim fails because his arrest was supported by probable cause. *Id.*

### iii. Defamation Claim

According to the County Defendants, there are four elements to a defamation claim under Maine state law: "[1] a false and defamatory statement concerning another; [2] an unprivileged publication to a third party; [3] fault amounting at least

to negligence on the part of the publisher; and [4] either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Id.* (quoting *Rice v. Alley*, 2002 ME 43, ¶ 19, 791 A.2d 932). They argue that Sheriff King's Facebook post and press release are not defamatory because the information in the statements is not false as they "accurately reflect that Mr. Charron had been accused of using his plow truck to hit another vehicle and that he had been charged with crimes as a result." *Id.* The County Defendants quote caselaw holding that "quotations by law enforcement officers reported in the newspaper describing the allegations against a criminal defendant were not false because 'they accurately reflected the nature of the case against the plaintiff, which was a matter of public interest.'" *Id.* at 18-19 (quoting *Jordan*, 2018 WL 4688724, at *24).

## b. Immunity for Individual County Defendants

The County Defendants state that the Maine Tort Claims Act "confers upon governmental employees absolute discretionary function immunity." *Id.* at 21 (citing 14 M.R.S. § 8111(1)(C); *Carroll v. City of Portland*, 1999 ME 131, ¶ 6, 736 A.2d 279). They assert that both an officer's decision to effectuate a warrantless arrest and a county sheriff's issuance of public statements "for the purposes of fostering transparency in the operations of the sheriff's office" are discretionary functions. *Id.* at 21-22 (discussing similar cases, including *Hilderbrand v. Washington County Commissioners*, 2011 ME 132, 33 A.3d 425, in which District of Maine judges and Maine Supreme Judicial Court judges applied discretionary function immunity). Thus, they argue, "the individual County Defendants are entitled to summary

judgment on all of Mr. Charron's tort claims because they are protected by absolute immunity." *Id.* at 22.

### c.     Immunity for York County

The County Defendants refer to the Maine Tort Claims Act, which provides that "all governmental entities shall be immune from suit on any and all tort claims seeking recovery of damages." *Id.* at 23 (quoting 14 M.R.S. § 8103(1)). They state that governmental entities include counties "by definition." *Id.* (citing 14 M.R.S. § 8102). Further, they assert that the only exceptions to the immunity appear in title 14, section 8104-A of the Maine Revised Statutes and that despite section 8104-A, "a governmental entity retains its immunity if the acts alleged constitute a discretionary function." *Id.* (citing 14 M.R.S. § 8104-B(3)). They add that the Maine Supreme Judicial Court "has applied Section 8104-B(3) consistent with the concept of discretionary function immunity afforded to governmental employees by Section 8111." *Id.* (citing *Roberts v. State*, 1999 ME 89, ¶ 7, 731 A.2d 855).

The County Defendants argue that York County has immunity against Mr. Charron's tort claims based on the above Maine Tort Claims Act provisions and that none of the exceptions to immunity apply to claims arising out of a warrantless arrest or defamation. *Id.* They add that even if an exception did apply, section 8104-B(3) would re-establish immunity because "all of the County Defendants' alleged actions constitute discretionary functions." *Id.* at 24. Finally, they state, York County has not waived its immunity by the purchase of insurance because—apart from a coverage certificate that did not waive the immunities afforded under Maine Tort

Claim Act—the County did not have any liability insurance coverage effective on the date of Mr. Charron's alleged injury. *Id.*

### 3. Punitive Damages

The County Defendants assert that, to the extent Mr. Charron seeks an award of punitive damages, the Court should grant summary judgment to the County Defendants with regard to such damages. *Id.* Regarding York County, they claim that "[p]unitive damages are not recoverable against the County under state tort law or under 42 U.S.C. § 1983." *Id.* Regarding the individual County Defendants, they state that there is no record evidence suggesting that "any of the individual County Defendants were motivated by evil motive or intent" or "acted with reckless or callous indifference to Mr. Charron's federally-protected rights," one of which is required for punitive damages against an individual in a section 1983 action. *Id.* at 24-25.

### B. John Charron's Opposition

Mr. Charron makes the following federal claims against the County Defendants: arrest without probable cause in violation of his Fourth Amendment rights, malicious prosecution in violation of his Fourth Amendment rights, and failure to preserve evidence and active concealment of evidence. *Pl.'s Opp'n* at 1. His state law claims are for false arrest, false imprisonment, malicious prosecution, and defamation per se. *Id.* He adds that his damage claim includes compensatory and punitive damages. *Id.* at 2.

## 1. Constitutional Claims Under 42 U.S.C. § 1983

### a. Three Claims

#### i. Arrest Without Probable Cause Claim

Mr. Charron claims that "he was arrested by four sheriff deputies" and "held for 14 hours" without probable cause in violation of his Fourth Amendment rights. *Id.* at 1. He highlights two First Circuit cases that he says apply to the determination of probable cause in this case: *Acosta v. Ames Dep't Stores, Inc.*, 386 F.3d 5 (1st Cir. 2004), and *B.C.R. Transport Co. v. Fontaine.* 727 F.2d 7 (1st Cir. 1984); *Pl.'s Opp'n* at 7.

Mr. Charron explains that *B.C.R. Transport* concerned a police officer who obtained search and arrest warrants based on an incoherent and unreliable alleged victim's statements and that the First Circuit disagreed that the victim's information alone provided probable cause as a matter of law. *Id.* He quotes the First Circuit: "While it is undoubtedly true that probable cause determinations predicated on information furnished by a victim are generally considered to be reliable, no court to our knowledge has ever adopted the *per se* approach which [the officer] advocates here." *Id.* (quoting *B.C.R. Transp.*, 727 F.2d at 10). He further quotes *B.C.R. Transport* for the holding that "whether or not probable cause exists in any given case invariably depends on the particular facts and circumstances of that case, a question to be resolved by the trier of fact." *Id.* (quoting *B.C.R. Transp.*, 727 F.2d at 10).

Mr. Charron then addresses *Acosta*, a case in which the First Circuit found probable cause as a matter of law when a store detective called the police to report a

shoplifting incident and the police officer arrested the alleged shoplifter based on the store detective's information. *Id.* at 8-9. He mentions the First Circuit's statements that "probable cause must be objectively determined based 'upon apparently trustworthy information,'" that the "cogency" of the source of information matters, and that information is not unreliable simply because the officer has never met the source before. *Id.* at 9 (quoting *Acosta*, 386 F.3d at 9-10).

Mr. Charron argues that the present facts align with *B.C.R. Transport* rather than *Acosta* for the following reasons: (1) Christopher Moss was "initially viewed as a suspect or perpetrator as a result of someone else's complaint, who then garnered sympathy by painting himself as a victim" because his mother called 911 to have him removed; (2) Deputy Horning could see and smell that Christopher Moss had been drinking, making him similar to the alleged victim in *B.C.R. Transport* who "might be on drugs"; (3) "the decision to arrest was made and implemented without speaking with or considering any information from" Mr. Charron; and (4) Christopher Moss' account could not be squared with what the deputies observed at the scene. *Id.* at 9-10.

Mr. Charron further argues that his case is "actually stronger than was the plaintiff's in *B.C.R. Transport*." *Id.* at 10. He claims that (1) "there was no determination of probable cause by any of the deputies," (2) Mr. Charron gave information to the four deputies by saying he did not do anything and the alleged victims rear-ended him, came to his house, and terrorized him, (3) Christopher Moss' written statement contradicted his oral statement regarding the location of the cars

during the collision—Mr. Pilvelait's driveway or the end of Langley Shores Drive—and how far the Sunfire was pushed; and (4) Christopher Moss' allegations regarding the location of the collision and push were implausible given the physical evidence, including the Sunfire being positioned front first in the snowbank, a broken window on Mr. Charron's truck, vehicle debris in the road, and marks on the Sunfire's hood. *Id.* at 9-12.

Mr. Charron concludes that "the absence of probable cause is established as a matter of law," *id.* at 12, because "existence of probable cause, or lack thereof, is amenable to summary judgment if material facts as to what police knew, their source of knowledge, and leads that they pursued or eschewed, are not in dispute." *Id.* at 12 (citing *Acosta*, 386 F.3d at 9). In other words, Mr. Charron seems to be asserting that there are no disputed material facts and that the Court should deny the County Defendants' Motion for Summary Judgment because the undisputed facts show there was no probable cause rather than because the circumstances require the jury to determine an issue of fact.

### ii. Malicious Prosecution Claim

Mr. Charron makes a malicious prosecution claim based on his fourteen-hour stay at York County Jail and the conditions placed on his release. *Id.* at 13-15. He lists the same requirements for a malicious prosecution claim under section 1983 that the County Defendants provide. *Id.* at 13-14. However, Mr. Charron argues, there is a seizure here due to factors besides the warrantless arrest. *Id.* at 14. He cites caselaw from other circuits in which courts have found a seizure based on various

conditions of release, such as reporting requirements, restriction of travel, provision of financial and identifying information, and bond amounts. *Id.* (citing *Evans v. Ball*, 168 F.3d 856 (5th Cir.1999); *Gallo v. City of Philadelphia*, 161 F.3d 217 (3d Cir. 1998); *Murphy v. Lynn*, 118 F.3d 938 (2d Cir.1997), *cert. denied*, 522 U.S. 1115 (1998)).

Mr. Charron equates the present case to these examples due to the "$3,000 cash bail with conditions including no use or possession of alcohol or weapons, surrendering his firearms, and submitting to searches of his person, vehicle, and residence 'at any time without articulable suspicion or probable cause.'" *Id.* He asserts that these conditions were "significant deprivations of liberty as contemplated by *Nieves* . . . and *Britton*[ *v. Maloney*, 196 F.3d 24 (1st Cir.1999)]—and by this Court [in *Wellines v. City of Portland,* No. CIV. 98-395-P-C, 1999 WL 33117076 (D. Me. Sept. 29, 1999)]." *Id.* at 14-15, 15 n.2. Thus, according to Mr. Charron, since he suffered a seizure, there was no probable cause for the arrest, and the deputies acted with malice and bad faith, he has an action against "the four deputies who arrested him . . .." *Id.* at 15.

### iii.  Failure to Disclose or Preserve Evidence Claim

Mr. Charron clarifies that his due process claim is not based on the deprivation of his right to a fair trial; rather, it is based on a deprivation of his liberty more generally "as a result of the failure to preserve and active concealment of exculpatory evidence." *Id.* at 15-16. He lists two elements of this claim developed in the Seventh Circuit: "(1) [T]he defendant destroyed exculpatory evidence in bad faith or engaged in other misconduct (2) that caused a deprivation of the plaintiff's liberty." *Id.* at 16

(quoting *Armstrong v. Daily*, 786 F.3d 529, 551 (7th Cir. 2015)). He adds that, "[t]hough the most common liberty deprivation cases are based on post-trial incarceration after a wrongful conviction, the essential elements of this constitutional claim are more general and not limited to wrongful convictions." *Id.* (quoting *Armstrong*, 786 F.3d at 551).

Continuing the parallel to the claim against the prosecutor in *Armstrong*, Mr. Charron claims that "'a reasonable prosecutor . . . would not have moved forward with the charges' if the exculpatory evidence had been preserved and 'provided to [the prosecutor and] the defense . . ..'" *Id.* (alterations in original) (quoting *Armstrong*, 786 F.3d at 553-54). He says the exculpatory evidence is the digital and measurement photos of the Sunfire, which the prosecutor did not receive until two and three months after the arrest respectively, and the Sunfire itself. *Id.* The harm, according to Mr. Charron, comes in the form of his bail conditions. *Id.* Therefore, Mr. Charron maintains, he has an action against "the deputies" for depriving him of his liberty through the bail conditions without due process of law. *Id.*

### iv. Defamation Claim

Mr. Charron does not discuss a constitutional defamation claim against Sheriff King in his response.

### b. Qualified Immunity

Mr. Charron again looks to *B.C.R. Transport* in asserting that the County Defendants are not protected by qualified immunity. *Id.* at 12. He provides the First Circuit's language in *B.C.R. Transport*: "Here again . . . the question of qualified

immunity is one of reasonableness—would a reasonable person in the shoes of [the officer] have known he was violating another's constitutional rights?" *Id.* (quoting *B.C.R. Transp.*, 727 F.2d at 10). He states that the First Circuit found this inquiry to be a proper jury question in *B.C.R. Transport* due to evidence of bad faith because the officer contacted gypsy truck drivers for corroboration without exhausting readily available first-hand sources (including the alleged victim's wife) and "'saw fit to embellish' with a 'gratuitous statement' that the alleged victim seemed 'to be an upstanding citizen.'" *Id.* at 12-13 (quoting *B.C.R. Transp.*, 727 F.2d at 10-11).

Mr. Charron uses the First Circuit's analysis in *B.C.R. Transport* to support his argument that "no reasonable officer could have believed that [Mr.] Charron's arrest was consistent with his constitutional rights." *Id.* at 13 (citing *Murphy*, 979 F.2d 259). He states that there is evidence of bad faith here because "t[h]e deputies tried unsuccessfully to make contact with [Mr.] Pilvelait" and "showed no interest in what [Mr.] Charron had to say or in the exculpatory physical evidence in front of them." *Id.* Mr. Charron adds that Deputy Horning's "skepticism" toward the evidence that contradicted Christopher Moss' allegations, expressed by calling it "irrelevant" during her deposition, also demonstrated bad faith. *Id.* It seems that, as above with probable cause, Mr. Charron is arguing that the Court should deny the County Defendants' Motion for Summary Judgment because there is no qualified immunity as a matter of law rather than because the circumstances require the jury to determine an issue of fact.

Mr. Charron separately argues that qualified immunity does not apply to his claim of failure to disclose evidence. *Id.* at 17. He states that, rather than looking at whether a remedy is available, "[t]he qualified immunity defense focuses instead on whether the official defendant's *conduct* violated a clearly established constitutional right." *Id.* (quoting *Armstrong*, 786 F.3d at 556). He applies logic from *Armstrong*— in which the prosecutor was a defendant—to the present case, stating that "[n]o reasonable police officer 'could have believed in 1980 that if he possessed exculpatory evidence, he had an obligation to disclose it . . . unless he deliberately destroyed it first.'" *Id.* (quoting *Armstrong*, 786 F.3d at 550). Thus, he argues, the individual County Defendants violated a clearly established constitutional right. *Id.*

### c. Governmental Liability Against York County and Supervisory Liability Against Sheriff King

Mr. Charron discusses municipal liability and supervisory liability together because, he maintains, both municipal and supervisory officials are "only liable for [their] own misconduct." *Id.* at 17 (quoting *Ashcroft*, 556 U.S. at 662). He states that both forms of liability require the plaintiff to show that the acts and omissions of the municipality or supervisor evidence "deliberate indifference" to the constitutional rights of others. *Id.* He argues that York County exhibited deliberate indifference in not reviewing allegations of misconduct or sharing them with Sheriff King unless there was an employee grievance. *Id.* at 18. According to Mr. Charron, this system prevents corrective or remedial action that would otherwise occur. *Id.* Mr. Charron adds that Sheriff King has also demonstrated deliberate indifference through his policy of "non-supervision, leaving his subordinates free to conduct themselves as

they see fit—indeed, as they did in this case—without training or corrective action." *Id.* According to Mr. Charron, Deputy Horning's decision to not take the Sunfire into evidence was pursuant to policy. *Id.* Thus, Mr. Charron claims, York County and Sheriff King "are responsible for the underlying constitutional violations in their own right." *Id.* at 18-19.

### 2. State Law Claims

#### a. Tort Claims

Mr. Charron asserts false arrest and false imprisonment state law tort claims against the four deputies. *Id.* at 19. He asserts a malicious prosecution state law tort claim against the four deputies and Court Officer Vachon. *Id.* He asserts a defamation per se claim against Deputy Horning and Sheriff King. *Id.* He does not assert any state law claims against York County due to its immunity as a "government entity" under the Maine Tort Claims Act. *Id.* (citing 14 M.R.S. § 8103).

#### i. False Arrest and Imprisonment Claims

Mr. Charron argues that his false arrest and false imprisonment claims turn on two elements: (1) the existence or non-existence of probable cause and (2) whether discretionary function immunity is available under the Maine Tort Claims Act. *Id.* at 19-20. He claims that, since there was no probable cause in this case as a matter of law, there is also no discretionary function immunity because deputies "have no discretion to make arrests without probable cause, at least when the existence of probable cause is not 'ambiguous.'" *Id.* at 20 (quoting *Blackstone v. Quirino*, 309 F. Supp. 2d 117, 130 (D. Me. 2004)).

### ii.     Malicious Prosecution Claim

Mr. Charron applies the same elements as in the false arrest and imprisonment claims above to his malicious prosecution claim. *Id.* He puts forward the conclusion that the four deputies and Court Officer Vachon do not have discretionary function immunity because "there is no discretion to withhold 'clearly exculpatory information from prosecutors resulting in the continuation of criminal proceedings.'" *Id.* (quoting *Trafton v. Devlin*, 43 F. Supp. 2d 56, 61 (D. Me. 1999)). The deputies, Mr. Charron asserts, withheld exculpatory information by "not sharing with the prosecutor in their reports and probable cause affidavits the exculpatory physical evidence that they observed at the scene, as well as [Mr.] Charron's protestation of innocence and complaint that he had been rear-ended, harassed, and terrorized by [Christopher] Moss and [Mr.] Pilvelait." *Id.* He adds that the deputies failed to secure the Sunfire and that the deputies and Court Officer Vachon actively concealed it from the prosecutor and defense counsel. *Id.* at 20-21.

### iii.     Defamation Claim

Mr. Charron disagrees with the County Defendants on the truth element of his defamation claim.   He asserts that "repetition of a defamatory statement is a publication in itself, regardless whether the repeater names the source." *Id.* at 21 (quoting *Olinger v. Am. Sav. & Loan Ass'n*, 409 F.2d 142, 144 (D.C. Cir. 1969)). Rather, he says, a person who repeats a statement "must prove the truth of the defamatory charges which he has thus repeated." *Id.* (quoting Restatement (Second) of Torts § 582, comment d (1938)).   Mr. Charron adds that "the Maine Supreme

75

Judicial Court has recognized that true statements may meet the falsity requirement if they are incomplete and omit critical facts." *Id.* (quoting JACK H. SIMMONS, DONALD N. ZILLMAN, & ROBERT H. FURBISH, MAINE TORT LAW § 13.10 (2018) (MAINE TORT LAW)).

Here, Mr. Charron argues, the following omissions by Sheriff King and based on Deputy Horning's report are critical and rise to meet the falsity requirement for defamation:

> (1)     [Christopher Moss'] mother called 911 to have her son removed;
>
> (2)     [Deputy] Horning "could see and smell" that [Christopher] Moss had been drinking;
>
> (3)     [Mr.] Charron complained twice to [Walter Moss] that [Christopher] Moss and [Mr.] Pilvelait were "laying rubber strips" in [Mr.] Charron's driveway;
>
> (4)     [Walter Moss] picked up his son from that location at [Mr.] Charron's request;
>
> (5)     [Mr.] Pilvelait was operating an unregistered motor vehicle and did not answer his door when police arrived to interview him, consistent with being OUI;
>
> (6)     in contrast, [Mr.] Charron sought out the deputies and told them that the Sunfire rear-ended his plow truck;
>
> (7)     the Sunfire was found at the end of Langley Shores Drive, a third of a mile away from [Mr.] Pilvelait's driveway, where it appeared to have driven into a snowbank;
>
> (8)     the damage to the Sunfire was consistent with having rear-ended [Mr.] Charron's plow truck and inconsistent having been struck by it head on as [Christopher] Moss alleged;
>
> (9)     [Christopher] Moss and [Mr.] Pilvelait's witness statements contradicted [Christopher Moss'] oral account that the Sunfire was struck in [Mr.] Pilvelait's driveway; and
>
> (10)    the location and orientation of the Sunfire made [Christopher Moss'] oral allegation not only implausible, but impossible.

*Id.* at 22. Mr. Charron does not address the other elements of a defamation per se claim.

Mr. Charron asserts that "[t]here is no discretionary function immunity for defamatory statements to the media." *Id.* (citing *Rippett v. Bemis*, 672 A.2d 82, 88 (Me. 1996)). He adds that the case for discretionary function immunity was stronger in *Rippett*, where it was denied, than here due to the internal impropriety being investigated in *Rippett*. *Id.* at 23.

### b. Discretionary Function Immunity

Mr. Charron incorporates discussions of discretionary function immunity under the Maine Tort Claims Act into the above subsections. *Id.* at 19-23. He states in general that, under the Maine Tort Claims Act, "liability is the rule and immunity the exception for *government employees*," while "immunity is the rule and liability the exception for *government entities*." *Id.* at 19 (quoting *Carroll v. City of Portland*, 1999 ME 131, ¶ 6 n.3).

### 3. Punitive Damages

Mr. Charron claims that the individual County Defendants are exposed to punitive damages for false arrest, false imprisonment, malicious prosecution, and defamation per se. *Id.* at 23. For the first three claims, he argues that there is malice because "[a]n absence of probable cause may serve as evidence of malice," *id.* (quoting *Bickford v. Lantay*, 394 A.2d 281, 285 (Me. 1978)), and "[t]he groundlessness of a suit may be so obvious as to allow the inference of malice." *Id.* (quoting MAINE TORT LAW § 3.05). For the defamation per se claim, he asserts that "[l]anguage imputing criminal conduct is actionable *per se*; malice in law is implied and no evidence of 'malice in fact' is necessary." *Id.* (quoting *Rippett*, 672 A.2d at 89).

## C.	The County Defendants' Reply

The County Defendants reply to four specific objections raised by Mr. Charron: probable cause for Mr. Charron's arrest, Mr. Charron's due process claim regarding the Sunfire, qualified immunity, and claims against York County.

### 1.	Probable Cause for Mr. Charron's Arrest

The County Defendants assert that—contrary to Mr. Charron's claims—Deputy Horning did make a probable cause determination with regard to the criminal threatening charge, as shown in her sworn testimony and not contradicted by her arrest report. *Id.* at 1 and 1 n.1. They point out that Mr. Charron "does not contest the information Deputy Horning received from Christopher and Walter Moss with regard to that charge," which they allege reflects the necessary elements for criminal threatening and provides "ample probable cause . . .." *Id.* at 1-2. Thus, they state, probable cause for the aggravated reckless conduct charge is not necessary and Mr. Charron's arguments with regard to that charge do not eliminate probable cause. *Id.* at 2.

The County Defendants then address Mr. Charron's discussion of *Acosta* and *B.C.R. Transport*, arguing that the present case is much closer to *Acosta*. *Id.* Specifically tackling Mr. Charron's arguments, they assert that (1) Deputy Horning stated in her report that Christopher Moss did not appear drunk, (2) Walter Moss' oral statement confirmed much of Christopher Moss' oral statement, including Walter Moss saying that Mr. Charron said "he had a plow truck and that he was going to take Mr. Pilvelait and Christopher into the ditch," and (3) Deputy Horning's

personal observations of a damaged vehicle with deployed airbags in a snowbank, vehicle parts and marks in the road, and a pickup truck with a plow in Mr. Charron's driveway matched Christopher Moss' and Walter Moss' statements. *Id.* at 2-3. The County Defendants maintain that "Deputy Horning had ample information to convince a reasonable person that Mr. Charron had committed the two crimes for which he was charged." *Id.* at 3.

The County Defendants also address other parts of Mr. Charron's response regarding probable cause. They state that "[t]he only relevant facts [to the question of probable cause] are those known to the officer," so information Deputy Horning did not have when she made the probable cause determination, such as measurements and other witness testimony, is irrelevant. *Id.* (some alterations in original) (quoting *Holder v. Town of Sandown*, 585 F.3d 500, 504 (1st Cir. 2009)). They also assert that Mr. Charron's claims of "conflicting" evidence are unsupported, such as the conflict regarding where the collision occurred, which was an ambiguity that Deputy Horning clarified during her deposition. *Id.* at 3-4. They add that, in any event, an actual conflict would not defeat probable cause because "the possibility that more than one conclusion could be drawn from information available to a police officer does not invalidate the officer's assessment of probable cause." *Id.* at 4 (citing *Acosta*, 386 F.3d at 9). According to the County Defendants, "probable cause does not require the level of certainty of criminal activity—including absolute consistency in all factual information—that Mr. Charron is advocating . . .." *Id.* (citing *United States v. Winchenbach,* 197 F.3d 548, 555-56 (1st Cir. 1999)). Finally, they maintain that

Deputy Horning did not need to follow up on any alleged exculpatory evidence before effecting Mr. Charron's arrest because "the First Circuit, following Supreme Court precedent, has 'disclaimed any unflagging duty on the part of law enforcement officers to investigate fully before making a probable cause determination.'" *Id.* at 4-5 (quoting *Acosta*, 386 F.3d at 11). Specifically, they assert, "[a] reasonable police officer is not required to credit a suspect's story," including declarations of innocence. *Id.* at 5 (quoting *Cox v. Hainey*, 391 F.3d 25, 32 n.2 (1st Cir. 2004)).

### 2. Mr. Charron's Due Process Claim Regarding the Sunfire

The County Defendants refute Mr. Charron's "suggestion that the temporary inability to locate the Sunfire in this case constitutes a due process violation . . .." *Id.* at 5. First, they assert that defendants do not have a liberty interest to be free from standard bail conditions such as "requiring a person to attend court proceedings, notify the court of any change in address, refrain from committing crimes, and forbear from consuming either controlled substances or excessive quantities of alcohol . . .." *Id.* (citing *Harrington v. City of Nashua*, 610 F.3d 24, 32 (1st Cir. 2010)).

Second, they argue that there is no evidence of intentional or deliberate failure to disclose or preserve evidence. *Id.* at 6. They explain that Deputy Horning took photographs of the Sunfire, provided the photographs to the prosecutor early in the criminal process, attempted to locate the Sunfire by contacting its owner, and conveyed the information she was provided. *Id.* While they do not concede negligence, they add that "[a]ny negligence in tracking down the vehicle . . . cannot support a due process claim." *Id.* (citing *Daniel v. Williams*, 474 U.S. 327, 328 (1986)).

Third, they state that qualified immunity protects them because "Mr. Charron has not presented case law to suggest that the [County] Defendants' alleged actions with regard to the vehicle violated clearly-established law." *Id.* (citing *Quintero de Quintero v. Aponte-Roque*, 974 F.2d 226, 228 (1st Cir. 1992)).

### 3.    Qualified Immunity

The County Defendants maintain that qualified immunity protects them from the constitutional claims in this case. *Id.* They argue that "[t]here can be no doubt that a reasonable officer, possessing the specific information Deputy Horning had, could have believed that probable cause existed to arrest Mr. Charron for the two crimes with which he was charged" and therefore, "even if her assessment of that information was erroneous, Deputy Horning is protected by qualified immunity." *Id.* at 6-7. They reiterate that Deputy Horning is the only deputy who made the probable cause determination. *Id.* at 7 n.4.

The County Defendants also respond directly to Mr. Charron's argument by calling his reliance on *B.C.R. Transport* "erroneous" because the Supreme Court has corrected the Ninth Circuit in a similar case by stating that "[i]mmunity ordinarily should be decided by the court long before trial," not by the jury. *Id.* at 7 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227-28 (1991)). They add that the First Circuit's holding in *Murphy* is also inapplicable because "the officer in [*Murphy*] provided no details in support of his probable cause determination, whereas Deputy Horning has documented in both her report and in her sworn testimony the totality of

circumstances that supported her determination." *Id.* at 7 (citing *Murphy*, 979 F.2d at 263).

### 4. Claims Against York County

The County Defendants claim that Mr. Charron "has not demonstrated that the [County's] approach was the moving force behind any constitutional violation." *Id.* Thus, they argue, Mr. Charron "fails to demonstrate a viable Section 1983 claim against the County." *Id.*

## IV. LEGAL STANDARD

A grant of summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Genuine issues of fact are those that a factfinder could resolve in favor of the nonmovant, while material facts are those whose 'existence or nonexistence has the potential to change the outcome of the suit.'" *Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30, 38 (1st Cir. 2014) (quoting *Tropigas de P.R.*, 637 F.3d at 56).

Once the moving party "has made a preliminary showing that there is no genuine issue of material fact, the nonmovant must 'produce specific facts, in suitable evidentiary form, to . . . establish the presence of a trialworthy issue.'" *McCarthy v. City of Newburyport*, 252 Fed. App'x 328, 332 (1st Cir. 2007) (alteration in original) (quoting *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999)). The nonmoving party must show "'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims." *Carroll v. Xerox Corp.*, 294 F.3d 231,

237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Bos.*, 985 F.2d 1113, 1116 (1st Cir. 1993)). The Court then "views the facts and draws all reasonable inferences in favor of the nonmoving party," *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011), while disregarding "[c]onclusory allegations, improbable inferences, acrimonious invective, or rank speculation." *Mancini*, 909 F.3d at 38 (quoting *Ahern*, 629 F.3d at 54).

## V. DISCUSSION

The County Defendants' Motion for Summary Judgment turns on whether (1) Mr. Charron suffered a Fourth Amendment or due process violation under section 1983 due to the actions of the County Defendants, (2) qualified immunity protects the County Defendants against Mr. Charron's section 1983 claims, (3) York County and Sheriff King have governmental and supervisory liability, (4) Mr. Charron has met the required elements of any state law tort claims, and (5) discretionary function immunity protects the individual County Defendants against Mr. Charron's state law tort claims. The Court addresses each question in turn. The Court also discusses whether Mr. Charron would be entitled to punitive damages.

### A. Constitutional Violation Under 42 U.S.C. § 1983

Section 1983 provides that

 [e]very person who, under color of [law], subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . ..

42 U.S.C. § 1983. The deprivation prong requires there to be a deprivation of a federally protected right, privilege, or immunity and a causal connection between the conduct complained of and the deprivation. *See Gutierrez-Rodriguez*, 882 F.2d at 559. As the County Defendants point out, section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Defs.' Mot.* at 3 (quoting *Graham*, 490 U.S. at 389-94). Thus, Mr. Charron must point to specific federal rights, show deprivation of those rights, and show a causal connection to the County Defendants' conduct.

### 1. Fourth Amendment Violations

Mr. Charron makes two claims of violations of his Fourth Amendment rights: arrest without probable cause and malicious prosecution. *Pl.'s Opp'n* at 7-15. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . .." U.S. CONST. amend. IV.

### a. Arrest Without Probable Cause Claim

Mr. Charron claims that his arrest on March 8 violated his Fourth Amendment rights because it was a seizure without probable cause. *Pl.'s Opp'n* at 1. He asserts this claim against the four deputies present during his arrest. *Id.*

### i. Existence of Probable Cause

The First Circuit has explained that the "ultimate question for determining whether an arrest violates the Fourth Amendment is . . . whether there was probable cause to believe that the arrestee had committed or was committing a crime." *Wilson*

*v. City of Boston*, 421 F.3d 45, 55 (1st Cir. 2005). "Probable cause for an arrest exists when the arresting officer, acting upon apparently trustworthy information, reasonably concludes that a crime has been (or is about to be) committed and that the putative arrestee likely is one of the perpetrators." *Acosta,* 386 F.3d at 9 (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). As the County Defendants explain, *Defs.' Mot.* at 4, a probable cause analysis uses an objective standard rather than looking at the officer's state of mind, *see Acosta*, 386 F.3d at 9; *Alexis*, 67 F.3d at 349, and looks at the facts known to the arresting officer at the time of the arrest rather than in hindsight. *See Roche*, 81 F.3d at 254; *see also Devenpeck v. Alford*, 543 U.S. 146, 152 (2004).

"[T]hough probable cause requires more than mere suspicion, it does not require the same quantum of proof as is needed to convict." *Logue*, 103 F.3d at 1044; *see also Holder*, 585 F.3d at 504 ("Probable cause requires only a probability that the defendant committed the crime"); *Acosta*, 386 F.3d at 9-10 ("The focus [for probable cause] is not on certitude, but, rather, on the likelihood of criminal activity"); *Winchenbach*, 197 F.3d at 555-56. "[P]robable cause determinations predicated on information furnished by a victim are generally considered to be reliable," *United States v. Barbosa*, 896 F.3d 60, 70 (1st Cir. 2018) (quoting *B.C.R. Transp.*, 727 F.2d at 10); *see also Holder*, 585 F.3d at 505 (quoting *Acosta*, 386 F.3d at 10), though exceptions apply. *See B.C.R. Transp.*, 727 F.2d at 10 (holding that information from a disoriented and ranting victim who "might be on drugs" did not necessarily establish probable cause to obtain and execute search and arrest warrants for the

defendant as a matter of law).  Moreover, law enforcement officers do not need to "investigate fully," *Acosta*, 386 F.3d at 11, or credit a suspect's "story" before making a probable cause determination.  *Cox*, 391 F.3d at 32 n.2; *see also Holder*, 585 F.3d at 505 (stating that a police officer does not have "a standing obligation to investigate potential defenses or resolve conflicting accounts prior to making an arrest").  Finally, "courts must apply these principles fluidly to the totality of the extant circumstances."  *Acosta*, 386 F.3d at 10 (citing *Illinois v. Gates*, 462 U.S. 213, 232 & n.7 (1983); *Winchenbach*, 197 F.3d at 555).

In the present case, the Court looks to what Deputy Horning knew at the time of the arrest to determine if a reasonable person in her position could conclude that, based on this information, Mr. Charron likely committed a crime.  In looking at Mr. Charron's "likelihood of criminal activity," *see Acosta*, 386 F.3d at 9-10, the Court analyzes the crimes of aggravated reckless conduct and criminal threatening because these are the two crimes for which Deputy Horning made a probable cause determination before arrest.  *See Defs.' Mot.* at 4-7; DSMF ¶ 48.

A person commits aggravated reckless conduct when he "with terroristic intent engages in conduct that in fact creates a substantial risk of serious bodily injury to another person."  17-A M.R.S. § 213(1).  "Terroristic intent" is defined in the Maine Criminal Code to mean "the intent to do any of the following for the purpose of intimidating or coercing a civilian population or to affect the conduct of government: [c]ause serious bodily injury or death to multiple persons; [c]ause substantial damage to multiple structures; or [c]ause substantial damage to critical infrastructure."  17-

A M.R.S. § 2(25). The Maine Criminal Code defines "serious bodily injury" as "bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement or loss or substantial impairment of the function of any bodily member or organ, or extended convalescence necessary for recovery of physical health." 17-A M.R.S. § 2(23). An example of aggravated reckless conduct appears in *Barnard v. Maine*, where this Court noted that the plaintiff had been convicted of aggravated reckless conduct for threatening to shoot officers and blow up a camper, pointing and firing a rifle at an officer, and throwing a Molotov cocktail at officers. No. 1:16-cv-00276-JAW, 2018 WL 4101377, at *4 (D. Me. Aug. 28, 2018).

A person commits criminal threatening when he "intentionally or knowingly places another person in fear of imminent bodily injury." 17-A M.R.S. § 209(1). "Bodily injury" means "physical pain, physical illness or any impairment of physical condition." 17-A M.R.S. § 2(5).

Looking first at aggravated reckless conduct, the information Deputy Horning knew at the time of Mr. Charron's arrest supports the conclusion that a reasonable person in her position would have probable cause to arrest. First, Deputy Horning heard from Christopher Moss that Mr. Charron had a long-standing feud with Mr. Pilvelait and that he peeled his tires and yelled threats from Mr. Pilvelait's driveway. *See* DSMF ¶¶ 8-9. The anonymous call to the SRCC about a person peeling out their tires, yelling, and making threats on Langley Shores Drive corroborated Christopher Moss' statements, *see* DSMF ¶ 5, as did Walter Moss' oral statement to Deputy Horning that Mr. Charron called him twice that night and said "someone was going

to get hurt" because Christopher Moss and Mr. Pilvelait were laying rubber strips in Mr. Charron's driveway and then that he was going to take them into a ditch with his plow truck. *See* DSMF ¶¶ 25-26. This evidence establishes a likelihood of Mr. Charron's intent to intimidate Christopher Moss and Mr. Pilvelait by causing them serious bodily injury.

Second, Deputy Horning heard from Christopher Moss that Mr. Charron drove at Christopher Moss and Mr. Pilvelait with his plow in the air and struck Mr. Pilvelait's car hood with the plow, causing the airbags to deploy and Christopher Moss to hit his head. *See* DSMF ¶¶ 10-12. Deputy Horning took photographs of Christopher Moss' alleged injuries. *See* DSMF ¶¶ 19-20. Christopher Moss also told Deputy Horning that Mr. Charron then pushed Mr. Pilvelait's car with the plow into a snowbank. *See* DSMF ¶ 13; PSAMF ¶ 140. Deputy Horning heard from Walter Moss that he saw the Sunfire after it had been pushed. *See* DSMF ¶ 27. Deputy Horning herself saw the Sunfire front first in a snowbank with extensive damage and deployed airbags, vehicle parts and markings on the road, and a plow truck in Mr. Charron's driveway. *See* PSAMF ¶ 141; DSMF ¶¶ 32-36. This information is enough to establish the likelihood that Mr. Charron engaged in conduct that created a substantial risk of serious bodily injury to Christopher Moss and Mr. Pilvelait.

Turning to criminal threatening,[105] the information Deputy Horning knew at the time of Mr. Charron's arrest supports a reasonable person finding probable cause

---

[105] Mr. Charron suggests that he was not charged with criminal threatening on the night of March 8. *See* PRDSMF ¶ 45. Whether Deputy Horning later charged Mr. Charron with criminal threatening is irrelevant to the determination of whether she had probable cause to conclude that Mr. Charron committed the crime of criminal threatening.

to arrest based on this crime. First, the same information that supports terroristic intent, described above, supports the conclusion that Mr. Charron intended his actions to place Christopher Moss and Mr. Pilvelait in fear of imminent bodily injury. The evidence about the collision also shows likelihood of knowledge because a reasonable person would know that driving a plow truck into a car with passengers would cause those passengers to fear imminent bodily injury. Second, a reasonable person in Deputy Horning's position could conclude that Christopher Moss actually did fear imminent bodily injury because he told Deputy Horning that night that he feared for his life, *see* DSMF ¶¶ 14, 18, and it would be objectively reasonable to fear imminent bodily injury before being hit by a plow truck.

Mr. Charron argues that Deputy Horning had no probable cause to arrest Mr. Charron by drawing parallels between the present case and *B.C.R. Transport*. *Pl.'s Opp'n* at 7. In *B.C.R. Transport*, the First Circuit addressed an officer's appeal of a jury verdict against him that found he acted without probable cause in obtaining search and arrest warrants against the plaintiffs. 727 F.2d at 8-9. The officer claimed that because he relied on the statements of a complainant-victim in obtaining the warrant, "probable cause to search, seize or arrest exists *per se*." *Id.* at 9-10. The First Circuit rejected the officer's per se rule, noting that even though an officer may have been acting on information provided by the alleged victim of a crime, "this fact did not preclude the jury from finding that probable cause did not exist in this case." *Id.* at 10. The obverse of this principle, urged by Mr. Charron, does not follow: It is not true that because an officer relies on the statements of a complainant-victim in

making her probable cause determination, it must mean that she per se acted without probable cause. As discussed above, in *United States v. Barbosa*, the First Circuit wrote that "probable cause determinations predicated on information furnished by a victim are generally considered to be reliable." 896 F.3d at 70 (quoting *B.C.R. Transp.*, 727 F.2d at 10).

Regardless, the facts here do not raise the same concerns as those in *B.C.R. Transport* that rebutted the general reliability of victim information.[106] In *B.C.R. Transport*, there was evidence that the complainant-victim was not acting rationally. The First Circuit described the complainant-victim as "yelling obscenities and repeating incoherent phrases" to the point where the officer wondered if the complainant-victim was affected by "some kind of mind-altering substance." 727 F.2d at 9.

Mr. Charron's argument that Christopher Moss' oral statement was unreliable because he was drunk, *id.*, is unconvincing. Intoxicated people can be victims of a crime just as sober people can be. It is true that Deputy Horning said she "could see and smell that [Christopher Moss] had been drinking," *see* PSAMF ¶ 133, but she did not say he seemed intoxicated. There is no evidence that Deputy Horning was aware at the time of the arrest of Walter Moss' earlier impression that Christopher Moss was "drunk," *see* PSAMF ¶ 113, if heard correctly by Mr. Lemay. Even if he was intoxicated, other witnesses and physical evidence corroborated his allegations, as

---

[106] Mr. Charron also argues that *B.C.R. Transport* places Christopher Moss in a different position for Deputy Horning's probable cause determination because Christopher Moss was initially considered a suspect. *Pl.'s Opp'n* at 9-10. But the First Circuit does not mention that the complainant-victim in *B.C.R. Transport* was considered a suspect.

described above.  Moreover, there is no evidence that he was disoriented or ranting in a way that confused his narrative, as in *B.C.R. Transport*.  *See* 727 F.2d at 10. Since information gathered from a victim is normally "sufficiently reliable to support a finding of probable cause," *Holder*, 585 F.3d at 505, and Mr. Charron has not demonstrated why it should not be here, the Court will not discount the evidence from Christopher Moss' oral statement on this ground.

Mr. Charron's further contention that his statements at the time of his arrest obviated probable cause because Deputy Horning did not consider conflicting information from Mr. Charron or the physical evidence, *see Pl.'s Opp'n* at 9-10, also fails.  While the Court does not view all the information Mr. Charron describes as necessarily conflicting with the view taken at the scene by Deputy Horning, this question need not be resolved because the First Circuit has clearly held that police officers do not need to credit a suspect's "story" before making a probable cause determination, *Cox*, 391 F.3d at 32 n.2, and that an officer need not "investigate fully" before determining probable cause.  *Acosta*, 386 F.3d at 11.  Thus, that Mr. Charron's statement of innocence, *see* PSAMF ¶ 188, and the existence of other information could be viewed in different ways or could lead to a different result does not invalidate the probable cause determination.

Finally, Mr. Charron's statement that "there was no determination of probable cause by any of the deputies" is both inaccurate, *see* DSMF ¶ 48, and irrelevant because the probable cause standard is objective.  *See Acosta*, 386 F.3d at 9.  On a related note, the claims against the three deputies other than Deputy Horning

necessarily fail because Deputy Horning alone made the probable cause determination. *See* DSMF ¶ 48.[107]

### ii. Issue of Law vs. Issue of Fact

In support of his position, Mr. Charron quotes the First Circuit in *B.C.R. Transport* as stating that "whether or not probable cause exists in any given case invariably depends on the particular facts and circumstances of that case, a question to be resolved by the trier of fact." *Pl.'s Opp'n* at 7 (quoting *B.C.R. Transp.*, 727 F.2d at 10). Taken to an extreme, this language would mean that a civil action against a police officer alleging a lack of probable cause would always have to be decided by a jury. Since *B.C.R. Transport*, however, the First Circuit has explained that "when the underlying facts claimed to support probable cause are not in dispute, whether those 'raw facts' constitute probable cause is an issue of law" for the court to decide. *Holder*, 585 F.3d at 504 (quoting *Bolton v. Taylor*, 367 F.3d 5, 8 (1st. Cir. 2004)); *see also Acosta*, 386 F.3d at 8-9 (explaining that the language in *Bolton* is more relevant to probable cause determinations than the First Circuit's ruling in *B.C.R. Transport*).

In contrast, when "these facts are in reasonable dispute, the fact-finder must resolve the dispute." *Holder*, 585 F.3d at 504. The First Circuit has held that "what the police knew at the moment of the arrest, the source of their knowledge, and the leads that they pursued or eschewed" are material facts that, if not in dispute, ordinarily make the probable cause to arrest question "amenable to summary

---

[107]     As regards the use of a suspect's silence to establish probable cause, an issue not raised by Mr. Charron, see *United States v. Zarauskas*, 814 F.3d 509, 515-16 (1st Cir. 2016) (citing *Salinas v. Texas*, 570 U.S. 178, 182-83, 191 (2013)).

judgment." *Acosta*, 386 F.3d at 9. The First Circuit in *Acosta* also limited its holding

in *B.C.R. Transport* that "the issue of probable cause was for the jury" due to the

particular facts and circumstances of the case, calling the holding "the exception, not

the rule." *Id.* at 8-9. Here, since none of the material facts is in dispute, the question

of probable cause is "amenable to summary judgment." *Acosta*, 286 F.3d at 9.

### b.     Malicious Prosecution Claim

Mr. Charron claims that the four deputies violated his Fourth Amendment

rights under a malicious prosecution theory because his conditions of release

constituted a seizure. *Pl.'s Opp'n* at 13-15; *Additional Attachs.* at 68 (ECF No. 67).

For a plaintiff to bring a suit under section 1983 to redress "malicious prosecution,"

under the Fourth Amendment, the plaintiff must establish that "the defendant (1)

caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable

cause, and (3) criminal proceedings terminated in plaintiff's favor." *Hernandez-

Cuevas*, 723 F.3d at 101 (quoting *Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir.

2012)). When a plaintiff was arrested without a warrant, he must show "some *post-

arraignment* deprivation of liberty, caused by the application of legal process, that

approximates a Fourth Amendment seizure." *Nieves*, 241 F.3d at 54.

Here, the four deputies arrested Mr. Charron without a warrant and he was

held in York County Jail for fourteen hours. *Pl.'s Opp'n* at 14 (citing PRDSMF ¶ 54).

He was not held in custody again after this fourteen-hour period. DSMF ¶ 52. Mr.

Charron's initial appearance happened over a month later, on April 25, DSMF ¶ 54,

so his arrest and detention cannot constitute a Fourth Amendment seizure because they were not post-arraignment. *See Nieves*, 241 F.3d at 54.

Mr. Charron was released on $3000 cash bail with conditions that included no use or possession of alcohol or weapons, the surrender of his firearms, and submission to searches of his person, vehicle, and residence "at any time without articulable suspicion or probable cause." *Pl.'s Opp'n* at 14 (citing PRDSMF ¶ 52). The Court turns to whether these post-arrest conditions of release constituted a Fourth Amendment seizure.

A Fourth Amendment seizure occurs "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen . . .." *Terry v. Ohio,* 392 U.S. 1, 19 n.16 (1968). "[R]un-of-the-mill conditions of pretrial release," such as orders to appear before the court, "do not fit comfortably within the recognized parameters of the term." *Nieves*, 241 F.3d at 55. The First Circuit has found conditions requiring the plaintiff to notify the court of a change of address, refrain from committing crimes, and forebear from consuming either controlled substances or excessive quantities of alcohol, as well as loss of employment, reputational harm, and stress resulting from pending criminal charges, to fall within the category of "run-of-the-mill conditions." *Harrington*, 610 F.3d at 32. The District of Maine has also held that having to hire a defense attorney is not enough to establish a malicious prosecution claim under the Fourth Amendment. *Wellines*, 1999 WL 33117076, at *4. The First Circuit recently declined to consider whether other conditions constitute a seizure for this purpose. *See Jordan v. Town of*

*Waldoboro*, 943 F.3d 532, 551 n.10 (1st Cir. 2019) (Barron, J., concurring) ("I also do not address whether the seizure that grounds this claim ended upon Jordan's release on bail or instead only upon the termination of certain bail conditions that restricted his liberty").

As Mr. Charron points out, *Pl.'s Opp'n* at 14, other circuits have found that certain "restrictive conditions of release," such as mandatory court appearances, reporting requirements, restrictions on travel, provision of financial and identifying information, and bond amounts, can constitute a seizure. *See Murphy*, 118 F.3d at 946 (holding that imposing a condition not to leave the state and requiring eight court appearances during the year constituted a seizure); *see also Evans*, 168 F.3d at 861, *abrogated on other grounds by Castellano v. Fragozo*, 352 F.3d 939 (5th Cir. 2003) (holding that a "summons to appear in court, coupled with the requirements that [the plaintiff] obtain permission before leaving the state, report regularly to pretrial services, sign a personal recognizance bond, and provide federal officers with financial and identifying information," constituted a seizure); *Gallo,* 161 F.3d at 222-25 (holding that conditions including mandatory court appearances and restricted travel constituted a seizure and placing special emphasis on the temporary seizure during a mandatory court appearance).

For this determination, whether Mr. Charron's release conditions constitute a seizure or whether the criminal proceedings terminated in Mr. Charron's favor is immaterial because, as discussed above, the deputies had probable cause to arrest Mr. Charron. Nonetheless, Mr. Charron cites no First Circuit authority that

considers the conditions of release to which he was subjected to constitute a seizure for a malicious prosecution claim.

Moreover, only two of Mr. Charron's conditions were discussed by the other circuits he cites. First, in *Gallo*, the Third Circuit mentioned that the plaintiff had to pay a $10,000 personal recognizance bond, but it did not focus on the bond when deciding a seizure had occurred. 161 F.3d at 222. Second, all three sister circuit decisions cited by Mr. Charron determined that mandatory court appearances, at least when coupled with other restrictions, constituted a seizure. In *Nieves*, the First Circuit held that "the view that an obligation to appear in court to face criminal charges constitutes a Fourth Amendment seizure is not the law." 241 F.3d at 55. As Mr. Charron provides no authority from any circuit suggesting that Mr. Charron's other specific conditions of release should constitute a seizure, the cases from the other circuits are not persuasive. Even if there were no probable cause, Mr. Charron's argument would fail because his view of what constitutes a seizure is unsupported by First Circuit law.

### 2. Due Process Violation: Failure to Disclose or Preserve Evidence Claim

Mr. Charron claims that the four deputies violated his due process rights by failing to disclose and preserve evidence and actively concealing evidence, resulting in a deprivation of his liberty through his conditions of release without due process of law. *Pl.'s Opp'n* at 15-16. He states the exculpatory evidence at issue consists of the digital and measurement photos of the Sunfire and the Sunfire itself. *Id.* at 16.

"The due process guarantees of the Fourteenth Amendment forbid the State itself from depriving a person of life, liberty, or property, without due process of laws." *Rivera v. Rhode Island*, 402 F.3d 27, 33 (1st Cir. 2005). "In order to establish a substantive due process claim, the plaintiff must first show a deprivation of a protected interest in life, liberty, or property." *Id.* at 33-34. "Second, the plaintiff must show that the deprivation of this protected right was caused by governmental conduct." *Id.* at 34.

Mr. Charron's claim fails on the first prong of this test. For the reasons discussed above, the Court declines to hold that Mr. Charron's conditions of release deprived him of a protected liberty interest. *See Nieves*, 241 F.3d at 55; *see also Terry,* 392 U.S. at 19 n.16 (requiring restraint on liberty for a Fourth Amendment seizure). Since Mr. Charron bases his claim on a deprivation of liberty due to these conditions, *see Pl.'s Opp'n* at 15-16, his due process violation claim is not viable.

Mr. Charron's own argument separately suggests there was no deprivation of liberty regarding any failure to disclose. He quotes the Seventh Circuit in *Armstrong*: "Though the most common liberty deprivation cases are based on post-trial incarceration after a wrongful conviction, the essential elements of this constitutional claim are more general and not limited to wrongful convictions." 786 F.3d at 551. In *Armstrong*, however, the Seventh Circuit distinguished the case—in which a prosecutor and state laboratory technicians destroyed evidence of a semen stain that did not match the defendant in a rape case—from cases in which the defendants violated *Brady v. Maryland*, 373 U.S. 83 (1963), in failing to disclose evidence.

*Armstrong*, 786 F.3d at 535, 551. In the latter situation, the Seventh Circuit explained, "*Brady* does not require pretrial disclosure," *id.* at 552 (quoting *United States v. Grintjes,* 237 F.3d 876, 880 (7th Cir. 2001); *Buckley v. Fitzsimmons,* 20 F.3d 789, 797 (7th Cir.1994)), because "the constitutional violation is not even ripe if the prosecution can still meet its *Brady* obligation by disclosing the evidence in time for the defendant to use it." *Id.* Since the present case involves a failure to disclose claim and the prosecutor dismissed the criminal charges before trial, Mr. Charron's due process violation claim based on the failure to disclose is not ripe.

Mr. Charron also refers to his claim as a "failure to preserve" claim. *Pl.'s Opp'n* at 15. He contends that this failure to preserve evidence claim involves an extra element: that the defendant "destroyed exculpatory evidence in bad faith or engaged in other misconduct . . .." *Pl.'s Opp'n* at 16 (quoting *Armstrong*, 786 F.3d at 551). Mr. Charron does not explain what exactly the County Defendants failed to preserve. *Id.* at 15-16. Viewing the evidence in the light most favorable to Mr. Charron, the County Defendants did not fail to preserve the digital and measurement photographs because they are present in the record. *See* DSMF ¶¶ 37-38; PSAMF ¶ 170.

The Court assumes Mr. Charron is referring to the Sunfire itself. The Court is unclear how Mr. Charron can satisfy the added element since the County Defendants did not destroy the Sunfire. The record in this case does not establish that any of the deputies other than Deputy Horning were involved in the removal and storage of the Sunfire.

Deputy Horning's involvement is minimal at best. The record does not establish that Deputy Horning selected Rankin Towing to tow the Sunfire or told Rankin Towing where to take the Sunfire. Upon request from a superior, Deputy Horning contacted Mr. Pilvelait, who told her that he did not want to pay the storage fees and had sold the Sunfire to the junkyard for salvage. DRPSAMF ¶ 165. Deputy Horning relayed this information through Court Officer Vachon[108] to ADA Myska. PSAMF ¶ 165. Deputy Horning's only other involvement appears to be her belief, along with Sheriff King, that when Mr. Charron went onto Mr. Rankin's property to search for the Sunfire, he was trespassing when he discovered it. PSAMF ¶ 169; DRPSAMF ¶ 169; PRDRPSAMF ¶ 169. Regardless of her belief, there is no evidence in this record that Deputy Horning took any actions to pursue a trespass charge against Mr. Charron. Even viewed in the light most favorable to Mr. Charron, Deputy Horning's actions do not constitute "other misconduct." If there was no destruction or other misconduct, it follows that there is no causation. For these reasons, Mr. Charron's failure to disclose or preserve evidence claim is not viable.

### B.    Qualified Immunity

Mr. Charron argues that qualified immunity does not protect the County Defendants from any of his claims. *Pl.'s Opp'n* at 12-13, 17. The County Defendants, on the other hand, argue that qualified immunity protects them against all of Mr. Charron's constitutional claims. *Defs.' Mot.* at 11-14.

---

[108]    In his response, Mr. Charron clarifies that his claim against Court Officer Vachon is limited to the state law tort claim of malicious prosecution. *Pl.'s Opp'n* at 19 ("[Mr.] Charron's [state] malicious prosecution claim is also asserted against the court officer, Wilfred Vachon"). Mr. Charron is not claiming that Court Officer Vachon played a role in the law enforcement investigation or his arrest.

"[T]he qualified immunity inquiry is a two-part test. A court must decide: (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." *Maldonado v. Fontanes*, 568 F.3d 263, 268-69 (1st Cir. 2009) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). "[T]he second, 'clearly established' step of the qualified immunity analysis . . ., in turn, has two aspects." *Id.* at 269. First, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right," *id.* (alteration in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); second, the Court must ask "whether a reasonable defendant would have understood that his conduct violated the plaintiff['s] constitutional rights." *Id.* The Supreme Court has instructed that "this inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Brosseau*, 543 U.S. at 198 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled on other grounds by Pearson*, 555 U.S. 223). The First Circuit has held that "[w]hen a defendant moves for summary judgment on the basis of qualified immunity, it is the plaintiff's burden to demonstrate the infringement of a federally assured right." *Quintero de Quintero*, 974 F.2d at 228.

Since Mr. Charron has not stated any viable violations of his constitutional rights, he has not met the first prong of the test. Even if Deputy Horning made a mistake in determining that there was probable cause to arrest Mr. Charron, Mr. Charron has not pointed to any caselaw clearly establishing that finding probable

cause based on a victim's statements corroborated by other witnesses and some physical evidence is actionable. Mr. Charron points to *B.C.R. Transport* in his reasoning, stating that the First Circuit there found enough evidence of bad faith to make the qualified immunity inquiry a jury question because the officer contacted gypsy truck drivers for corroboration without exhausting readily available first-hand sources (including the alleged victim's wife) and "'saw fit to embellish' with a 'gratuitous statement' that the alleged victim seemed 'to be an upstanding citizen.'" *Pl.'s Opp'n* at 12-13 (quoting *B.C.R. Transp.*, 727 F.2d at 10-11). He equates those facts to the present case, in which the four deputies "tried unsuccessfully to make contact with [Mr. Pilvelait]" and "showed no interest in what [Mr.] Charron had to say or in the exculpatory evidence in front of them," and in which Deputy Horning used the word "irrelevant" to describe evidence that Mr. Charron alleges contradicted Christopher Moss' allegations. *Id.* at 13; *see* DSMF ¶ 39; PSAMF ¶¶ 136, 143, 188.

The Court does not see how trying to contact a witness shows bad faith. Further, as stated above, officers need not credit what a suspect says at the time of his arrest, *see Cox*, 391 F.3d at 32 n.2, or take a particular view of evidence that may lead to multiple conclusions. *See Acosta*, 386 F.3d at 11. None of these reasons provides evidence of bad faith or gives reason for Deputy Horning to understand that she was violating Mr. Charron's rights.

Mr. Charron does not address why qualified immunity does not apply to the malicious prosecution claim beyond the reasons it should apply to the arrest without probable cause claim. Thus, for the same reasons, the Court determines that the

qualified immunity analysis as applied to the malicious prosecution claim fails on both prongs.

Concerning the failure to disclose or preserve evidence claim, Mr. Charron again does not provide any caselaw showing that Deputy Horning's decision not to take the Sunfire into evidence and her inability to find the Sunfire later violated clearly-established law. He cites the logic in *Armstrong*, a Seventh Circuit case, to show that the four deputies' conduct violated a clearly established constitutional right because "[n]o reasonable police officer 'could have believed in 1980 that if he possessed exculpatory evidence, he had an obligation to disclose it . . . unless he deliberately destroyed it first.'" *Pl.'s Opp'n* at 17 (quoting *Armstrong*, 786 F.3d at 550). This reference misses the mark for two reasons. First, the holding in *Armstrong* applied to a prosecutor defendant, not a police officer. *See Armstrong*, 786 F.3d at 535. Second, failing to preserve a car is markedly different than intentionally destroying evidence of a semen stain in a rape case. *See id.* Since the burden is on Mr. Charron to demonstrate the infringement, *see Quintero de Quintero*, 974 F.2d at 228, and "this inquiry must be taken in light of the specific context of the case, not as a broad proposition," *Brosseau*, 543 U.S. at 198, this claim also does not meet either prong of the qualified immunity test.

### C. Governmental Liability Against York County and Supervisory Liability Against Sheriff King

Mr. Charron argues that York County and Sheriff King "are responsible for underlying constitutional violations in their own right" and thus are liable for the

violations of Mr. Charron's constitutional rights under governmental liability and supervisory liability respectively. *Pl.'s Opp'n* at 17-19.

To hold a governmental entity liable under section 1983, there must be an "underlying, identifiable constitutional violation[] attributable to official municipal policy . . .." *Kennedy*, 617 F.3d at 531. An action by an employee (1) must be pursuant to an official policy and (2) must have "caused [the] constitutional tort." *Id.* at 531-32 (emphasis omitted) (quoting *Monell*, 436 U.S. at 691).

"Notice is a salient consideration in determining the existence of supervisory liability," but "supervisory liability does not require a showing that the supervisor had actual knowledge of the offending behavior; [the supervisor] 'may be liable for the foreseeable consequences of such conduct if he would have known of it but for his deliberate indifference or willful blindness.'" *Camilo-Robles*, 151 F.3d at 7 (quoting *Maldonado-Denis v. Castillo–Rodriguez,* 23 F.3d 576, 582 (1st Cir.1994)). The deliberate indifference standard has three elements: "(1) a grave risk of harm, (2) the defendant's actual or constructive knowledge of that risk, and (3) his failure to take easily available measures to address the risk." *Id.* (citing *Manarite v. City of Springfield,* 957 F.2d 953, 956 (1st Cir.1992)).

Supervisory liability can arise under section 1983 if the supervisor (1) is the "primary violator" or "direct participant in the rights-violating incident" or (2) "supervises, trains, or hires a subordinate with deliberate indifference toward the possibility that deficient performance of the task eventually may contribute to a civil

rights deprivation." *Sanchez*, 590 F.3d at 49 (quoting *Camilo-Robles*, 175 F.3d at 44). The second method mirrors the elements for governmental liability.

Mr. Charron specifically alleges that York County exhibited deliberate indifference in not reviewing allegations of misconduct or sharing them with Sheriff King unless there was an employee grievance. *Pl.'s Opp'n* at 18. He contends the harm of this policy is that "no correction or remedial action that would otherwise occur can occur." *Id.* He does not elaborate further on the "grave risk of harm" and does not address whether York County had actual or constructive knowledge of that risk. The Court assumes that Mr. Charron intends to argue that reviewing all allegations of misconduct and sharing them with Sheriff King are easily available remedial measures, but Mr. Charron does not assert this argument himself or explain why these measures are easy. Mr. Charron has not met the burden of showing deliberate indifference here. For this reason, because York County's employees did not commit an underlying constitutional violation, and because Mr. Charron's interpretations of various policies are inaccurate, *see Dep. of Zinser* at 13:02-05, 42:17-21; PSAMF ¶¶ 178, 180, 182, Mr. Charron does not establish governmental liability for York County.

Mr. Charron also alleges that Sheriff King demonstrated deliberate indifference through a policy of "non-supervision, leaving his subordinates free to conduct themselves as they see fit—indeed, as they did in this case—without training or corrective action." *Pl.'s Opp'n* at 18. He considers Deputy Horning's decision not to take the Sunfire into evidence as pursuant to this policy and puts forward the grave

risk of losing exculpatory evidence. *Id.* As before, Mr. Charron leaves for the Court to guess how much Sheriff King knew about the risk and what remedial measures he could have taken. Even after viewing the contested facts in the light most favorable to Mr. Charron, his vague claim of deliberate indifference does not survive analysis, and the Court cannot fill in the gaps. For this reason, because Sheriff King's employees did not commit an underlying constitutional violation, and because the policies Mr. Charron alleges exist are inaccurate, *see* PSAMF ¶¶ 185-86, Mr. Charron does not establish supervisory liability for Sheriff King.

### D. State Law Tort Claims

Mr. Charron asserts four state law tort claims: false arrest, false imprisonment, malicious prosecution, and defamation. *Pl.'s Opp'n* at 19. In order to survive summary judgment, a plaintiff must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Noveletsky*, 2013 WL 2945058, at *9 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). For the following reasons, the Court holds that none of these claims is viable.

### 1. False Arrest and False Imprisonment Claims

Mr. Charron asserts false arrest and false imprisonment state law tort claims against the four deputies. *Pl.'s Opp'n* at 19. He does not explain the difference between these two claims and provides no caselaw to support a separate false arrest tort under Maine law, so the Court views the two claims together as a false imprisonment claim based on Mr. Charron's arrest.

Under Maine law, false imprisonment "involves the unlawful detention or restraint of an individual against his will." *Nadeau*, 395 A.2d at 116 (citing *Palmer v. Me. Cent. R.R. Co.*, 92 Me. 399, 42 A. 800 (1899)). "To be actionable, the authority upon which the plaintiff is confined must be unlawful . . .." *Id.* "The analysis of the state law [tort] claim[] of illegal arrest [also referred to as false imprisonment] . . . is the same as for the federal law claim[]." *Blackstone*, 309 F. Supp. 2d at 129 (quoting *Richards v. Town of Eliot*, 2001 ME 132, ¶ 31, 750 A.2d 281, 292). The federal false arrest claim requires the plaintiff to show "that an arresting officer lacked probable cause to believe that" the plaintiff had committed a crime. *Jordan*, 943 F.3d at 545.

Both parties rely on their earlier arguments to establish the presence or absence of probable cause for Mr. Charron's arrest. *Defs.' Mot.* at 17-18; *Pl.'s Opp'n* at 19-21. For the reasons discussed above, the Court holds that probable cause existed and that Mr. Charron has not established an essential element of his false arrest and false imprisonment claims.

### 2. Malicious Prosecution Claim

Mr. Charron asserts a malicious prosecution state law tort claim against the four deputies and Court Officer Vachon. *Pl.'s Opp'n* at 19.

Under Maine law, a plaintiff asserting a malicious prosecution claim must show by a preponderance of the evidence that: "(1) [t]he defendant initiated, procured or continued a criminal action without probable cause; (2) [t]he defendant acted with malice; and (3) [t]he plaintiff received a favorable termination of the proceedings." *Trask*, 2002 ME 10, ¶ 11.

106

Both parties discuss only the presence or absence of probable cause, again relying on their earlier arguments. *Defs.' Mot.* at 18; *Pl.'s Opp'n* at 19-20. Mr. Charron does not directly assert that there was an absence of probable cause in continuing the criminal action, so the Court's earlier ruling on the probable cause to arrest is sufficient to determine that Mr. Charron has not established an essential element of the malicious prosecution claim. Regardless, Mr. Charron fails to meet his burden on the essential elements because he does not address the second and third elements of the tort at all.

### 3. Defamation Claim

Mr. Charron asserts a defamation per se state law tort claim against Deputy Horning and Sheriff King concerning Sheriff King's press release and a Facebook post about his arrest. *Pl.'s Opp'n* at 1, 21.

Maine law has established four elements to a defamation claim: (1) "a false and defamatory statement concerning another"; (2) "an unprivileged publication to a third party"; (3) "fault amounting at least to negligence on the part of the publisher"; and (4) "either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Rice*, 2002 ME 43, ¶ 19 (citing *Lester v. Powers*, 596 A.2d 65, 69 (Me. 1991)). "Words that falsely charge a punishable offense . . . constitute slander *per se*." *Rippett*, 672 A.2d at 86 (citing *Picard v. Brennan*, 307 A.2d 833, 834 (Me. 1973)). "Recovery for slander *per se* requires no showing of special harm beyond the publication itself." *Id.* (citing *Saunders v. VanPelt*, 497 A.2d 1121, 1126 (Me. 1985)).

For the falsity requirement, if a statement describing a plaintiff's arrest and indictment "accurately reflect[s] the nature of the case against the plaintiff," then the statement is not false. *Jordan*, 2018 WL 4688724, at *24. However, "one who repeats a defamatory statement may be as liable as the original defamer" and cannot escape liability simply because the statement is an accurate repetition of the original statement. *Franchini v. Bangor Publ'g Co.*, 383 F. Supp. 3d 50, 60 (D. Me. 2019) (quoting *Pan Am. Sys. Inc. v. Atl. Ne. Rails & Ports, Inc.*, 804 F.3d 59, 64 (1st Cir. 2015)).

Sheriff King argues that he is entitled to summary judgment on the defamation claim because the "statements [in the press release and Facebook post] accurately reflect that Mr. Charron had been accused of using his plow truck to hit another vehicle and that he had been charged with crimes as a result." *Defs.' Mot.* at 18. Sheriff King quotes *Jordan* for the proposition that "quotations by law enforcement officers reported in the newspaper describing the allegations against a criminal defendant were not false because 'they accurately reflected the nature of the case against the plaintiff, which was a matter of public interest.'" *Id.* at 18-19 (quoting *Jordan*, 2018 WL 4688724, at *24).

Significantly, Mr. Charron does not claim that any of Sheriff King's statements were false based on the information that Sheriff King had at the time. *Pl.'s Opp'n* at 22. In fact, a comparison between Sheriff King's statements and Deputy Horning's incident report demonstrates that Sheriff King's description of the events was

consistent with Deputy Horning's description. *Compare Horning Narrative* at 1-2, with *Dep. of King Exs.* at 1.

Instead, Mr. Charron alleges only that Sheriff King's statements "omitted critical facts . . . ."[109] *Pl.'s Opp'n* at 22. As Mr. Charron correctly notes, *id.*, under Maine law "there is no liability for a true statement," but the Maine Supreme Judicial Court has allowed "true but incomplete statements to fulfill the falsity requirement, thus forming the basis for liability in a defamation action when those statements falsely impute criminal conduct to the plaintiff." *Schoff v. York Cty.*, 2000 ME 205, ¶ 10, 761 A.2d 869, 871. As the Maine Supreme Judicial Court noted, this type of defamation action is known as "implied defamation . . . ." *Id.* ¶ 11. Implicit in this subcategory of the law of defamation is that the publisher of the information "failed to tell the whole story . . . ." *Id.* ¶ 10. In other words, the publisher knew material facts but chose not to disclose them, resulting in a misleading impression. *Id.* ¶ 10.

In *Marston v. Newavom*, for example, the defendants told others that the plaintiff had charged personal expenses to the company credit card without saying that this was an accepted practice so long as the employee promptly reimbursed the

---

[109] Mr. Charron lists ten omitted facts: (1) Christopher Moss' mother called 911 to have her son removed, (2) Deputy Horning "could see and smell" that Christopher Moss had been drinking, (3) Mr. Charron complained twice to Walter Moss that Christopher Moss and Mr. Pilvelait were "laying rubber strips" in Mr. Charron's driveway, (4) Walter Moss picked up his son from that location at Mr. Charron's request, (5) Mr. Pilvelait was operating an unregistered motor vehicle and did not answer his door when the police arrived to interview him, consistent with OUI, (6) Mr. Charron sought out the deputies and told them that the Sunfire rear-ended his plow truck, (7) the Sunfire was found at the end of Langley Shores Drive, a third of a mile away from Mr. Pilvelait's driveway, where it appeared to have driven into a snowbank, (8) the damage to the Sunfire was consistent with having rear-ended Mr. Charron's plow truck and inconsistent with having been struck head-on as Christopher Moss alleged, (9) Christopher Moss' and Mr. Pilvelait's witness statements contradicted Christopher Moss' oral account that the Sunfire was struck in Mr. Pilvelait's driveway, and (10) the location and orientation of the Sunfire made Christopher Moss' oral allegation "not only implausible, but impossible." *Pl.'s Opp'n* at 22.

company. 629 A.2d 587, 589 (Me. 1993). Moreover, *Memphis Publishing Co. v. Nichols*, 569 S.W.2d 412 (Tenn. 1978), is described as "the quintessential modern case of defamation by implication . . .." *Toney v. WCCO Television*, 85 F.3d 383, 387 (8th Cir. 1996). In *Nichols*, a newspaper truthfully reported that a woman, upon finding her husband at the plaintiff's home, shot the plaintiff, but the article failed to mention that the plaintiff was hosting a social gathering at her home at the time, thereby implying that the plaintiff and the suspect's husband were having an affair. 599 S.W.2d at 414, 420. The defendant in *Nichols* knew or should have known from police reports at least some of the omitted facts that would have eliminated the implication of an affair. *Id.* at 414. But here there is no allegation that Sheriff King knew or in the exercise of reasonable care should have known the facts Mr. Charron claims he omitted.

These omitted facts essentially reflect Mr. Charron's view of the incident, his innocence, and the culpability of Christopher Moss and Mr. Pilvelait. But Mr. Charron has failed to demonstrate that Sheriff King in his synoptic report to the public the day after the arrest knew or should have known what the whole story was and decided to publish only a "partial truth . . .." *Schoff*, 2000 ME 205, ¶ 10. Sheriff King was not required to adopt the details of Mr. Charron's later defense, especially since Mr. Charron had declined to speak to Deputy Horning and the Sheriff's Office had not heard his side of the incident. Additionally, the Court notes that Sheriff King also omitted several facts that would have put Mr. Charron in a bad light, such as his high level of apparent intoxication and his alleged threat to kill both Christopher

Moss and Mr. Pilvelait. In other words, taking the King statement as a whole, the Court concludes that Mr. Charron fails to explain why it amounted either to defamation or implied defamation. Regarding Deputy Horning, Mr. Charron fails to establish that she published anything and that, to the extent she reviewed what Sheriff King published, the statements meet the elements of defamation or implied defamation.

### E. Discretionary Function Immunity

Mr. Charron concedes that the Maine Tort Claims Act provides immunity to York County against any state law tort claims because of the County's status as a "government entity." *Pl.'s Opp'n* at 19. He argues that the individual County Defendants are not immune.

The Maine Tort Claims Act "applies a policy of broad liability to governmental employees, subject to the" enumerated exceptions. *Carroll v. City of Portland*, 1999 ME 131, ¶ 6. One such exception provides absolute immunity to employees of governmental entities "[p]erforming or failing to perform any discretionary function or duty, whether or not the discretion is abused . . .." 14 M.R.S. § 8111(1)(C). The immunity applies to discretionary acts that are "reasonably encompassed by the duties of the governmental employee in action" and is available to "police officers who are required to exercise judgment or discretion in performing their official duties." *Carroll v. City of Portland*, 1999 ME 131, ¶ 6. "[T]ort liability should not be imposed for conduct of a type for which the imposition of liability would substantially impair

the effective performance of a discretionary function." *Id.* ¶ 6 n.4 (alteration in original) (quoting *Grossman v. Richards*, 1999 ME 9, ¶ 6, 722 A.2d 371, 373).

When considering whether an act is discretionary, courts consider whether it "require[s] the exercise of basic policy evaluation, judgment, and expertise . . .." *Id.* ¶ 7 (emphasis omitted). Making the decision to "effectuate a warrantless arrest" is a discretionary act. *See, e.g., Hegarty v. Somerset Cty.*, 848 F. Supp. 257, 269 (D. Me. 1994), *aff'd in part, remanded in part on other grounds*, 53 F.3d 1367 (1st Cir. 1995). The immunity protects police officers from civil liability for warrantless arrests even "in circumstances where the existence of probable cause is ambiguous." *Blackstone*, 309 F. Supp. 2d at 130 (holding that the use of excessive force during an arrest exceeded the scope of the officer's discretion but the illegal arrest did not). Similarly, prosecution is generally viewed as discretionary, although a District of Maine court found an exception when officers "deliberately and unlawfully withheld clearly exculpatory information from prosecutors resulting in the continuation of criminal proceeding." *Trafton*, 43 F. Supp. 2d at 61.

Finally, in considering whether public statements constitute a discretionary function, courts should consider the four factors introduced in *Darling v. Augusta Mental Health Institute*, 535 A.2d 421, 426 (Me. 1987), including whether they are "essential to accomplish any basic governmental policy, program, or objective . . .." *Rippett*, 672 A.2d at 88; *see also Hilderbrand*, 2011 ME 132, ¶ 12-22. The Maine Supreme Judicial Court requires "a strong link between the basic governmental objective and the means used to realize it." *Hilderbrand*, 2011 ME 132, ¶ 14. It found

that a sheriff's decision to "end cooperation with the [Maine Drug Enforcement Agency]" was "essential to the realization or accomplishment of [a] basic governmental objective of the department—transparency in governmental action." *Id.*

Mr. Charron's position that the individual County Defendants do not have discretionary function immunity for his false arrest, false imprisonment, and malicious prosecution state law tort claims is unconvincing. Concerning the first two claims, even if probable cause were ambiguous here, which it was not, the decision to make a warrantless arrest falls under the protection of discretionary function immunity. *See Blackstone*, 309 F. Supp. 2d at 130. Mr. Charron's attempt to parallel this case and the facts in *Blackstone*, where the officer used excessive force, is unpersuasive. Regarding the malicious prosecution claim, Mr. Charron did not argue why Deputy Horning's actions in not recovering the Sunfire were deliberate, and they do not rise to the level of the facts in *Trafton* that overcame the general rule that prosecution is discretionary.

Mr. Charron's argument that Sheriff King's public statements are closer to the situation in *Rippett* than that in *Hilderbrand* is similarly unconvincing. In *Rippett*, a sheriff's office returned a firearm to Thomas Rippett, a convicted felon, and when the felon publicized this fact, the sheriff ordered an internal investigation. *Rippett*, 672 A.2d at 84-85. Detective Michael McAlevey conducted a cursory internal investigation and erroneously concluded that the deputy had handed the rifle over to Lola Rippett, the felon's wife, not the felon. *Id. at* 85. Under public pressure to

explain why it had given a rifle to a felon, the sheriff insisted, contrary to office policy that prohibits the public revelation of the results of internal investigations, that Detective McAlevey participate in a public interview during which Detective McAlevey accused Lola Rippett of retrieving the firearm. *Id.* After the truth was revealed, Lola Rippett sued Detective McAlevey. *Id.*

In *Rippett*, the Maine Supreme Judicial Court found no discretionary function immunity for public statements about the results of an internal investigation. Rejecting the defense of conditional immunity, the *Rippett* Court wrote:

> The evidence presented, that the York County Sheriff's Department policy prohibited public statements concerning departmental investigations, is sufficient to sustain a finding that Detective McAlevey's statement was neither required nor permitted in the performance of his official duties. At the very least, a genuine issue of material fact exists as to whether Detective McAlevey enjoys a conditional privilege for his statement.

*Id.* at 87. The Court turned to the issue of discretionary function immunity. Applying this same logic, the Law Court concluded:

> Detective McAlevey's investigation was a discretionary official act. His public statements concerning the results of that investigation, however, were not essential to accomplish any basic governmental policy, program, or objective and in fact violated a written policy of the York County Sheriff's Department. His statements were not a discretionary function of his governmental employment, and the Maine Tort Claims Act thus does not shield Detective McAlevey from liability for publishing defamatory statements concerning Lola Rippett.

*Id.* at 88.

While Mr. Charron asserts that the case for discretionary function immunity was stronger in *Rippett* than here "given the internal impropriety that was being investigated there," *Pl.'s Opp'n* at 23, the Court does not interpret *Rippett* as saying

that the revelation of the results of the internal investigation was discretionary. To the contrary, the *Rippett* Court concluded that in part because the revelation broke the Sheriff's Office's own rules against disclosure of the results of internal investigations, the revelation fell outside the discretionary function protections of the Maine Tort Claims Act.

Here, by contrast, Sheriff King's decision to post the information was consistent with his discretionary decision to make such posts in an effort to keep the public informed of the activities of the York County Sheriff's Office in performing its law enforcement duties. Thus, Sheriff King's posts were consistent with the exercise of his discretion within the scope of his office, whereas Detective McAlevey had violated the policies of the Sheriff's Office and therefore stepped out from the discretionary function protection. This case, in the Court's view, is much more like *Hildebrand*, where the Law Court found "a strong link between the basic governmental objective"—transparency—"and the means used to realize it." *Hildebrand*, 2011 ME 132, ¶ 14.

## F.    Punitive Damages

Mr. Charron contends that the individual County Defendants are exposed to punitive damages for all his state law tort claims. *Pl.'s Opp'n* at 23. The short answer is that under Maine law, punitive damages are not a separate and distinct cause of action but a remedy. *South Port Marine, LLC v. Gulf Oil Ltd. P'ship*, 234 F.3d 58, 64 (1st Cir. 2000); *Redmond v. Yachting Solutions, LLC*, No. 2:17-cv-292-GZS, 2018 WL 1075030, at *2 (D. Me. Feb. 27, 2018). Once Mr. Charron's underlying causes of

actions are found not to be viable, his claim for punitive damages, which is a remedy for those claims, must also be non-viable.

### G. Summary

#### 1. An Overview

Late in the evening of March 8, 2016, Deputy Horning was called to a chaotic and volatile situation in Acton, Maine. She first responded to a call from a woman who wanted her son removed from her home. About the same time, she was advised by the dispatcher that an anonymous caller had complained of someone peeling car tires, yelling, and making threats in the same general area. Deputy Horning's view of what happened was likely anchored by Christopher Moss' description of a wild encounter with John Charron, stemming from a feud about vehicle sales and stolen tires. As Christopher Moss related it, Mr. Charron was the aggressor, coming to Eric Pilvelait's driveway, peeling his tires, and yelling threats. Christopher Moss then claimed that Mr. Charron came at Mr. Pilvelait's car with his snowplow up and struck the Sunfire, driving it down the road and into a snowbank. Christopher Moss said he thought Mr. Charron was capable of killing them and that he was in fear of his life.

When Deputy Horning spoke with Walter Moss, Christopher Moss' father, his account differed in that he said Mr. Charron had called him to complain that Mr. Pilvelait with Christopher Moss were peeling tires in front of Mr. Charron's house. Significantly, however, Walter Moss said that Mr. Charron told him someone was going to get hurt and he was going to take them into the ditch. When Deputy Horning came to the scene of the incident, she found evidence generally consistent with what

Walter and Christopher Moss had related: vehicle debris on the road and the Sunfire in a snowbank. She took photographs of the scene to document what she had found. She tried to speak with Mr. Pilvelait, but no one answered the door.

Her first contact with Mr. Charron was to hear him yelling at her fellow deputies.[110] As she approached him, she could see that he was intoxicated. Mr. Charron's belligerence and intoxication were consistent with the Moss' contention that he was the aggressor. As she placed him under arrest, he told her that she was arresting an innocent man.[111] Even though Mr. Charron was not required to speak with Deputy Horning, his decision not to do so at the jail left her with only the Moss' version of the incident.

Police work of this sort is not an exact science. Once Mr. Charron told his side of the story, once the damage to the Sunfire was compared to design of the plow, once all the facts were shifted in the light of day and the sober reflection of the participants, based on the record before the Court, Mr. Charron's version of these events is correct and Mr. Pilvelait and Christopher Moss were the aggressors, causing their own problems. It is true that Deputy Horning could have arrested no one, given the participants time to sober up, warned them not to contact each other, and allowed the civil justice system to ferret out the facts. It is also unarguable that Deputy Horning could have credited the evidence differently and reached a different

---

[110]     Deputy Horning's report indicates that Mr. Charron was swearing at the deputies, but this fact is not in the summary judgment record. *See Horning Narrative* at 2.

[111]     Deputy Horning's report also states that on his way to the police station, Mr. Charron said he would "[k]nock their fucking heads off" and that "[t]hose kids are fucking with me." *Horning Narrative* at 2. Again, this is not in the summary judgment record, and it took place after Deputy Horning arrested him. *Id.*

conclusion regarding Mr. Charron's actions that night. But the situation was volatile. People were angry and had been drinking. Threats had been made. Thus, the Court views Deputy Horning's decision to arrest Mr. Charron in light of law enforcement's overriding obligation to maintain the peace. Under the law, her discretionary decision cannot form the basis for the imposition of civil liability against Deputy Horning or the other deputies.

Perhaps it should. As it turns out, based on the record before the Court, Mr. Charron was the victim, not the perpetrator of the crimes. Mr. Pilvelait and Christopher Moss, both under the influence of alcohol, had harassed him about a feud, screeched tires in his driveway, yelled hostilities at him, rammed his truck from behind, approached him to assault him, driven their car off the road into a snowbank only later to blame him, chased him into his house, and smashed the passenger window on his truck. Having endured a traumatic evening, Mr. Charron was then arrested for crimes he did not commit, was hauled off to the station, spent time in jail while being bailed, was indicted, and was vindicated when the prosecutor dismissed the charges.

Giving full credit to Deputy Horning—and the difficulty she faced trying to make order out of chaos—it still seems a rather basic principle that law enforcement officers should not arrest and initiate charges against the victims of crime. In *Irish v. Fowler*, No. 1:15-cv-503-JAW, 2020 WL 535961 (D. Me. Feb. 3, 2020), the Court recently discussed its unease with the current state of qualified immunity law. *Id.* at *51 n.157. If the law recognized, for example, that even good deputies are bound to

make mistakes and those mistakes can have untoward consequences for the persons arrested and accused of crimes they did not commit, and if the law applied a negligence standard and imposed liability on deputies' employers for good faith mistakes of judgment, Mr. Charron would at least have his day in court. Nor, it would seem, would the public object to paying Mr. Charron, perhaps with restrictions on recovery, some amount for the damages he sustained as a result of good faith but erroneous actions by public officials. But as things currently stand, the law simply does not allow such cases to proceed past the summary stage.

The Court has a slightly different take on Sheriff King's decision to publicize Mr. Charron's arrest. None of these events is private. The public has a right to know the workings of its law enforcement agencies and specifically whether someone has been arrested and why. Sheriff King had the right and perhaps the duty to inform the public of what the deputies in his office have done to enforce the law. In addition, if the Sheriff publicizes similar arrests and it emerges over time that his deputies have engaged in a pattern of arresting innocent people, the public will have learned valuable information about law enforcement, information that would be unavailable if nothing was said publicly. At the same time, a certain percentage of arrested defendants will in fact be innocent of the crimes with which they have been charged and by publicizing the charge before the investigation is complete, the Sheriff runs the risk that the reputations of some citizens will be besmirched by the public posts. Sheriff King, as the chief law enforcement officer of York County, must balance these

countervailing principles and the fact that he struck the balance in favor of immediate public disclosure does not provide the basis for a civil action.

### 2. Conclusion

The Court concludes that, on the record before it, taking all inferences reasonably supported by that record in favor of the non-moving party, Mr. Charron has not established any genuine issues of material fact regarding his constitutional or state tort law claims. Further, he has not established any viable constitutional or state law tort claims. The Court also concludes that, even if any genuine issues of material fact existed as to any viable claims, qualified immunity protects the County Defendants from the constitutional claims and discretionary function immunity protects them from the state law tort claims. Moreover, the Court concludes that York County does not have governmental liability and Sheriff King does not have supervisory liability for any of the claims. Finally, the Court concludes that punitive damages are not available under these claims.

## VI. CONCLUSION

The Court GRANTS the County Defendants' Motion for Summary Judgment (ECF No. 68).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 14th day of April, 2020