UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| JOHN A. CHARRON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:18-cv-00105-JAW |
| | ) | |
| COUNTY OF YORK et al., | ) | |
| | ) | |
| Defendants. | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This is a case about a false police report and its consequences. On May 20, 2021, the Court held a bench trial concerning plaintiff John A. Charron's damages attributable to defendants Christopher Moss and Eric J. Pilvelait. In accordance with Federal Rule of Civil Procedure 52, the Court reviewed all evidence presented and Mr. Charron's supplemental briefing and now finds, in part, for Mr. Charron. The Court makes the following findings of fact and conclusions of law.

**I.    PROCEDURAL BACKGROUND**

On March 8, 2018, John Charron filed a complaint against York County, Deputy Sheriff Rachel Horning, Deputy Sheriff Darren Cyr, Deputy Sheriff Heath Mains, Sergeant Steven Thistlewood, York County Sheriff William King, Jr., and Court Officer Wilfred Vachon (County Defendants), as well as Christopher Moss and Eric Pilvelait. *Compl.* at 1 (ECF No. 1). Mr. Moss and Mr. Pilvelait did not answer the Complaint and on July 27, 2018, Mr. Charron moved for entry of default and default judgment against them. *Pl.'s Appl. to Clerk for Default Against Non-County Defs. Christopher Moss and Eric J. Pilvelait* (ECF No. 18); *Pl.'s Verified Mot. for*

*Default J. Against Non-County Defs. Christopher Moss and Eric J. Pilvelait* (ECF No. 19).  On July 30, 2018, the Deputy Clerk granted the Motion for Entry of Default. *Order Granting Mot. for Entry of Default* (ECF No. 20).

On October 22, 2018, the Court dismissed Mr. Charron's Motion for Default Judgment without prejudice, *Order* (ECF No. 27), because Mr. Charron requested a damages determination by the jury at trial.  *Pl.'s Mot. for Jury Determination of Damages Against Defaulted Defs.* (ECF No. 24); *Order* (ECF No. 25).  On July 25, 2019, the County Defendants moved for summary judgment.  *County Defs.' Mot. for Summ. J.* (ECF No. 68).  On April 14, 2020, the Court granted the County Defendants' motion for summary judgment.  *Order on Mot. for Summ. J.* (ECF No. 100).

On May 20, 2021, after Mr. Charron waived his right to a jury trial, the Court conducted a bench trial and received witness testimony, documentary evidence, and video evidence concerning the amount of Mr. Charron's damages attributable to Mr. Moss and Mr. Pilvelait.  *Min. Entry* (ECF No. 122); *Tr. of Proceedings* (ECF No. 130) (*Trial Tr.*).  Mr. Pilvelait attended some of the trial; Mr. Moss did not.  Mr. Charron submitted post-trial memoranda on July 20, 2021, and July 21, 2021.  *Pl.'s Mem. of Law on Damages* (ECF No. 128) (*Pl.'s Mem.*); *Suppl. to Pl.'s Mem of Law on Damages* (ECF No. 129) (*Pl.'s Suppl. Mem.*).

## II.   JOHN CHARRON'S POST-TRIAL MEMORANDA

At the close of the trial, the Court ordered Mr. Charron to provide authority supporting his claim that Mr. Moss and Mr. Pilvelait are liable for damages from arguably unforeseeable actions by County Defendants.  *Trial Tr.* at 146:2-23.  When

2

Mr. Charron's attorney said that he wanted to supplement the record with additional statements Mr. Moss and Mr. Pilvelait made to police, the Court told Mr. Charron he would need to convince the Court those statements are not hearsay. *Id.* at 147:23-148:9.

### A.   Post-Trial Memorandum

Mr. Charron's post-trial memorandum cites no Maine authority about the scope of damages a malicious prosecution plaintiff may recover. *Pl.'s Mem.* at 1-13. Instead, he relies on *Seidel v. Greenberg*, 260 A.2d 863 (N.J. Super. Ct. 1969) and argues that Mr. Moss and Mr. Pilvelait should be held liable for the full measure of damages Mr. Charron incurred from the state prosecutor's conduct, in part, because Mr. Moss and Mr. Pilvelait failed to come forward to exonerate Mr. Charron after he was charged. *Id.* at 3-4.

Mr. Charron argues the potentially hearsay statements of Mr. Moss and Mr. Pilvelait to police support his claim. *Id.* at 5-7. He insists that by making these statements, Mr. Moss and Mr. Pilvelait did not merely set this prosecution in motion, they "followed the ball and affirmatively pushed it." *Id.* at 7. He further argues that it "cannot be surprising or unforeseeable to the defendants . . . that the prosecutor did not accept Mr. Charron's protestations of innocence and claims of exculpatory evidence." *Id.* at 8. Specifically, Mr. Charron flags Mr. Moss and Mr. Pilvelait's handwritten statements to law enforcement on March 9, 2016, *id.*, Attach. 1, *Voluntary Written Statement* at 1-2 (*Pl.'s Ex. A-1*), Mr. Pilvelait's oral statement to Deputy Horning on March 29, 2016, about the Sunfire's location, contained in Deputy

3

Horning's email to York County Assistant District Attorney Kyle Myska, *id.*, Attach. 2, *Mar. 29, 2016, Email from Deputy Horning to ADA Myska* (*Pl.'s Ex. A-2*), handwritten statements by Mr. Moss and Mr. Pivelait to law enforcement on or about March 30, 2016, *id.*, Attach. 3, *Voluntary Written Statement* (*Pl.'s Ex. A-3*), and a law enforcement report of an interview of Mr. Pilvelait on or about June 30, 2016, *id.*, Attach. 4, *Report of Tamson H. Ross* (*Pl.'s Ex. A-4*).[1]

## B.   Supplemental Post-Trial Memorandum

---

[1]   At trial, the Court expressed concerns to Mr. Charron's counsel that statements from Mr. Moss and Mr. Pilvelait to police may be inadmissible hearsay. *Trial Tr.* at 148:2-23. After reviewing the submissions, the Court finds Plaintiff's Exhibits A-1 and A-3 are not hearsay. The Court cannot say the same for Plaintiff's Exhibits A-2 and A-4.

Plaintiff's Exhibit A-1 contains handwritten statements apparently signed by Mr. Moss and Mr. Pilvelait, relating the false accusations against Mr. Charron to the York County Sheriff's Department. These statements are not hearsay because they are words of independent legal significance, that is, they are the false accusations that support Mr. Charron's defamation and malicious prosecution claims. These statements are admissible to show that they were made. Moreover, Mr. Charron seeks admission not for the truth of these statements, but for their untruth.

Plaintiff's Exhibit A-2 is an email chain between ADA Kyle Myska, Mr. Vachon, and Deputy Horning, and an attached excerpt of Deputy Horning's deposition testimony. *Pl.'s Ex. A-2.* Mr. Charron seeks to admit this exhibit for the truth of Deputy Horning's assertion that Mr. Pilvelait told her that he had sold the Pontiac Sunfire for salvage value. *Pl.'s Mem.* at 6-7. Mr. Charron has not persuaded the Court that the Federal Rules of Evidence permit this. While Federal Rule of Evidence 801(d)(2)(B) might render the statement not hearsay if offered against Deputy Horning, Mr. Charron seeks to admit the statement against Mr. Moss and Mr. Pilvelait. Mr. Charron seems to acknowledge this, noting that Mr. Pilvelait's oral statement "can be admitted through the testimony of Deputy Horning." *Pl.'s Mem.* at 5.

Plaintiff's Exhibit A-3 contains supplemental handwritten statements to law enforcement from Mr. Moss and Mr. Pilvelait. *Pl.'s Ex. A-3* at 2-3. Although Mr. Moss' statement is undated, Mr. Pilvelait's statement is dated March 30, 2016. *Id.* The Court concludes these statements are not hearsay for the same reasons as the statements in Plaintiff's Exhibit A-1.

Plaintiff's Exhibit A-4 is a written report of Tamson H. Ross, an investigator at the York County District Attorney's Office. *Pl.'s Ex.* A-4. The report describes a June 30, 2016, conference call between ADA Myska, a victim witness advocate, and Mr. Pilvelait, in which Mr. Pilvelait allegedly repeated the claim that Mr. Charron rammed the Sunfire with his plow. *Id.* at 1-2. It appears Mr. Charron seeks to admit the Ross Report not only for the truth that Mr. Pilvelait made these statements, but also that Mr. Pilvelait claimed his statements were true when he made them. Mr. Charron failed to show that a hearsay exception would permit admission of the Ross Report for its truth and acknowledges that the statements "can be admitted through the testimony of [ADA] Myska or the investigator who recorded them, Tamson Ross." *Pl.'s Mem.* at 5-6.

4

Mr. Charron's supplemental memorandum further analyzes *Seidel*. *Pl.'s Suppl. Mem.* at 1-4. He argues fundamental principles of tort law permit a plaintiff to recover damages for an intentional tort under a laxer standard of proximate cause than in a negligence action. *Id.* at 2-3.

## III.   LEGAL STANDARD

"It is settled law that, upon entry of default, the defaulted party concedes the well-pleaded facts in the complaint." *Parker v. Dall-Leighton*, No. 2:17-cv-00216-GZS, 2018 U.S. Dist. LEXIS 163856, at *1-2 (D. Me. Sept. 25, 2018) (citing *Quirindongo Pacheco v. Rolon Morales*, 953 F.2d 15, 16 (1st Cir. 1992)). When the plaintiff's factual allegations state a claim upon which relief may be granted, "the defendant's liability is established at the moment of default." *Id.* at *2 (citing *Hooper-Haas v. Ziegler Holdings, LLC*, 690 F.3d 34, 41 (1st Cir. 2012); *Brockton Sav. Bank v. Peat, Marwick, Mitchell & Co.*, 771 F.2d 5, 13 (1st Cir. 1985)).

An entry of default is not always conclusive regarding damages. *See G. & C. Merriam Co. v. Webster Dictionary Co.,* 639 F.2d 29, 34 n.7 (1st Cir. 1980). Whenever the plaintiff's alleged damages are not for a "sum certain," Federal Rule of Civil Procedure 55(b) requires the plaintiff "apply to the court" for a default judgment. FED. R. CIV. P. 55(b). Thus, "where a plaintiff's claim for damages is not ascertainable from the pleadings, the court should hold a post-default hearing to appraise the damage total." *Parker*, 2018 U.S. Dist. LEXIS 163856, at *2 (citing *Graham v. Malone Freight Lines, Inc.*, 314 F.3d 7, 16 n.12 (1st Cir. 1999)). Pursuant to Federal Rule of Civil Procedure 52(a)(1), the Court must "find the facts specially and state its

5

conclusions of law separately" in "an action tried on the facts without a jury or with an advisory jury."  FED. R. CIV. P. 52(a)(1).

## IV.   FINDINGS OF FACT[2]

### A.   The Parties

Mr. Charron, Mr. Moss, and Mr, Pilvelait each resided in the town of Acton, Maine at all times relevant to this lawsuit.  *Compl.* ¶¶ 2, 10-11.

### B.   The March 8, 2016, Incident on Langley Shores Drive[3]

On March 8, 2016, Mr. Moss and Mr. Pilvelait were harassing Mr. Charron while traveling in a Pontiac Sunfire near Mr. Charron's home at 106 Langley Shores Drive in Acton, Maine.  *Compl.* ¶ 13.  Mr. Moss and Mr. Pilvelait were yelling obscenities and threats at Mr. Charron and peeling out their car tires in Mr. Charron's dirt driveway.  *Compl.* ¶ 14.  They intended to intimidate Mr. Charron. *Compl.* ¶ 14.

Mr. Charron's neighbor, Ryan Lemay, was bedding down for the night when he heard the clamor unfold.  *Trial Tr.* at 61:10-21.  Mr. Lemay first heard a vehicle outside Mr. Charron's house.  *Id.* at 61:18-19.  The men in the vehicle were yelling, screaming, and threatening to kill Mr. Charron.  *Id.*  Mr. Lemay then saw the vehicle

---

[2]      The Court prepared these findings of fact after considering the entire record including the Complaint.  Mr. Moss and Mr. Pilvelait are defaulted parties.  *Order Granting Mot. for Entry of Default.*  Through their default, Mr. Moss and Mr. Pilvelait admitted the factual allegations in Mr. Charron's Complaint.  *See Brockton Sav. Bank*, 771 F.2d at 13 ("[T]here is no question that, default having been entered, each of [the plaintiff's] allegations of fact must be taken as true").  Accordingly, some factual findings may differ from the Court's description of the facts in the Court's order granting the County Defendants' motion for summary judgment.  *See Order on Mot. for Summ. J.*

[3]      Mr. Charron's submissions repeatedly refer to the March 8, 2016, incident as taking place on "Langley Shores Drive" but a map he moved into evidence during the damages hearing identifies the street as Langley Shore Drive.  *Pl.'s Ex.* 1.  As the difference is not material, the Court accepts Mr. Charron's naming of the street on which he resides.

pull out of Mr. Charron's dooryard and speed up Langley Shores Drive away from Great East Lake. *Id.* at 61:20-21. Moments later, Mr. Charron pulled out of the driveway in his plow truck and followed the car. *Id.* at 63:24-64:7.

Several minutes later, while Mr. Charron was driving his plow truck down Langley Shores Drive, Mr. Moss and Mr. Pilvelait intentionally crashed the Pontiac Sunfire into the rear of Mr. Charron's plow truck. *Compl.* ¶ 15. The force of the collision caused the Sunfire to slide under the rear bumper of Mr. Charron's truck. *Compl.* ¶ 16. The crash left marks on the hood of the Sunfire, which clearly matched the underside of the plow truck's rear bumper. *Compl.* ¶ 16. Following the crash, Mr. Charron drove back to his home on Langley Shores Drive to get away from Mr. Moss and Mr. Pilvelait. *Compl.* ¶ 17.

Mr. Moss and Mr. Pilvelait followed Mr. Charron home. *Compl.* ¶ 18. They drove by his house in the Pontiac Sunfire, cussed at him, and raced to the end of Langley Shores Drive, where the Sunfire spun around and drove into a ditch. *Compl.* ¶ 18. When the Sunfire came to a stop, its tire tracks were clearly visible and showed the car had traveled off the road and into the ditch. *Compl.* ¶ 19. Mr. Moss and Mr. Pilvelait fled the scene because they had been drinking and had just gone off the road after crashing into Mr. Charron's plow truck. *Compl.* ¶ 20.

Abandoning the Sunfire in the ditch, Mr. Moss and Mr. Pilvelait again returned to Mr. Charron's home. *Compl.* ¶ 21. This time, they shattered his plow truck's window. *Compl.* ¶ 21. Mr. Moss and Mr. Pilvelait did this to further harass and intimidate Mr. Charron. *Compl.* ¶ 21. Mr. Moss started kicking and banging on

Mr. Charron's door, screamed "I'm going to fucking kill you," and yelled "Come out you fucking pussy!" *Trial Tr.* at 41:17-21, 42:5-6.  Mr. Charron stayed inside. *Id.* at 42:7-8.

Around this time, Mr. Lemay heard a person running up the road past his home. *Id.* at 67:2-3.  Then, a vehicle came down the road and Mr. Lemay heard a man yell "Get in the truck!  You're drunk!  You don't need to be down here!  We need to go!" *Id.* at 67:4-7.  Mr. Lemay heard more yelling at Mr. Charron before hearing a car door close and the car driving away. *Id.* at 67:7-9.

After Mr. Moss returned home, his mother contacted the police and requested assistance removing him from her home on Buzzell Road in Acton, Maine. *Compl.* ¶ 22.  York County Deputy Sheriff Rachel Horning arrived and spoke with Mr. Moss. *Compl.* ¶ 22.  Mr. Moss falsely told Deputy Horning that Mr. Charron had rammed his plow truck into the Pontiac Sunfire while Mr. Moss and Mr. Pilvelait were inside the vehicle at the end of Mr. Pilvelait's driveway at 425 Buzzell Road, Acton, Maine. *Compl.* ¶ 23.  Mr. Moss also falsely told Deputy Horning that Mr. Charron had his plow raised when he rammed the Sunfire, such that the plow scraped over the Sunfire's hood. *Compl.* ¶ 24.  Mr. Moss further told Deputy Horning that Mr. Charron used his plow truck to push the Pontiac Sunfire, with Mr. Moss and Mr. Pilvelait inside, more than a quarter of a mile to the end of Langley Shores Drive. *Compl.* ¶ 25.  Mr. Moss made these false allegations to deflect attention from himself as a criminal suspect or perpetrator and to make himself look like a victim. *Compl.* ¶ 23.

8

York County Deputy Sheriff Darren Cyr arrived at the Moss residence to assist Deputy Horning with the investigation. *Compl.* ¶ 26. Deputy Horning and Deputy Cyr then left the Moss residence and drove to the end of Langley Shores Drive where they rendezvoused with York County Deputy Sheriff Steven Thistlewood and Deputy Sheriff Heath Mains. *Compl.* ¶ 27.

Each deputy saw the Sunfire in the ditch. *Compl.* ¶ 28. It was apparent from the Sunfire's physical damage and its tracks that Mr. Charron had not pushed the car into the ditch with his plow as Mr. Moss claimed. *Compl.* ¶ 29. It was equally apparent from the Sunfire's condition that Mr. Charron had not pushed the car down Langley Shores Drive for a quarter of a mile. *Compl.* ¶ 30.

Based on Mr. Moss' false allegations, the deputies went to Mr. Charron's home and arrested him. *Compl.* ¶ 31. Upon arriving at the Charron residence, the four deputies could clearly see that Mr. Charron's plow truck window had been smashed. *Compl.* ¶ 32. This was consistent with a statement Mr. Charron made to deputies before his arrest that he witnessed Mr. Moss smash the window after Mr. Moss and Mr. Pilvelait rear ended the plow truck. *Compl.* ¶ 32.

Mr. Charron was standing in his dooryard when law enforcement arrived. *Trial Tr.* at 81:21-82:1. Approaching Mr. Charron with their guns drawn, law enforcement ordered him to get on the ground. *Id.* at 82:1-2. Mr. Charron complied, but questioned why this was necessary because he did not do anything wrong. *Id.* at 82:2-4. Mr. Charron tried to explain that Mr. Moss and Pilvelait were at fault for terrorizing him and rear-ending his plow truck. *Id.* at 82:4-6. The officers stood

9

Mr. Charron up and handcuffed him. *Id.* at 82:14-15. This was painful for Mr. Charron because he has spinal stenosis and was handcuffed behind his back. *Id.* at 141:24-142:9. Law enforcement refused to handcuff Mr. Charron in front of his body. *Id.* at 142:9-12.

Authorities placed Mr. Charron in a holding cell where he was kept for many hours and suffered great discomfort. *Compl.* ¶ 34. Mr. Charron was placed inside a cell with no heat, no shirt, and no socks. *Trial Tr.* at 83:20-22. He had no mattress and no sheets. *Id.* at 84:8-11. He was very cold. *Id.* at 83:21-22. Mr. Charron was denied the opportunity to sleep and left to lay on freezing cold steel. *Compl.* ¶ 34.

During the events of March 8, 2016, Mr. Pilvelait concealed himself from the sheriff's deputies who tried to contact him before arresting Mr. Charron. *Compl.* ¶ 35. Mr. Pilvelait chose to conceal himself because he was obviously intoxicated and wanted to avoid being arrested and charged with operating under the influence of alcohol. *Compl.* ¶ 36.

### C.    The Next Day: March 9, 2016

On March 9, 2016, Mr. Charron's mother, Josephine Charron, paid $3,000.00 to bail Mr. Charron out of jail. *Trial Tr.* at 10:12-14; 11:7-12:6; *Pl.'s Ex.* 5 at 1; *Pl.'s Ex. 5C.* Mr. Charron's bail bond required him to submit to searches of his person, vehicle, and residence at any time without reasonable suspicion or probable cause. *Trial Tr.* at 86:18-22; *Pl.'s Ex. 5C.* The bail bond also prohibited Mr. Charron from possessing alcoholic beverages, dangerous weapons, or firearms. *Trial Tr.* at 86:23-87:15. Mr. Charron's firearms had to be secured away from him. *Id.* at 87:13-15.

While Mr. Charron was on bail, he recalls two instances in which law enforcement came to his home and searched it. *Id.* at 135:8-9. The searches were wide-ranging; law enforcement even searched his refrigerator. *Id.* at 135:10-11. A state judge struck the no-alcohol condition on June 13, 2016. *Id.* at 87:16-17.

Also, on March 9, 2016, Mr. Pilvelait met with Deputy Horning after sobering up. *Compl.* ¶ 37. He told Deputy Horning the same false story that Mr. Moss concocted the night before. *Compl.* ¶ 37. Mr. Pilvelait's handwritten statement related that the Sunfire's air bags deployed and knocked him out after Mr. Charron collided with the Sunfire. *Pl.'s Ex. A-1* at 1. Mr. Pilvelait wrote that he was "scared [to] death" and that Mr. Charron yelled Mr. Pilvelait and Mr. Moss "were dead." *Id.* Dated the same day, Mr. Moss' handwritten statement claimed that Mr. Charron was "burning tires" in front of the Pilvelait residence and that he "pushed [Mr. Moss and Mr. Pilvelait] against a snow bank with his plow truck – then yelled 'you guys are fucking dead.'" *Id.* at 2

Later that day, York County Sheriff William King caused or allowed the substance of Mr. Moss' and Mr. Pilvelait's false allegations against Mr. Charron to be posted on the York County Sheriff's Department website. *Compl.* ¶ 38. Sheriff King also told the Portland Press Herald and other news sources that Mr. Charron was arrested for "using his plow truck to ram a car with two teens in it." *Compl.* ¶ 39. Sheriff King said this even though he and his deputies knew that Mr. Moss was twenty-seven and Mr. Pilvelait was twenty. *Compl.* ¶ 40. Sheriff King further told the Portland Press Herald that Mr. Charron "drove straight into the front of a vehicle

11

parked in his neighbor's driveway with the plow raised in the air." *Compl.* ¶ 41.  He also said "[t]he blade slid up and over the car's front hood and broke the windshield." *Compl.* ¶ 42.  He noted that this caused the air bags to deploy and that Mr. Moss and Mr. Pilvelait "suffered minor bumps and bruises."  *Id.*  The Portland Press Herald and other news outlets reported Sheriff King's statements in print and online sources, and those reports remain on the internet.  *Compl.* ¶ 43.

### D.    Investigation, Indictment, Prosecution, and Dismissal

State prosecutors charged Mr. Charron with three felonies: Aggravated Reckless Conduct, Aggravated Assault, and Criminal Threatening with a Dangerous Weapon.[4]  *Compl.* ¶ 33.  The charges were based on Mr. Moss' false allegations and the deputies' reports that accepted those allegations, despite the physical evidence from the Sunfire showing that the allegations were false.  *Compl.* ¶ 33.  On March 15, 2016, Mr. Charron moved for appointment of counsel.  *Pl.'s Ex. 5* at 1.  That same day, Maine District Court Judge Richard Mulhern granted the motion and appointed Attorney Gregory McCullough to represent Mr. Charron.  *Id.*  On March 30, 2016, Mr. Moss and Mr. Pilvelait supplemented their March 9, 2016 handwritten statements with additional handwritten statements, repeating the same allegations.  *Pl.'s Ex. A-1.*

---

[4]    The indictment reflects that, in total, state prosecutors charged Mr. Charron with six counts: (1) aggravated reckless conduct toward Mr. Moss, (2) aggravated assault toward Mr. Moss, (3) aggravated assault toward Mr. Pilvelait, (4) criminal threatening with a dangerous weapon toward Mr. Moss, (5) criminal threatening with a dangerous weapon toward Mr. Pilvelait, and (6) driving to endanger.  *Pl.'s Ex. 5B* at 1-2.

12

Instead of securing the Pontiac Sunfire that Mr. Charron allegedly rammed, which contained a wealth of exculpatory evidence, the individuals involved failed to take possession of it, failed to present the Sunfire to the prosecutor, and failed to report the Sunfire's whereabouts to the prosecutor when asked on or about April 1, 2016. *Compl.* ¶ 50. This occurred even though the individuals knew the Sunfire was in the possession of Rankin Towing, which had towed it from the crash scene at their request. *Compl.* ¶ 50.

On April 1, 2016, Attorney McCullough emailed Assistant District Attorney Kyle Myska to inquire about the whereabouts of the Pontiac Sunfire. *Pl.'s Ex. 9A* at 14-15. Attorney McCullough stressed that a visual inspection of the Sunfire would show the marks on its hood were consistent with the Sunfire sliding under the back bumper of Mr. Charron's plow truck and refute Mr. Moss and Mr. Pilvelait's allegations against Mr. Charron. *Id.* On April 4, 2016, Attorney McCullough emailed ADA Myska several photographs and a video showing that Mr. Charron's plow could not be lifted high enough to make the marks observed on the Sunfire's hood. *Id.* at 16-46. On April 5, 2016, Attorney McCullough moved for discovery and to amend Mr. Charron's bail conditions. *Pl.'s Ex. 5* at 2.

On April 25, 2016, Mr. Charron, his attorney, and ADA Myska appeared before Maine Superior Court Justice John H. O'Neil, Jr. for Mr. Charron's initial appearance. *Pl.'s Ex. 5* at 2. An audio recording of the proceeding confirms that Attorney McCullough raised his pending motion for discovery and the State's potential failure to preserve exculpatory evidence. *Pl.'s Ex. a1* at 00:40-01:00. Justice

O'Neil, then asked ADA Myska whether the Sunfire was in the State's possession and ADA Myska replied the Sunfire was not in the State's possession and never had been, although the State "heavily documented" the damage to the vehicle. *Id.* at 01:01-01:07.

Attorney McCullough then addressed the motion to amend bail and said he wanted to challenge probable cause for the charge against Mr. Charron. *Id.* at 01:42-02:12. The State objected and urged that Mr. Charron's conduct on March 8, 2016 justified the alcohol condition. *Id.* at 01:42-02:40. Judge O'Neil told the parties that if they wished to have to a bail hearing, he would require the State to produce an affidavit supporting probable cause for the bail conditions, and that he could not guarantee that Mr. Charron's bail conditions would not be increased, decreased, or remain the same. *Id.* at 03:40-04:20.

After leaving Court on April 25, 2016, Mr. Charron contacted Rankin Towing and Recovery, LLC, and learned the Pontiac Sunfire was in a garage bay attached to Moody's Collusion Center in Sanford, Maine. *Trial Tr.* at 99:19-100:18. Mr. Charron traveled to the garage and located the Sunfire. *Pl.'s Ex. v3.* Over the next few days, Mr. Charron returned to Rankin Towing several times to confirm the Sunfire's whereabouts. *Pl.'s Ex. 19B.* Mr. Charron did this because he was concerned Rankin Towing would get rid of the Sunfire and that the only potentially exculpatory evidence would be lost. *Trial Tr.* at 111:12-16.

On April 27, 2016, Attorney McCullough subpoenaed Rankin Towing to permit inspection of the Sunfire and also requested surveillance camera footage from the

garage. *Pl.'s Ex.* 21 at 1-2. On April 29, 2016, the Sanford Police Department gave notice to Mr. Charron to refrain from contact with Rankin Towing, Moody's, and their employees, after an employee observed Mr. Charron peering through a garage window with a video camera. *Pl.'s Ex. 7*; *Pl.'s Ex. 19B* (100_2182.mov).

On May 10, 2016, Mr. Charron's attorney purchased the Sunfire for $200.00 from Rankin Towing. *Pl.'s Ex. 8.* On June 6, 2016, Attorney McCullough notified ADA Myska via email that he had located the Sunfire and invited ADA Myska to inspect it. *Pl.'s Ex. 9A* at 11. ADA Myska responded that he would inspect the vehicle in the presence of a sheriff's deputy, but not before presenting Mr. Charron's case to a grand jury for a potential indictment. *Pl.'s Ex. 9A* at 12-13.

On June 7, 2016, a grand jury indicted Mr. Charron on six counts: (1) aggravated reckless conduct toward Mr. Moss, (2) aggravated assault toward Mr. Moss, (3) aggravated assault toward Mr. Pilvelait, (4) criminal threatening with a dangerous weapon toward Mr. Moss, (5) criminal threatening with a dangerous weapon toward Mr. Pilvelait, and (6) driving to endanger. *Pl.'s Ex. 5B* at 1-2; *Pl.'s Ex. 5* at 3. On June 13, 2016, a bail hearing was held before Maine Superior Court Justice Wayne Douglas, who granted the motion to amend bail in part and struck the condition of Mr. Charron's bail that prohibited him from using or possessing alcohol or illegal drugs. *Pl.'s Ex. 5* at 3; *Pl.'s Ex. a2a*; *Pl.'s Ex. a2b*.

On June 22, 2016, ADA Myska moved to disqualify Attorney McCullough from representing Mr. Charron. *Pl.'s Ex. 5* at 4; *Pl.'s Ex. 10.* The motion argued that Attorney McCullough's involvement in "finding, taking, storing, measuring, and

photographing" the Sunfire made "it likely that Attorney McCullough will be called as a witness at trial." *Pl.'s Ex. 10* at 1. The motion further argued that Attorney McCullough's representation of Mr. Charron likely violated Rule 3.7 of the Maine Rules of Professional Conduct. *Id.* On July 1 and 5, 2016, Attorney McCullough responded in opposition to ADA Myska's motion to disqualify. *Pl.'s Ex. 5* at 4; *Pl.'s Ex.* 11; *Pl.'s Ex. 12.* On July 13, 2016, the motion to disqualify came before Justice Douglas for a hearing and he continued disposition of the motion as not ripe. *Pl.'s Ex.* 5 at 5.

At the request of Mr. Charron's attorney, Crash Lab, Inc., an accident reconstruction service, analyzed the damage to the Pontiac Sunfire. *Pl.'s Ex.* 13. Crash Lab's report, dated July 13, 2016, concluded the marks on the Sunfire were consistent with the Sunfire sliding under the rear bumper of Mr. Charron's plow truck, and did not support Mr. Moss and Mr. Pilvelait's claim that Mr. Charron had rammed them with the plow. *Id.* at 11. The cost of this report was $4,175.32. *Pl.'s Ex. 15* at 4.

On July 22, 2016, state prosecutors dismissed all charges against Mr. Charron shortly before trial. *Pl.'s Ex. 5D*; *Compl.* ¶ 46. The prosecution initiated the dismissal because of the physical evidence showed the allegations against Mr. Charron were false and that, in fact, Mr. Moss and Mr. Pilvelait rear ended his plow truck, just as Mr. Charron had claimed since the night of March 8, 2016. *Compl.* ¶ 46. That same day, the state began the process of returning the $3,000.00 bail to Josephine Charron and the bail bond was eventually disbursed on August 3, 2016. *Pl.'s Ex. 5* at 1, 6. The

state of Maine paid Attorney McCullough $4,710.00 to defend Mr. Charron. *Pl.'s Ex. 17* at 1.

### E.    Aftermath

As a result of Mr. Moss' and Mr. Pilvelait's actions, Mr. Charron suffered humiliation, embarrassment, anxiety, and severe emotional distress. *Compl.* ¶ 47. When Mr. Charron's mother bailed him out of jail on March 9, 2016, he was mad and emotionally upset. *Trial Tr.* at 12:16-17. After Ms. Charron dropped Mr. Charron off at his house that day, she did not see him much. *Id.* at 12:22-13:3. Mr. Charron became withdrawn, upset, and depressed. *Id.* at 12:24-13:20. He was always tired and had trouble sleeping. *Id.* at 13:19-20; 134:14-23. He also experienced loss of appetite. *Id.* at 136:7-8.

Mr. Charron was angry about the false allegations against him, which several new outlets publicized. *Id.* at 14:25-16:17. Local ABC affiliate WMTW8 ran the story on television with a mugshot of Mr. Charron. *Pl.'s Ex. 4* at 1. The Portland Press Herald ran the story online with the title "Acton man accused of ramming plow truck into car with 2 teens inside." *Id.* at 2. The Press Herald article had pictures of Mr. Charron's mug shot, the Pontiac Sunfire, Mr. Charron's plow truck, and a description from York County Sheriff William King of how Mr. Charron rammed his plow into the Sunfire. *Id.* at 2-4. The Bangor Daily News and Journal Tribune ran similar stories. *Id.* at 5-10.

Widespread publication of these allegations harmed Mr. Charron's social life. *Id.* at 134:3-6. Mr. Charron does not feel comfortable going out as he did before his

arrest, and he says people do not come over to his house as they used to. *Id.* at 134:3-4.  Furthermore, the allegations harmed Mr. Charron's romantic prospects.  *Id.* at 137:18-24.  He had a number of girlfriends before the March 8, 2016, incident but none since. *Id.* at 138:2-7.

Mr. Charron's self-employment business as a tree removal expert declined because of the news coverage of his arrest and prosecution. *Compl.* ¶ 45.  Although Mr. Charron is now totally disabled because of his spine, he previously climbed and cut trees, performed yardwork, or worked as a carpenter. *Trial Tr.* at 20:7-20.  Mr. Charron's back problems began limiting his ability to climb and cut trees six months to a year after his March 8, 2016, arrest. *Id.* at 20:25-21:8.  As a tree climber, Mr. Charron made between $5,000.00 and $7,000.00 per month. *Id.* at 22:2-3.  Directly following his arrest, however, many of Mr. Charron's regular customers stopped contacting him and his business declined. *Id.* at 21:9-21.

## V.      CONCLUSIONS OF LAW

Mr. Charron's Complaint seeks $100,000.00 in compensatory damages and $150,000.00 in punitive damages from Mr. Moss and Mr. Pilvelait for "malicious prosecution, false arrest, false imprisonment, conspiracy to deprive him of his civil rights under 42 U.S.C. § 1985(3), defamation per se, intentional infliction of emotional distress, and for such further relief as is just and appropriate." *Compl.* ¶ 52(a).  Mr. Charron's post-trial memorandum does not pursue a claim for damages under 42 U.S.C. § 1985(3) and states that "[h]ere, damages are sought for malicious

prosecution, false arrest, false imprisonment, defamation per se, and intentional infliction of emotional distress." *Pl.'s Mem.* at 1.

Although Mr. Moss and Mr. Pilvelait are defaulted, "it remains incumbent upon the Court to make certain that the theories of liability are justified by the admitted facts and presented evidence." *Filler v. Hancock Cty.*, No. 1:15-cv-00048-JAW, 2019 U.S. Dist. LEXIS 39451, at *34 (D. Me. Mar. 12, 2019). The Court first reviews Mr. Charron's Complaint to determine whether it states a claim for relief on each alleged theory of liability. The Court then assesses compensatory and punitive damages for the meritorious claims.

### A. Jurisdiction

The Court has federal question jurisdiction because Mr. Charron's claim under 42 U.S.C. § 1985(3) arises under federal law. 28 U.S.C. § 1331. The Court has supplemental jurisdiction over Mr. Charron's state law claims against Mr. Moss and Mr. Pilvelait because the state law claims share a common nucleus of operative fact with Mr. Charron's section 1985(c) claim and "form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367.

### B. Civil Rights Conspiracy Under 42 U.S.C. § 1985(3)

Given Mr. Charron's post-trial memoranda, the Court understands he has abandoned his claims against Mr. Moss and Pilvelait under 42 U.S.C. § 1985(3). Nevertheless, the Court will briefly address this claim before ruling on Mr. Charron's state law claims. Mr. Charron failed to state a claim under section 1985(3) and therefore the Court finds no damages are appropriate for this theory of liability.

19

A claim under 42 U.S.C. § 1985(3) has four elements. *Pérez-Sánchez v. Pub. Bldg. Auth.*, 531 F.3d 104, 107 (1st Cir. 2008). "First, the plaintiff must allege a conspiracy; second, he must allege a conspiratorial purpose to deprive the plaintiff of the equal protection of the laws; third, he must identify an overt act in furtherance of the conspiracy; and finally, he must show either injury to person or property, or a deprivation of a constitutionally protected right." *Id.* (citing *Aulson v. Blanchard*, 83 F.3d 1, 3 (1st Cir. 1996)). "[N]ot every agreement is sufficient to ground a section 1985(3) conspiracy: the agreement must involve 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Parker v. Landry*, 935 F.3d 9, 18 (1st Cir. 2019) (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971)).

Mr. Charron failed to state a claim against Mr. Pilvelait and Mr. Moss under 42 U.S.C. § 1985(3) because the Complaint does not allege Mr. Pilvelait, Mr. Moss, or any other defendant harbored a race or class-based discriminatory motive for their actions toward Mr. Charron. Thus, Mr. Charron is not entitled to damages against Mr. Moss and Mr. Pilvelait for a violation of 42 U.S.C. § 1985(3).

## C.   Malicious Prosecution

Mr. Charron's allegations against Mr. Moss and Mr. Pilvelait establish liability for malicious prosecution. Under Maine tort law, "[t]o prevail in a malicious prosecution action, a plaintiff must prove, by a preponderance of the evidence, that: (1) [t]he defendant initiated, procured or continued a criminal action without probable cause; (2) [t]he defendant acted with malice; and (3) [t]he plaintiff received

20

a favorable termination of the proceedings." *Trask v. Devlin*, 2002 ME 10, ¶ 11, 788 A.2d 179, 182 (quoting *Davis v. Currier*, 1997 ME 199, ¶ 4, 704 A.2d 1207, 1208-09).

"To establish the absence of probable cause, the plaintiff must show that the defendant initiated the prosecution without reasonable grounds for believing that the party against whom the prosecution is initiated was guilty of the charged offense." *Price v. Patterson*, 606 A.2d 783, 785 (Me. 1992). "[M]alice may be inferred from the lack of probable cause" but a "factfinder is not obliged to infer malice from the absence of probable cause." *Nyer v. Carter*, 367 A.2d 1375, 1378 (Me. 1977) (citing *Pullen v. Glidden*, 66 Me. 202, 204 (1877)). Inferring malice "is proper only when the absence of probable cause establishes in the mind of the factfinder, by a fair preponderance of the evidence, that there is malice in fact." *Id.* at 1378-79 (citing *Wills v. Noyes*, 29 Mass. 324, 326 (1832) (Shaw, C.J.)). Initiating a prosecution is malicious in fact when it is "wrongfully and willfully done with a consciousness that it is not according to law or duty." *Id.* (emphasis omitted).

This is a classic malicious prosecution. Mr. Moss and Mr. Pilvelait knowingly and falsely accused Mr. Charron of several crimes when they told Deputy Horning that Mr. Charron rammed the Pontiac Sunfire with his plow truck and pushed the Sunfire into a ditch. The utter falsity and extreme seriousness of these allegations establish Mr. Moss and Mr. Pilvelait acted with malice and without probable cause. Mr. Moss and Mr. Pilvelait's intent to shift criminal responsibility for the Sunfire's demise onto Mr. Charron and away from their own acts, which they may have committed while under the influence of alcohol, further supports the Court's finding

21

that they acted with malice.  Finally, Mr. Charron received a favorable termination of the criminal proceedings when the state prosecutor dismissed the charges.  Thus, the entry of default establishes Mr. Moss and Mr. Pilvelait are liable for malicious prosecution.

### D.    False Arrest and False Imprisonment

Mr. Charron's Complaint does not state claims against Mr. Moss and Mr. Pilvelait for false arrest or false imprisonment under Maine tort law.[5]  In Maine, a private party may be liable for "[a]ssisting a law enforcement officer in making an arrest or otherwise instigating the officer to enforce a warrant . . . ."  *Holland v. Sebunya*, 2000 ME 160, ¶ 19, 759 A.2d 205, 212.  However, absent "action on the part of [the defendant], such as physically assisting the officer," or a conspiracy between a private defendant and law enforcement, that liability arises under the tort of malicious prosecution, not false arrest or false imprisonment.[6]  *Id.*; RESTATEMENT

---

[5]      The Court construes Mr. Charron's false arrest claim against Mr. Moss and Mr. Pilvelait as a claim under Maine tort law rather than a Fourth Amendment claim of an unreasonable seizure brought under 42 U.S.C. § 1983.  The Complaint lists section 1983 as a cause of action against the County Defendants, but not Mr. Moss and Mr. Pilvelait.  *Compl.* ¶ 52.  Regardless, the Complaint fails to state a claim against Mr. Moss and Mr. Pilvelait for a Fourth Amendment violation under section 1983.  Mr. Moss and Mr. Pilvelait are private actors.  A section 1983 claim against Mr. Moss and Mr. Pilvelait is cognizable only if Mr. Charron alleges the men conspired with state actors to deprive Mr. Charron of his constitutional rights.  *See Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999) (explaining section 1983 claims are only viable when the alleged constitutional violation "was committed under color of state law"); *Dennis v. Sparks*, 449 U.S. 24, 27 (1980) (explaining that a private individual acts "under color of state law" when "he is a willful participant in joint action with the State or its agents").  Mr. Charron made no such allegation.  Thus, he failed to state a Fourth Amendment claim against Mr. Moss and Mr. Pilvelait.

[6]      In section 1983 litigation, the First Circuit explained the doctrinal differences among the common law torts of malicious prosecution, false arrest, and false imprisonment.  *Calero-Colón v. Betancourt-Lebron*, 68 F.3d 1, 3-4 (1st Cir. 1995).  The divergent theories of liability arise because the torts remedy injuries to different interests.  *Id.* at 3-4.  For instance, "[t]he interest at stake in a malicious prosecution claim is the right to be free from deprivations of liberty interests caused by unjustifiable criminal charges and procedure."  *Id.* at 3.  False arrests, by contrast, "infringe upon the right to be free from restraints on bodily movement."  *Id.* at 4.

(SECOND) OF TORTS § 45A, cmt. b ("One who instigates or participates in a lawful arrest, as for example an arrest made under a properly issued warrant by an officer charged with the duty of enforcing it, may become liable for malicious prosecution . . . but he is not liable for false imprisonment since no false imprisonment has occurred").

Mr. Charron failed to state a false arrest or false imprisonment claim against Mr. Moss and Mr. Pilvelait.  Although their false police reports led to Mr. Charron's arrest, no allegation in the Complaint asserts Mr. Pilvelait and Mr. Moss physically participated in Mr. Charron's arrest or detention beyond reporting the false allegations to law enforcement or conspired with law enforcement to arrest Mr. Charron without probable cause.  Thus, Mr. Charron failed to state claims for false arrest and false imprisonment as to Mr. Moss and Mr. Pilvelait and no damages are appropriate on these claims.  Nevertheless, the same underlying facts establish liability and damages for Mr. Charron's malicious prosecution claim, as discussed above.

### E.    Defamation Per Se

Mr. Charron asserts a defamation per se Maine law tort claim against Mr. Moss and Mr. Pilvelait.  *Compl.* ¶ 52(a); *Pl.'s Mem.* at 1.  Defamation has four elements: "(1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault amounting at least to negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Charron v. Cty. of York*, No. 2:18-cv-00105-JAW, 2020 U.S. Dist. LEXIS 65281, at *109 (D. Me.

Apr. 14, 2020) (quoting *Rice v. Alley*, 2002 ME 43, ¶ 19, 791 A.2d 932, 936) (quotation marks omitted).   "Words that falsely charge a punishable offense . . . constitute slander *per se*."   *Rippett v. Bemis*, 672 A.2d 82, 86 (Me. 1996).   "Recovery for slander *per se* requires no showing of special harm beyond the publication itself."   *Id.* (citing *Saunders v. Van Pelt*, 497 A.2d 1121, 1126 (Me. 1985)).

The Complaint states a claim for slander per se against Mr. Pilvelait and Mr. Moss.   The two men knowingly and falsely accused Mr. Charron of multiple crimes by telling law enforcement that Mr. Charron rammed his plow truck into the Pontiac Sunfire with them inside and pushed the Sunfire down the road into a ditch.   This behavior constitutes publication of slander per se and the entry of default establishes liability.

## F.   Intentional Infliction of Emotional Distress

The Court turns to Mr. Charron's intentional infliction of emotional distress claim.   Under Maine law, intentional infliction of emotional distress has four elements.   *Bratton v. McDonough*, 2014 ME 64, ¶ 22, 91 A.3d 1050, 1057-58.   "To recover . . . a plaintiff must show (1) either that the defendant intentionally or recklessly inflicted severe emotional distress or that his or her conduct was substantially certain to inflict severe emotional distress, (2) that the defendant's conduct was 'so extreme and outrages as to exceed all possible bounds of decency and must be regarded as atrocious' and 'utterly intolerable in a civilized community,' (3) that the defendant's conduct caused the plaintiff's emotional distress, and (4) that the

emotional distress was 'so severe that no reasonable person could be expected to endure it.'" *Id.* (quoting *Lyman v. Huber*, 2010 ME 139, ¶ 16, 10 A.3d 707, 711).

Mr. Charron's Complaint states a claim for intentional infliction of emotional distress. Mr. Moss and Mr. Pilvelait's actions on March 8, 2016 toward Mr. Charron were extreme and outrageous such that no reasonable person could be expected to endure it. The Complaint describes an evening in which Mr. Moss and Mr. Pilvelait harassed Mr. Charron at his home, threatened to kill him, shouted obscenities, intended to intimidate him, drunkenly drove a Pontiac Sunfire into the rear of his plow truck, and made a false police report that caused Mr. Charron's arrest, brief incarceration, and prosecution. The Complaint further alleges Mr. Charron suffered severe emotional distress because of Mr. Moss and Mr. Pilvelait's actions. Thus, the entry of default establishes Mr. Moss and Mr. Pilvelait are liable for Mr. Charron's intentional infliction of emotional distress claim.

## G. Damages

In light of the Court's factual findings and legal conclusions regarding liability, the Court makes the following conclusions of law regarding damages.

### 1. Compensatory Damages

The Court only assesses damages for Mr. Charron's malicious prosecution, defamation per se, and intentional infliction of emotional distress claims because the Complaint fails to state a claim for false arrest, false imprisonment, and a civil rights conspiracy under section 1985(3). Mr. Charron demands $100,000.00 in compensatory damages; but he has not proven that amount. Considering the totality

of harm Mr. Moss and Mr. Pilvelait caused to Mr. Charron, the Court awards $65,000.00 in compensatory damages. Below, the Court considers the various damages proven by Mr. Charron that support this damages award.

### a. Legal Standard

"Under Maine law, tort damages 'are intended to make the plaintiff whole by compensating him or her for any injuries or losses proximately caused by the defendant.'" *Filler*, 2019 U.S. Dist. LEXIS 39451, at *41 (quoting *Estate of Hoch v. Stifel*, 2011 ME 24, ¶ 41, 16 A.3d 137, 150). A plaintiff must prove damages "and the plaintiff's proof must be more than 'speculation or conjecture.'" *Id.* (quoting *King v. King*, 507 A.2d 1057, 1060 (Me. 1986)).

Specific to Mr. Charron's defamation claim, "it is not necessary for [him] to prove special damages or actual malice . . . to recover a substantial amount." *Saunders*, 497 A.2d at 1126 (citing *Hall v. Edwards*, 23 A.2d 889, 890 (1942); RESTATEMENT (SECOND) OF TORTS § 621 (1976)). Actual malice may justify a heightened damages award. *Id.* (citing *Hall*, 23 A.2d at 890). A court may award compensatory damages to remedy the plaintiff's "mental suffering, humiliation, embarrassment, effect upon reputation and loss of social standing, so far as they have been proved or may reasonably be presumed." *Id.* (citing *McMullen v. Corkum*, 54 A.2d 753 (1947); RESTATEMENT (SECOND) OF TORTS § 623 (1976)).

### b. Lost Income

The Court considered the damages Mr. Pilvelait and Mr. Moss' actions caused to Mr. Charron's self-employment income as a tree climber. Prior to his March 8,

2016, arrest, Mr. Charron testified that he earned between $5,000.00 and $7,000.00 per month as a tree climber. The Court is somewhat skeptical this is accurate. The only evidence of Mr. Charron's income is his own testimony. Mr. Charron offered no expert testimony on his monthly earnings, nor any business or tax records to show his typical monthly earnings as a tree climber.

While the Court acknowledges tree climbing is a risky occupation, the Court is chary of assuming the accuracy of Mr. Charron's self-serving statements, which border on speculation. At the same time, there is no evidence that contradicts Mr. Charron's testimony regarding lost wages and therefore the Court accepts his statements on their face. Thus, the Court conservatively adopts $5,000.00 per month as the benchmark for Mr. Charron's monthly income. The Court concludes Mr. Moss and Mr. Pilvelait are liable for six months of lost wages to Mr. Charron because Mr. Charron's spinal stenosis rendered him disabled approximately six months to a year after the March 8, 2016, incident.

### c.    Bail, Attorney's Fees, and the Accident Report

The Court considered other compensatory damages Mr. Charron presented. Specifically, the cost of Mr. Charron's $3,000.00 bail that his mother paid and was returned to her after the prosecution ended, $4,710.00 in attorney's fees for his court-appointed lawyer in the state court, and the $4,175.32 cost of the accident reconstruction report that eventually disproved Mr. Moss and Mr. Pilvelait's claims.

Mr. Charron did not personally incur these expenses, but he may still recover their cost. As Mr. Charron's lawyer mentioned at trial, *Trial Tr.* at 127:11-128:3,

Maine recognizes the collateral source rule. *See Werner v. Lane*, 393 A.2d 1329, 1336 (Me. 1978) (adopting the collateral source rule and finding it applies when "gratuitous services were furnished by a state supported agency or public charity"). Under that doctrine, "a plaintiff who has received compensation for [his] damages from sources independent of the tortfeasor remains entitled to a full recovery [from the tortfeasor]." *Nason v. Pruchnic*, 2019 ME 38, ¶ 22, 204 A.3d 861, 869 (quoting *Grover v. Boise Cascade Corp.*, 2004 ME 119, ¶ 24, 860 A.2d 851) (alteration in *Nason*). The rule rests on the premise that "either the injured party or the tortfeasor is going to receive a windfall, if a part of the pecuniary loss is paid for by an outside source and that it is more just that the windfall should inure to the benefit of the injured party than it should accrue to the tortfeasor." *Werner*, 393 A.2d at 1335-36 (quoting *Olivas v. United States*, 506 F.2d 1158, 1163-64 (9th Cir. 1974)).

Applying the collateral source rule, the Court concludes the fees paid to Mr. Charron's court-appointed attorney and the cost of the accident report are legitimate compensatory damages. These expenses were proximately caused by Mr. Moss and Mr. Pilvelait falsely telling law enforcement that Mr. Charron rammed them with his plow truck and the foreseeable prosecution that followed. Failing to award these damages would result in a windfall to Mr. Moss and Mr. Pilvelait, which justifies applying the collateral source rule. However, the Court further concludes the $3,000.00 bail paid by Josephine Charron is not proper collateral source damages. Ms. Charron received her money back after the prosecution dismissed the charges

against her son.  Therefore, there was no loss to Ms. Charron and no windfall to Mr. Moss and Mr. Pilvelait.

### d.     Emotional Damages

The Court considered Mr. Charron's proven emotional damages that Mr. Moss and Mr. Pilvelait caused through their actions on March 8, 2016, and the ensuing prosecution.  Their extreme and outrageous conduct on March 8, 2016, such as threatening to kill Mr. Charron, shouting expletives at him, and crashing the Pontiac Sunfire into his plow truck, all in an attempt to intimidate him is grounds for emotional damages.  The resulting prosecution from their false police report is too. In the aftermath of this incident, Mr. Charron's incarceration, and subsequent prosecution, Mr. Charron suffered stress, anger, loss of appetite, trouble sleeping, and was withdrawn from his family.  Although these emotional harms are hard to quantify in dollars, the Court has weighed the proven harms alongside the other proven damages in crafting the appropriate damages award.

### e.     Reputational Harm

The Court also considered harm to Mr. Charron's reputation.  These damages arise from Mr. Charron's defamation and vindictive prosecution claims.  As noted, the defamatory statements constitute slander per se, and are compensable injuries without a showing of special damages.  Mr. Charron presented evidence that Mr. Moss and Mr. Pilvelait's false statements to police were published in print, video, and internet media, and remain on the internet to this day.  Additionally, Mr. Charron offered testimony that his social life has been considerably less enjoyable than before

the March 8, 2016, incident, his subsequent prosecution, and news reporting on the incident. He reports that people do not come over to his home as they used to, and that he has had no success cultivating intimate romantic relationships since the incident.

While these injuries are similarly difficult to quantify in dollars, the harm to Mr. Charron's reputation is clear. Mr. Moss and Mr. Pilvelait's false reports to police and the prosecution their allegations initiated proximately caused the social stigma Mr. Charron experienced. The reputational harm is also likely to continue for as long as the stories about Mr. Charron's arrest and prosecution remain accessible online. The Court weighed these considerations when crafting the compensatory damages award.

### f.   Liberty Interests

Finally, the Court considered how Mr. Moss and Mr. Pilvelait's false accusations to law enforcement proximately caused injuries to Mr. Charron's liberty interests. Once again, the compensation needed to remedy these injuries is difficult to measure; however, some compensation is appropriate. Mr. Moss and Mr. Pilvelait's false statements proximately caused Mr. Charron to be arrested at gunpoint. Mr. Charron was handcuffed behind his back, which was painful. He spent a restless night and a portion of the following day in county jail. He tried to sleep on a metal bed without a mattress. It was cold.

Incursions on Mr. Charron's liberty interests continued after his release. Between his release from jail on March 9, 2016, and the dismissal of the indictment

on July 22, 2016, Mr. Charron's bail conditions prohibited possession of firearms and authorized law enforcement to search his home without probable cause or reasonable suspicion. He was also prohibited from possessing alcohol from March 9, 2016, until June 16, 2016. On two occasions, law enforcement searched his home. They even searched his refrigerator.

The Court views these injuries to Mr. Charron's liberty interests as extremely serious. Protection from undue government intrusions on the liberty and privacy interests undergirds much of this nation's legal system. Constitutional law, in particular, recognizes the extraordinary privacy interests a person possesses in the home. *See Lange v. California*, 141 S. Ct. 2011, 2018 (2021) (emphasizing the "sanctity of a person's living space" in the Fourth Amendment context); *Collins v. Virginia*, 138 S. Ct. 1663, 1670 (2018) (describing "the right of a man to retreat into his own home and there be free from unreasonable government intrusion" as the "very core" of the Fourth Amendment's protections). Furthermore, the Supreme Court describes the right to keep arms in the home for self-defense as "deeply rooted in this Nation's history and tradition." *McDonald v. City of Chicago*, 561 U.S. 742, 768 (2010) (internal quotation marks omitted).

By levying false accusations, Mr. Moss and Mr. Pilvelait weaponized the legal process to deprive Mr. Charron of these fundamental liberty interests. The Court concludes Mr. Moss and Mr. Pilvelait's false accusations proximately caused Mr. Charron's arrest, incarceration, prosecution, and release on strict bail conditions. The Court considered this in crafting an appropriate damages award.

### g.    Joint Tortfeasors

The Court must address the apportionment of liability between Mr. Moss and Mr. Pilvelait.  The Court concludes Mr. Moss and Mr. Pilvelait were joint tortfeasors of defamation, malicious prosecution, and intentional infliction of emotional distress. Maine tort law imposes joint and several liability when two tortfeasors "are the direct cause of a single injury and it is impossible to determine apportionment of liability." *Paine v. Spottiswood*, 612 A.2d 235, 240 (Me. 1992).  The Law Court has affirmed the application of joint and several liability to intentional torts.  *See Eaton v. Cormier*, 2000 ME 65, ¶ 8, 748 A.2d 1006, 1008-09 (affirming trial court's application of joint and several liability to joint tortfeasors in a nuisance action); MAINE TORT LAW § 16.01 (explaining joint liability may "be imposed for non-negligent tortious conduct"). Under joint and several liability, "[e]ach defendant is liable for the entire amount of the plaintiff's damages, although the plaintiff may have but one satisfaction."  MAINE TORT LAW § 16.01.

Here, Mr. Moss and Mr. Pilvelait acted in concert to harass Mr. Charron on March 8, 2016, and relate a false version of the events to police, which proximately caused the indivisible injuries to Mr. Charron's business, reputation, emotional well-being, and liberty interests.  Therefore, Mr. Moss and Mr. Pilvelait are jointly and severally liable for the compensatory and punitive damages awarded to Mr. Charron. As intentional tortfeasors, Mr. Moss and Mr. Pilvelait have no right of contribution. *Bedard v. Greene*, 409 A.2d 676, 678-79 (1979) (adopting the RESTATEMENT (SECOND) OF TORTS § 886A(3) view that intentional tortfeasors have no right of contribution).

### h.    Summary

The Court concludes a $65,000.00 award of compensatory damages is a reasonable and appropriate remedy for Mr. Moss and Mr. Pilvelait's torts of malicious prosecution, defamation, and intentional infliction of emotional distress.  Although Mr. Charron demanded $ 100,000.00 in compensatory damages, he did not prove that he actually suffered that amount of damages.  While Mr. Charron proved $ 30,000.00 in lost wages and approximately $ 8,000.00 in damages from collateral sources, the Court is persuaded that an additional $27,000 damages award accurately reflects the harm to Mr. Charron's reputation, emotional well-being, and liberty interests and is reasonable, appropriate, and supported by the evidence.

The Court awards no damages for the alleged misconduct by the County Defendants because Mr. Charron failed to present admissible evidence that Mr. Moss and Mr. Pilvelait proximately caused any such misconduct.

### 2.    Punitive Damages

The Court concludes an award of $25,000.00 in punitive damages is appropriate.  Maine law permits a tort plaintiff to recover punitive damages "only if the defendant acted with malice."  *Sebra v. Wentworth*, 2010 ME 21, ¶ 14, 990 A.2d 538, 543 (citing *Shrader-Miller v. Miller*, 2004 ME 117, ¶ 20, 855 A.2d 1139, 1145).  To recover, a plaintiff must prove "by clear and convincing evidence that the defendant was motivated by ill will toward the plaintiff, or acted so outrageously that malice could be implied."  *Id.* (citing *Tuttle v. Raymond*, 494 A.2d 1353, 1361, 1363 (Me. 1985)).  "[A]n award of punitive damages may be issued 'for the purpose of

33

deterrence or punishment or both.'" *Filler*, 2019 U.S. Dist. LEXIS 39451, at *55 (quoting *Tuttle*, 494 A.2d at 1355). A plaintiff is not required to submit evidence of the defendant's financial circumstances before a court awards punitive damages. *Id.* at *54-55 (citing *Ferrell v. Cox*, 617 A.2d 1003, 1008 (Me. 1992)). At the same time, the record reflects that both Mr. Moss and Mr. Pilvelait are young men and there is no evidence in this record that they would be able to pay a large punitive damages award. Therefore, the Court has imposed an award that penalizes them for their malicious conduct but does not exact a penalty so far beyond their ability to pay that the award becomes overly punitive.

Mr. Charron demands $150,000.00 in punitive damages against Mr. Moss and Mr. Pilvelait. Here, Mr. Charron demonstrated that Mr. Moss and Mr. Pilvelait acted with malice as an element of the tort of malicious prosecution. Based on the record before it, the Court concludes Mr. Charron demonstrated Mr. Moss and Mr. Pilvelait's malice by clear and convincing evidence. The Court concludes that punitive damages are appropriate against Mr. Moss and Mr. Pilvelait for malicious prosecution, defamation per se, and intentional infliction of emotional distress. *See Filler*, 2019 U.S. Dist. LEXIS 39451, at *54 (imposing punitive damages for malicious prosecution and collecting cases doing the same).

The Court agrees with Mr. Charron that an award of punitive damages is reasonable and appropriate because Mr. Moss and Mr. Pilvelait's conduct was extreme and outrageous and the law must deter and punish individuals who try to weaponize the legal process, spout off false accusations, and incite malicious

prosecutions.   The $25,000 award is what the Court finds is reasonable under the circumstances.

## VI.   CONCLUSION

After reviewing the entire record, the Court finds Mr. Charron is entitled to sixty-five thousand dollars ($65,000.00) in compensatory damages and twenty-five thousand dollars ($25,000.00) in punitive damages from Defendants Christopher Moss and Eric Pilvelait.  As joint tortfeasors, the Defendants are jointly and severally liable to Mr. Charron for the compensatory and punitive damages.  Pursuant to 14 M.R.S. § 1602-B and 28 U.S.C. § 1961(a), Mr. Charron is entitled to prejudgment and post-judgment interest at the applicable statutory rates.

Finally, the Court DISMISSES without prejudice Mr. Charron's false arrest, false imprisonment, and section 1985(3) claims against Mr. Moss and Mr. Pilvelait for failure to state a claim.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATE DISTRICT JUDGE

Dated this 23rd day of August, 2021